## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

AMAZON.COM, INC.,
410 Terry Avenue North,
Seattle, Washington, 98109-5210;

     *Plaintiff,*

v.

CONSUMER PRODUCT
SAFETY COMMISSION,
4330 East West Highway,
Montgomery County,
Bethesda, Maryland, 20814-4408;

PETER A. FELDMAN, in his official capacity
as Acting Chairman of the Consumer Product
Safety Commission,
4330 East West Highway,
Montgomery County,
Bethesda, Maryland, 20814-4408;

MARY T. BOYLE, in her official capacity as
Commissioner of the Consumer Product Safety
Commission,
4330 East West Highway,
Montgomery County,
Bethesda, Maryland, 20814-4408;

DOUGLAS DZIAK, in his official capacity as
Commissioner of the Consumer Product Safety
Commission,
4330 East West Highway,
Montgomery County,
Bethesda, Maryland, 20814-4408;

ALEXANDER HOEHN-SARIC, in his official
capacity as Commissioner of the Consumer
Product Safety Commission,
4330 East West Highway,
Montgomery County,
Bethesda, Maryland, 20814-4408; and

Civil Action No. _____

RICHARD L. TRUMKA JR., in his official
capacity as Commissioner of the Consumer
Product Safety Commission,
4330 East West Highway,
Montgomery County,
Bethesda, Maryland, 20814-4408,

　　　*Defendants*.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Amazon.com, Inc. ("Amazon" or "Plaintiff") brings this action against Defendants Consumer Product Safety Commission ("CPSC" or "Commission"), Peter A. Feldman, in his official capacity as Acting Chairman of the Commission, and Mary T. Boyle, Douglas Dziak, Alexander Hoehn-Saric, and Richard L. Trumka Jr., in their official capacities as CPSC Commissioners (collectively, "Defendants"), and alleges as follows:

## INTRODUCTION

1.     When a product presents a safety hazard, federal law grants the Consumer Product Safety Commission authority to order a recall.  But Congress has enacted requirements the Commission must follow when exercising that authority.  The Commission may issue recall orders to the manufacturers, distributors, and retailers of a product, but not to third-party logistics providers who store the product in their warehouses and transport it to customers.   The Commission's recall orders must also be tailored to the facts of each case; for example, the agency may only mandate notices that are required to protect the public.

2.     The Commission overstepped those statutory limits by ordering Amazon to conduct a wide-ranging recall of products that were manufactured, owned, and sold by third parties.  As described below, that order relies on an unprecedented legal theory that stretches the Consumer Product Safety Act ("CPSA") beyond the breaking point and fails to discharge the Commission's obligations under the Administrative Procedure Act ("APA").

3.     Amazon operates an online store in which some products are sold by Amazon itself, while others are sold by independent businesses, known as "third-party sellers."  These businesses set the prices for their products and earn the revenue when a customer buys them.  Third-party sellers can opt to control the logistics of shipping and delivering their products, or they can (for a fee) outsource the storage, packing, shipment, and delivery of their products to Amazon by

enrolling in the Fulfillment by Amazon ("FBA") service. Under the FBA service, Amazon does not sell or take title to any of the products; third-party sellers retain title and are the sellers of record.

4.     In 2020 and 2021, the Commission notified Amazon that it had safety concerns regarding three sets of products sold by third parties through the FBA service—certain electric hair dryers, carbon monoxide detectors, and sleepwear. In response, out of concern for the safety of its customers—but independent of any legal obligation—Amazon voluntarily took prompt and decisive action. Amazon immediately blocked further sales of the products on Amazon.com, then quarantined and, consistent with its contracts with the third-party sellers, destroyed the products stored in its warehouses. Amazon directly contacted each of the 376,009 purchasers of the products by email and through their Amazon.com accounts, notifying them of the hazards and instructing them to stop using and dispose of the products immediately. In addition, Amazon provided every customer a full purchase price refund through a credit to their accounts to make them whole. Although Amazon acted voluntarily, it based its actions and consumer notifications on recalls approved by the CPSC for the same types of products.

5.     By the Commission's standard metrics, Amazon's remedial action was 100% effective, rendering further action unnecessary. The Commission nevertheless saw an opportunity to attempt to expand its jurisdiction. In July 2021, the Commission filed an administrative complaint against Amazon, seeking to hold Amazon responsible for recalling the products—on Commission-dictated terms—because it provided the third-party sellers with logistics services under the FBA program. That complaint was the first of its kind: Never before had the Commission sought to label an online marketplace as a "distributor" under the CPSA in a mandatory recall proceeding because it furnished logistics support to a third-party seller. Although

the CPSA directs that third-party logistics providers may not be classified as manufacturers, distributors, or retailers for recall purposes, the Commission heralded the administrative complaint as "a huge step forward" in its push to "deal with these massive third-party platforms."[1]  The Commission did so even though its then-Acting Chairman admitted that the "statute is not perfectly clear on" whether the Commission's authority extends to Amazon's FBA service.[2]  In short, rather than trying to clarify the statute or promulgate a generally applicable rule, the Commission brought an administrative lawsuit only against Amazon to expand its authority over online marketplaces.

6.     In a pair of orders issued July 29, 2024, and January 16, 2025, the Commission granted itself summary judgment, largely adopting the arguments made in the administrative complaint.  *See* Ex. 1, Decision and Order Approving Notification and Action Plan, *Amazon.com, Inc.*, CPSC No. 21-2 (Jan. 16, 2025) (the "Final Order"); Ex. 2, Decision and Order, *Amazon.com, Inc.*, CPSC No. 21-2 (July 29, 2024) ("July 29 Order").  These orders conclude that Amazon acted as a distributor of the products sold by third-party sellers and instruct Amazon to conduct a sweeping recall of those products.  The Final Order establishes the requirements for that recall, directing Amazon, among other things, to send a new round of notices to consumers (despite having already twice notified every individual who purchased the products) and issue new refunds to purchasers (despite having already provided a full refund to every customer in 2021 or 2022).

7.     The Final Order's chief infirmity is that it is "not in accordance with law," 5 U.S.C. § 706(2)(A), because Amazon is a third-party logistics provider with respect to the products at

---

[1] *CPSC Sues Amazon to Force Recall of Hazardous Products Sold on Amazon.com*, CPSC (July 14, 2021), https://www.cpsc.gov/Newsroom/News-Releases/2021/CPSC-Sues-Amazon-to-Force-Recall-of-Hazardous-Products-Sold-on-Amazon-com [hereinafter *CPSC Sues Amazon*].

[2] Statement of Acting Chairman Robert S. Adler on the Vote to Approve Filing of an Administrative Complaint Against Amazon.com, CPSC (July 14, 2021), https://perma.cc/L6RE-9RHK [hereinafter Adler Statement].

issue.[3]  As noted above, the CPSA grants the Commission authority to order a recall only with respect to a "manufacturer," "distributor," or "retailer."  15 U.S.C. § 2064(c)(1), (d)(1).  The statute excludes "third-party logistics provider[s]" from those categories, stating that such a provider "shall not . . . be deemed to be a manufacturer, distributor, or retailer of a consumer product solely by reason of receiving or transporting a consumer product in the ordinary course of its business."  *Id.* § 2052(b).  Elsewhere, the CPSA defines a "third-party logistics provider" as a "person who solely receives, holds, or otherwise transports a consumer product in the ordinary course of business but who does not take title to the product."  *Id.* § 2052(a)(16).  Amazon falls within the definition of third-party logistics provider with respect to products sold using the FBA service because it does not manufacture, own, or sell those products, but instead stores and ships them on behalf of third-party sellers who retain title throughout the transaction.  Indeed, courts have recognized for similar reasons that Amazon's activities under the FBA service do not render it a "distributor" or a "seller" under product liability common law.  *See, e.g.*, *Erie Ins. Co. v. Amazon.com, Inc.*, 925 F.3d 135, 141 (4th Cir. 2019); *Eberhart v. Amazon.com, Inc.*, 325 F. Supp. 3d 393 (S.D.N.Y. 2018).  As a result, Amazon is not properly a subject of the Commission's order.  The Commission's contrary determination of this legal question is not entitled to deference.  *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2261, 2273 (2024).

8.      The Final Order's remedial provisions are also unlawful.  *First*, the requirement for Amazon to send additional notifications to purchasers and provide public notice on its website exceeds the Commission's statutory authority and violates Amazon's First Amendment rights.

---

[3] Throughout, we refer to the Final Order based on the Commission's clarification that the July 29 Order did not constitute final agency action, *see* Order Denying Amazon.com, Inc.'s Motion to Stay, *Amazon.com, Inc.*, CPSC No. 21-2 (Aug. 16, 2024), and the Commission's incorporation of the July 29 Order's conclusions in its Final Order, *see* Final Order at 1–3.

Amazon issued robust direct notices—which the Commission has long considered to be the most effective form of notice—to all purchasers in 2021 and 2022, promptly after the Commission raised its safety concerns.  The Commission has not demonstrated that an additional round of notice, many years after consumers purchased the products, is "required in order to adequately protect the public."  15 U.S.C. § 2064(c)(1).  Instead, the Commission speculates that such notice would be desirable as a policy matter.  Both the CPSA and the First Amendment demand more.

*Second*, the Final Order's requirement to issue a second refund to consumers (conditioned on proof of destruction or disposal) similarly exceeds the bounds of the Commission's authority.  The CPSA provides for three remedies: refund, repair, and replacement.  There is no provision authorizing the Commission to mandate duplicative refunds, or to condition refunds on product destruction.  Even worse, the Commission's position—that a refund is not valid unless and until ordered by the agency—would force consumers to wait years to receive refunds for defective products.  While Amazon refunded every consumer before May 2022, promptly upon learning of the safety concerns, those consumers would not have received a refund until 2025 under the Commission's bureaucratic approach.

9.    The Final Order also violates the APA because it conflicts with the Commission's standard product recall practices, which have historically required only a single round of notice and authorized notice language almost identical to that used by Amazon in its voluntary notices.  Although the Commission—like any agency—may depart from its past practice, binding precedent holds that the Commission must acknowledge and provide a "reasoned explanation for" the change when it does so.  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  The Commission failed to take those steps here, several times over.

10.     Finally, in addition to its statutory shortcomings, the Final Order should also be set aside because the Commission's structure violates the constitutional separation of powers.

11.     The CPSA insulates CPSC Commissioners from Presidential oversight by allowing them to "be removed by the President" only "for neglect of duty or malfeasance in office but for no other cause." 15 U.S.C. § 2053(a).  Under Article II of the U.S. Constitution, "the President's removal power is the rule, not the exception," *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2206 (2020), and no exception permits the Commission's structure.  Indeed, the Executive Branch recently took the position that the Commissioners' for-cause removal protections are unconstitutional.  *See* Letter from Sarah M. Harris, Acting Solicitor General, DOJ, to Hon. Mike Johnson, Speaker of the U.S. House of Reps. (Feb. 12, 2025), https://perma.cc/6N3G-P26A.

12.     The statute exacerbates that problem by vesting the CPSC Commissioners with a potent combination of governmental functions, authorizing them to act as judge, jury, and prosecutor in the same proceeding.  The body that voted to file the complaint against Amazon— the Commissioners—also has the power to hear the evidence, decide factual disputes, interpret and apply the law to the facts, and fashion the remedy.  That arrangement contravenes Amazon's Fifth Amendment rights because it "violates the [Supreme] Court's longstanding teaching that ordinarily 'no man can be a judge in his own case' consistent with the Due Process Clause." *Chrysafis v. Marks*, 141 S. Ct. 2482, 2482 (2021) (citation omitted); *cf. SEC v. Jarkesy*, 144 S. Ct. 2117, 2139 (2024) (reaffirming right to be heard "before a neutral adjudicator").

13.     The Commission undoubtedly has an important role to play with respect to product safety, but the importance of that task does not excuse the Commission from its obligation to "turn square corners in dealing with" regulated parties. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020).  Because the Commission failed to discharge that obligation

here, Amazon respectfully requests that this Court declare that the Commission exceeded its authority in designating Amazon as a distributor of products sold through the FBA service, set aside the unlawful and unnecessary notice and remedies mandated by the Commission, and vacate the Final Order in its entirety.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction under 28 U.S.C. § 1331 because Amazon's claims arise under the U.S. Constitution and the APA, 5 U.S.C. §§ 701–706.

15.     The Commission's Final Order constitutes "final agency action" subject to judicial review, *id.* § 704, because it completes the Commission's decision-making process and has concrete legal consequences for Amazon, *see* 16 C.F.R. § 1025.55(b) ("The Commission shall issue an order reflecting its Final Decision."); *Bennett v. Spear*, 520 U.S. 154, 177 (1997).

16.     This Court has authority to grant declaratory and injunctive relief under the Declaratory Judgment Act, *see* 28 U.S.C. §§ 2201–2202; the APA, 5 U.S.C. § 702; and the Court's inherent equitable powers.

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1) because this action seeks relief against a federal agency and officials acting in their official capacities, all of whom reside in this district, and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

18.     Plaintiff Amazon.com, Inc. is a Delaware corporation with its principal place of business at 410 Terry Avenue North, Seattle, Washington, 98109-5210.

19.     Defendant Consumer Product Safety Commission is an agency of the United States with its principal office at 4330 East West Highway, Bethesda, Maryland, 20814-4408.

20.     Defendant Peter A. Feldman is the Acting Chairman of the Consumer Product Safety Commission, sued in his official capacity only.  Defendant Feldman was a Commissioner of the Consumer Product Safety Commission when it authorized the adjudication and when it issued the Final Order.

21.     Defendants Mary T. Boyle, Douglas Dziak, Alexander Hoehn-Saric, and Richard L. Trumka Jr. are Commissioners of the Consumer Product Safety Commission, sued in their official capacities only.  Defendant Hoehn-Saric was the Chairman of the Consumer Product Safety Commission when the Final Order was issued.

## STATUTORY AND REGULATORY BACKGROUND

### I.     The Consumer Product Safety Commission

22.     The Consumer Product Safety Commission was established in 1972 as an "independent regulatory commission."  15 U.S.C. § 2053(a).  The Commission is authorized to enforce several federal laws, including the CPSA.

#### A.     The Commission's Structure

23.     The Commission consists of five Commissioners who are appointed by the President, subject to Senate confirmation, for staggered, seven-year terms.  *Id.* § 2053(a), (b)(1).

24.     The CPSA permits the President to remove the Commissioners for "neglect of duty or malfeasance in office but for no other cause."  *Id.* § 2053(a).

25.     The Commission is led by a Chairman, who is appointed by the President from among the five Commissioners, subject to Senate confirmation.  *Id.*

#### B.     The Commission's Expansive Executive Powers and Combination of Functions

26.     The CPSA affords the Commission a broad but defined range of powers, including rulemaking, investigatory, prosecutorial, and adjudicatory authorities.  These sweeping powers are

consolidated in the Commissioners, who are insulated from Presidential oversight and accountability due to their tenure protections.

27.    ***Rulemaking.***    The CPSA affords the Commission rulemaking powers, including the authority to promulgate safety standards "necessary to prevent or reduce an unreasonable risk of injury" from consumer products. *Id.* §§ 2056, 2058.

28.    ***Investigation.***    The CPSA grants the Commission investigatory powers, including the ability to issue subpoenas and to compel "any person" to submit written, sworn answers to questions "as the Commission may prescribe to carry out a specific regulatory or enforcement function of the Commission." *Id.* § 2076(b)(1)–(3), (c).

29.    ***Prosecution.***    The Commission also exercises prosecutorial powers, including the power to seek civil penalties, as well as injunctive relief, in federal court. The CPSA empowers the Commission to "initiate, prosecute, or . . . appeal" a "civil action" to enforce any of the laws subject to its jurisdiction—provided that the Commission first asks the Attorney General to represent it. *Id.* § 2076(b)(7)(A). In such a civil action, the Commission is authorized to seek injunctive relief, as well as substantial civil penalties (as of 2021, up to $120,000 for each violation and $17.15 million for any series of violations). *Id.* §§ 2071(a), 2069(a); Civil Penalties; Notice of Adjusted Maximum Amounts, 86 Fed. Reg. 68, 244 (Dec. 1, 2021).

30.    ***Adjudication.***    The Commission also has authority to conduct in-house adjudications to determine whether a product poses a "substantial product hazard" and whether notice or remedial measures are necessary to protect consumer safety. *See* 15 U.S.C. § 2064(c)(1), (d)(1); *see also id.* § 2076(a) (authorizing the Commission to conduct "any hearing or other inquiry necessary or appropriate to its functions anywhere in the United States").

31.    "[A]djudicative proceedings" before the Commission begin with "issuance of a complaint," which must be "authorized by the Commission" itself.  16 C.F.R. § 1025.11(a).  Upon information and belief, when exercising this power, the Commissioners often discuss and request substantive changes to the complaint.

32.    If the Commission's in-house adjudication determines that a consumer product presents a "substantial product hazard" and certain other requirements are met, the Commission may order specified statutorily authorized remedies, discussed below.  15 U.S.C. § 2064(a), (c)– (e).

33.    Commission hearings are conducted in the first instance by a Presiding Officer (ordinarily an administrative law judge), who issues an Initial Decision, which may then be reviewed by the full Commission—either on appeal by a party to the adjudication or by order of the Commissioners.  *See* 16 C.F.R. §§ 1025.53(a), 1025.54.

34.    In reviewing the Initial Decision, the Commission "exercise[s] all the powers which it could have exercised if it had made the Initial Decision."  *Id.* § 1025.55(a).  It can "adopt, modify, or set aside the findings, conclusions, and order contained in the Initial Decision."  *Id.* § 1025.55(b).  Accordingly, the Commission reviews the Presiding Officer's Initial Decision *de novo*, allowing the Commissioners to decide the outcome of the case they elected to pursue.  Following such review, the Commission then issues a Final Decision and Order.

35.    Although the CPSC has been conducting in-house adjudications since the 1970s, the agency has only made adjudication records from 2012 to the present publicly available.  *Recall Lawsuits: Adjudicative Proceedings*, U.S. Consumer Prod. Safety Comm'n, https://www.cpsc.gov/Recalls/Recall-Lawsuits-Adjudicative-Proceedings (last visited Mar. 14, 2025).  For more than two years, Amazon sought copies of the agency's earlier adjudication

records through a Freedom of Information Act ("FOIA") action, which resulted in the agency's production of records from approximately 70 adjudications to Amazon. The Commission produced many of these records long after briefing was complete in the underlying administrative proceeding.

## II.    The Consumer Product Safety Act and the Commission's Remedial Authority

36.    A purpose of the CPSA is "to protect the public against *unreasonable* risks of injury associated with consumer products." 15 U.S.C. § 2051(b)(1) (emphasis added). To determine whether a risk is unreasonable, one must apply "a balancing test like that familiar in tort law: The regulation may issue if the severity of the injury that may result from the product, factored by the likelihood of the injury, offsets the harm the regulation imposes upon manufacturers and consumers." *Southland Mower Co. v. CPSC*, 619 F.2d 499, 508–09 (5th Cir. 1980) (quoting *Aqua Slide 'N' Dive Corp. v. CPSC*, 569 F.2d 831, 839 (5th Cir. 1978)).

37.    As noted, the Commission has authority to conduct in-house adjudications to determine whether a substantial product hazard exists and whether notice or remedial measures are necessary—i.e., whether to mandate a recall. *See* 15 U.S.C. § 2054. After such an adjudication, the Commission may order a manufacturer, distributor, or retailer of consumer products to provide certain forms of notice to consumers and undertake certain remedial measures.

38.    There are four key requirements for such an order. *First*, the order may only be directed at a manufacturer, retailer, or distributor. *Id.* § 2064(c). *Second*, the Commission may order notice to consumers or other remedial action only if it finds that a specific product presents a "substantial product hazard." *Id.* § 2064(c), (d). *Third*, the Commission may mandate notice only if it finds that "notification is required in order to adequately protect the public." *Id.* § 2064(c)(1). *Fourth*, the Commission may mandate remedial action only to the extent that such

remedial action is enumerated in the statute and "is in the public interest." *Id.* § 2064(d)(1). Each of these limits on the Commission's authority is described in more detail below.

A. **The Commission's Remedial Authority Is Limited to "Manufacturers," "Distributors," and "Retailers" and Does Not Extend to "Third-Party Logistics Providers"**

39. The Commission's product hazard recall remedial authority is limited to manufacturers, distributors, and retailers, 15 U.S.C. § 2064, each of which is defined in the CPSA, *id.* § 2052. The CPSA was enacted in 1972, and its definitions reflect the nature of commerce at that time.

40. In 2008, Congress amended the CPSA to exempt "third-party logistics providers" from being classified as manufacturers, distributors, or retailers. *See* Consumer Product Safety Improvement Act of 2008, Pub. L. No. 110-314, § 235, 122 Stat. 3016, 3074 (2008). Congress adopted this amendment against the backdrop of a growing e-commerce market, as Amazon and other logistics service providers began providing third-party logistics services. *See, e.g.*, William Hoffman, *Pushing the Shopping Cart*, Shipping Digest (May 21, 2007) (describing Amazon's FBA service as the "new third-party logistics player on the block" which represented "potentially a major move into the business-to-consumer fulfillment sector" that was "dominated by parcel and package carriers such as the U.S. Postal Service, UPS and others").

41. A "third-party logistics provider" is "a person who solely receives, holds, or otherwise transports a consumer product in the ordinary course of business but who does not take title to the product." 15 U.S.C. § 2052(a)(16).

42. Under the CPSA, a "third-party logistics provider" "shall not . . . be deemed to be a manufacturer, distributor, or retailer of a consumer product solely by reason of receiving or transporting a consumer product in the ordinary course of its business." *Id.* § 2052(b). The

Commission thus lacks authority to order notice or remedial measures to be taken by third-party logistics providers. *Id.* § 2064.

> **B.    The Commission May Order Notice or Remedial Measures Only if It Finds That a Product Presents a Substantial Product Hazard**

43.    The CPSA provides that the Commission may order a manufacturer, distributor, or retailer to issue notice or take remedial measures only "[i]f the Commission determines (after affording interested persons . . . an opportunity for a hearing . . . ) that a product distributed in commerce presents a substantial product hazard." *Id.* § 2064(c)(1); *see also id.* § 2064(d)(1).

> **C.    The Commission's Authority to Order Notice or Remedial Actions Is Limited to Certain Enumerated Actions**

44.    If the Commission finds that a consumer product poses a substantial product hazard, it may order a manufacturer, distributor, or retailer to take only those actions listed in 15 U.S.C. § 2064.

45.    If the Commission determines that "notification is required in order to adequately protect the public from [the] substantial product hazard," it may order the manufacturers, distributors, and retailers of the product to "cease distribution of the product," *id.* § 2064(c)(1)(A), and to issue one or more notices, including through "public notice of the defect or failure to comply" or by "mail[ing] notice to every person to whom the person required to give notice knows such product was delivered or sold," *id.* § 2064(c)(1)(D), (F).

46.    The statute authorizes only three remedies: the Commission may order manufacturers, distributors, and retailers to "repair the defect" such that the product is brought "into conformity with the requirements of the applicable rule, regulation, [or] standard," "replace [the] product with a like or equivalent product," and/or "refund the purchase price." *Id.*

§ 2064(d)(1)(A)–(C).  The Commission must find that such a remedy is "in the public interest" before ordering it.  *Id.* § 2064(d)(1).

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    The "Fulfillment by Amazon" Logistics Service

47.    Amazon operates an online store at Amazon.com that offers customers a range of purchasing options.  Amazon sells and ships some of the items in the store itself—including Amazon-branded products.[4]  Amazon owns these branded products and is a manufacturer or retailer with respect to them for purposes of the CPSA.  Other products in the store are sold by third parties—businesses that operate independently of Amazon and use Amazon.com as an outlet (often one of many outlets) to sell their goods.  Subject to basic ground rules set by Amazon (e.g., prohibiting fraud), these third-party sellers set the prices for their products, earn the revenue when customers buy the products, own the products throughout the transaction, and are responsible for shipping the products to purchasers (unless they opt into the FBA service).[5]  Amazon is not a manufacturer, distributor, or retailer of these products.

48.    In 2007, Amazon established its FBA logistics service.  Through the FBA service, Amazon gives third-party sellers the option, for a fee, to store their products in Amazon warehouses (known as fulfillment centers) located across the country and list such products on

---

[4] For example, Amazon sells AAA batteries under the "Amazon Basics" brand and explains on the relevant webpage that the batteries "Ship[] from" and are "Sold by" Amazon.com.  *See Amazon Basics AA & AAA High-Performance Alkaline Batteries Value Pack*, Amazon, https://perma.cc/SRP8-Y4FW.

[5] For example, United Art and Education, a retailer founded in Fort Wayne, Indiana in 1960, sells AMACO Potter's Choice High Fire pottery glazes through the Amazon.com store.  *See AMACO Potter's Choice High Fire Glazes Class Pack Set 4*, Amazon, https://perma.cc/FGF5-J2LA (stating that the glazes "Ship[] from" and are "Sold by" United); *see also UnitedNow*, Amazon, https://www.amazon.com/sp?ie=UTF8&seller=AINP2KT37D9JI (United Art and Education seller page) (last visited Mar. 14, 2025).

Amazon.com.  The listings for these products make clear that the products are "Sold by" third-party entities and "Ship[] from Amazon."[6]  A third-party seller on Amazon.com is not required to use the FBA service and may instead elect to handle logistics and shipping itself or through a preferred shipper.

49.    Once a customer orders a third-party seller's product on Amazon.com for which the seller has purchased FBA services, Amazon picks, packs, ships, and delivers the product to the customer on behalf of the third-party seller, and also facilitates product returns.

50.    Under the FBA service, Amazon's role is circumscribed.  Amazon does not take title to or sell the products sold by third parties and fulfilled through the FBA service.[7]  Amazon does not direct the design or manufacturing decisions of third-party sellers.  The third-party sellers choose what products to sell and generate and update their product listings on Amazon.com, including the product name and description.  Amazon sets only basic ground rules, such as limiting the product title to 200 characters and requiring product descriptions to be accurate and free of obscene material.  Third-party sellers also set the prices of their products, subject to policies designed to protect customers from unfair prices.  Third-party sellers who use the FBA logistics service may at any time stop using the FBA logistics service and withdraw their products from the service or request return of the products from Amazon's warehouses.

51.    Even though third-party sellers retain control over and responsibility for products fulfilled through the FBA logistics service, Amazon wants its customers to have peace of mind

---

[6] *See, e.g.*, *Aqua Joe SJI-OS16 Indestructible Metal Base Oscillating Sprinkler with Adjustable Spray*, Amazon, https://perma.cc/ER32-LZ4W (sold by JOE Authorized, "the official Amazon seller account for" Aqua Joe® products).

[7] Though not the subject of this lawsuit, Amazon also does not sell or take title to products sold on its platform by third parties who choose not to use the FBA service and instead manage their own shipping and logistics.

when shopping on Amazon.com—including for items sold by third-party sellers. Accordingly, as part of its commitment to product safety and independent of any legal obligations, Amazon voluntarily takes action to protect consumers when it becomes aware of potential hazards posed by third-party sellers' products. For instance, where appropriate, Amazon identifies and delists products that could pose potential safety hazards, notifies affected customers, and offers product refunds. Amazon takes these actions in accordance with its contracts with the third-party sellers.

## II.    The Commission Notifies Amazon of Hazards Posed by the Subject Products

52.    In a series of communications between January 2020 and March 2021, the Commission notified Amazon that, in the Commission's view, certain products sold on Amazon.com by third-party sellers and fulfilled through the FBA logistics service posed safety hazards to consumers.

53.    The Commission raised concerns about certain electric hair dryer, carbon monoxide detector, and children's sleepwear products. According to the Commission, some hair dryers did not have an immersion protection device, some children's sleepwear garments failed to meet federal flammability requirements, and some carbon monoxide detectors failed to alarm within 15 minutes when subjected to 400 parts per million of carbon monoxide. We refer to these products, which Amazon did not manufacture, sell, or at any time take title to, collectively as the "Subject Products."

## III.    Amazon Voluntarily Takes Corrective Action

### A.    Amazon Stops the Sale of, Quarantines, and Destroys the Subject Products

54.    In 2020 and 2021—shortly after being notified by the Commission about the safety issues affecting the third-party sellers' products—Amazon removed the Subject Products from Amazon.com and quarantined any units remaining in its fulfillment centers. In doing so, Amazon ensured that no additional units would be sold to customers. Amazon contacted the third-party

sellers to alert them of the safety issues, requested that they conduct a recall or provide information contradicting the CPSC's allegations, and, consistent with its contracts with the sellers, ultimately destroyed all units of the Subject Products stored in its fulfillment centers.

**B.    Amazon Issues Direct Notices and Full Refunds to All Subject Product Purchasers**

55.    To protect customers and further reduce risks from the Subject Products, Amazon emailed each of the 376,009 purchasers of the Subject Products, notifying them of the hazards and instructing them immediately to stop using and dispose of the products.  Amazon also provided this notice via the Amazon Message Center—a messaging portal on Amazon.com through which users can receive messages from Amazon and communicate with sellers.  *See* Ex. 3.

56.    Commission regulations and guidance have consistently stated that direct notice to consumers, which Amazon provided, is the most effective way to inform consumers about product safety issues.  16 C.F.R. § 1115.26(a)(4); *see also* 83 Fed. Reg. 29,102, 29,102 (June 22, 2018) ("Direct notice recalls have proven to be the most effective recalls.").

57.    Amazon's messages to purchasers of the Subject Products clearly described the products at issue, the hazards they present, and the remedies available to the purchaser.  Purchasers were also instructed to immediately stop using and dispose of the products, and to notify any secondary users to stop using and dispose of the products.  Amazon's messages were modeled on messages the Commission had previously approved in recalls for the same types of products and were consistent with other messages sent by Amazon and approved by the Commission.

58.    Amazon also provided a full refund to every purchaser of the Subject Products in 2021 or 2022, in the form of a credit on their Amazon account, totaling over $21 million in credits.

**IV.**     **The Commission Nevertheless Sues Amazon to Force a Duplicative Mandatory Recall**

59.     Despite Amazon's prompt action to halt sales of the Subject Products, directly notify all affected customers of the hazards posed by those products, and refund them in full for their purchases, the Commission filed an administrative complaint against Amazon months (and in some cases years) later, on July 14, 2021. The Commissioners approved the Complaint by a 3–1 vote.

60.     In a statement on the vote to approve filing the Complaint against Amazon, then-Acting Chairman Robert Adler acknowledged that the "statute is not perfectly clear on" whether the Commission's authority extends to Amazon in connection with the FBA service.[8] But the Commission nevertheless proceeded, using this adjudication as a test case in an attempt to expand the Commission's authority to an area where even its Chairman doubted its jurisdiction. After it was filed, then-Acting Chairman Adler stated that the Complaint was "a huge step forward for this small agency" in "grappl[ing] with how to deal with these massive third-party platforms."[9]

61.     After proceedings before Presiding Officers and an administrative appeal, the Commission issued two orders. The July 29 Order concluded that Amazon was a distributor under the CPSA with respect to the Subject Products and ordered Amazon to issue additional rounds of notice and refunds to customers, but it left the details of those steps to be negotiated with Complaint Counsel through a Proposed Notification and Action Plan.[10] July 29 Order at 72–73. The July 29 Order also rejected Amazon's separation-of-powers claims but reserved judgment on the

---

[8] Adler Statement.

[9] *CPSC Sues Amazon*.

[10] The parties had stipulated that the products identified in the CPSC's administrative complaint presented a substantial product hazard based on evidence produced by Complaint Counsel for the first time during the CPSC proceedings, despite Amazon's repeated pre-adjudication requests for test results.

remaining claims pending Amazon's submission of a Proposed Notification and Action Plan. *Id.* at 60–72. After Amazon and Complaint Counsel submitted additional briefing, the Commission issued its Final Order on January 16, 2025. The Final Order rejected the remainder of Amazon's constitutional claims and directed Amazon to (1) issue an additional round of direct notice to purchasers, using language dictated by the Commission; (2) provide public notice on its website, using language dictated by the Commission; (3) issue a second set of refunds to consumers, conditioned on proof of destruction; and (4) take other measures, such as filing periodic reports with the Commission regarding the status of the recall. *See* Final Order at 51–52.

62.     Amazon then requested that the Commission stay the Final Order pending judicial review pursuant to 5 U.S.C. § 705 and 16 C.F.R. § 1025.57(a). On February 28, 2025, the Commission granted Amazon's motion. *See* Ex. 4, Order Granting Amazon.com, Inc.'s Motion to Stay the Final Order, *Amazon.com, Inc.*, CPSC No. 21-2 (Feb. 28, 2025). As a result, the Final Order is stayed until 14 days after this Court issues a final judgment in this litigation.

## V.    The Commission Incorrectly Deemed Amazon a Distributor and Not a Third-Party Logistics Provider

63.     The Final Order's threshold error is its classification of Amazon as a distributor of products sold by third parties and fulfilled through the FBA logistics service. The Final Order should have instead recognized that Amazon's role under the FBA service is that of a "third-party logistics provider," a type of entity excluded from "distributor" classification under the Act. 15 U.S.C. § 2052(a)(16), (b).

64.     A "third-party logistics provider" is an entity that "solely receives, holds, or otherwise transports a consumer product in the ordinary course of business but who does not take title to the product." *Id.* § 2052(a)(16). This definition describes Amazon's activities in

connection with the FBA service: it receives, holds, and transports consumer products, and does not take title to them.

65.     The CPSA provides that an entity that, like Amazon, meets the definition of third-party logistics provider "*shall not* . . . be deemed to be a manufacturer, distributor, or retailer of a consumer product solely by reason of receiving or transporting a consumer product in the ordinary course of its business as such a carrier or forwarder." *Id.* § 2052(b) (emphasis added).

66.     The Commission treated Amazon as a distributor and not a "third-party logistics provider" on the basis that Amazon did not "solely" receive, hold, or transport third-party products. The Commission conceded that the term "solely" does not preclude third-party logistics providers from performing activities that are "ancillary to receiving, holding, or transporting products, such as taking inventory or checking on the contents of a damaged box." July 29 Order at 35.  But the Commission then cursorily concluded, with no analysis, that "this is not a close case" and that Amazon "does considerably more than is allowed by the definition of 'third-party logistics provider.'" *Id.* at 35–36.

67.     Although the Commission correctly recognized that entities could engage in activities ancillary to receiving, holding, and transporting and still qualify for the third-party logistics provider exception, the Commission defined the scope of ancillary activities too narrowly and arbitrarily.  The Commission failed to acknowledge that many of the services Amazon provides as part of its FBA program—inspecting products, tracking shipments, and processing product returns—are precisely the types of activities carried out by third-party logistics providers. Indeed, UPS and FedEx, which Complaint Counsel cited as examples of third-party logistics providers before the Presiding Officer, provide a variety of such services. *See, e.g.*, *Small Business*

*Services*, UPS Store, https://perma.cc/LUR2-DJVW (listing accounting, business management, and financial services as examples of additional services).

68.     Moreover, the Commission incorrectly concluded that engaging in any other activity that is not "strictly ancillary to receiving, holding, or transporting products" disqualifies an entity from being a third-party logistics provider.  July 29 Order at 35.  Congress added the "third-party logistics provider" exception to exclude firms engaging in receiving, holding, and transporting products from the definition of "distributor," as long as they did not hold title to the products and were solely involved in the specified distribution activities.  *See* Consumer Product Safety Improvement Act of 2008, Pub. L. No. 110-314, § 235(c), 122 Stat. 3016, 3074 (2008) (excluding the newly defined category of "third-party logistics provider" from the definition of manufacturer, retailer, and distributor).  Read within this context, the provision is best understood to mean that the "sole[]" *distribution* activities in which third-party logistics providers can engage are receiving, holding, and transporting products—not that they are prohibited from engaging in non-distribution activities.  *See generally Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.").

69.     Amazon did not engage in any distribution activities other than receiving, holding, or transporting products.  The CPSA defines a distributor as "a person to whom a consumer product is delivered or sold *for purposes of distribution in commerce*."  15 U.S.C. § 2052(a)(8) (emphasis added).  "[D]istribution in commerce" means "to sell in commerce, to introduce or deliver for introduction into commerce, or to hold for sale or distribution after introduction into commerce." *Id.* § 2052(a)(7).

70.    Amazon did not sell—and could not have sold—the Subject Products because it never took title to those products.  A "'sale' [is] defined as 'the transfer of ownership of and the title to property from one person to another for a price.'"  *Erie Ins. Co. v. Amazon.com, Inc.*, 925 F.3d 135, 141 (4th Cir. 2019) (quoting Merriam-Webster's Collegiate Dictionary 1129, 1097 (11th ed. 2007)).  Thus, parties like Amazon "who do not take title to property during the course of a distribution but rather render services to facilitate that distribution or sale, are not sellers." *Id.*  For the same reasons that the court in *Erie* concluded Amazon was not a "seller" for purposes of product liability law, Amazon does not "sell in commerce" for purposes of the CPSA.

71.    Nor did Amazon introduce or deliver the Subject Products for introduction into commerce.  As the Commission has consistently recognized, introduction into commerce covers only "the first shipment of an individual finished product in interstate commerce."  CPSC General Counsel Advisory Opinion No. 6 (July 6, 1973);[11] *see also* CPSC General Counsel Advisory Opinion No. 8 (July 12, 1973) ("The phrase 'introduced into interstate commerce' was intended to mean the first shipment of an individual finished product in interstate commerce.").[12]  It is undisputed that third-party sellers, not Amazon, made the first shipments of the Subject Products.

72.    Even if Amazon held the Subject Products for sale or distribution, such activities are expressly covered by the third-party logistics provider exception.  The CPSA provides that a firm that "hold[s] [a product] for sale or distribution" is a distributor *unless* it "solely . . . holds . . . [the] consumer product in the ordinary course of business but . . . does not take title to the product," in which case it is a third-party logistics provider.  15 U.S.C. § 2052(a)(7), (a)(16).  Accordingly, because Amazon did not engage in any other distribution activities enumerated in the CPSA and

---

[11] Available at https://perma.cc/G9RG-SWYQ.

[12] Available at https://perma.cc/N3KR-FUFF.

did not take title to the products, Amazon is a third-party logistics provider, not a distributor. Simply put, all the activities Amazon performed in connection with the FBA service were either (1) expressly permitted by the third-party logistics provider exemption or (2) non-distribution activities that do not affect application of that exemption.

73.     Indeed, numerous courts have concluded in the product liability common law context that Amazon's activities under the FBA service do not render it a "distributor" or a "seller." *See, e.g.*, *Erie*, 925 F.3d at 141; *Eberhart v. Amazon.com, Inc.*, 325 F. Supp. 3d 393 (S.D.N.Y. 2018) (holding that Amazon is not a "distributor" under New York law because it does not take title to or own products sold through FBA); *Phila. Indem. Ins. Co. v. Amazon.com, Inc.*, 425 F. Supp. 3d 158 (E.D.N.Y. 2019) (similar); *Berkley Reg'l Ins. Co. v. John Doe Battery Mfr.*, No. 20-CV-2382, 2023 WL 375934 (D. Minn. Jan. 24, 2023) (holding the FBA service falls outside the scope of "distributor liability" under Minnesota law). Federal courts and the Commission have both recognized that the CPSA is properly interpreted against this common law backdrop. *See, e.g.*, *Zepik v. Tidewater Midwest, Inc.*, 856 F.2d 936, 942 (7th Cir. 1988) (analyzing the CPSA in the context of "conventional notions of causation . . . [at] common law" "in the absence of any indication that Congress intended to depart from" them.); 49 Fed. Reg. 13,820, 13,825 (Apr. 6, 1984) (considering "the case law in the area of products liability" as relevant to defect determinations under the CPSA).

74.     In disregarding the plain meaning of the CPSA, the Commission focused on Amazon's (1) separate operation of Amazon.com, through which consumers can buy products; (2) administration of a fair pricing policy and ability to delist products from its website that violate FBA policies; (3) provision of "live customer support" to consumers who purchase products; and (4) processing of product returns. July 29 Order at 33–35. But these activities are either ancillary

to receiving, holding, and transporting the products, or are not distribution activities, and thus do not remove Amazon from the scope of the third-party logistics provider exemption.

75.     That Amazon operates the store in which consumers can buy products and can influence transactions between the sellers and consumers to some extent by administering a fair pricing policy or delisting products from Amazon.com does not render Amazon a distributor. None of these activities involves introducing a product into commerce, nor do these activities give Amazon title to the products and thereby transform the company into a seller.

76.     Likewise, providing customer support and processing payments for products it does not own does not render Amazon a distributor of those products. *See, e.g.*, *Eberhart v. Amazon.com, Inc.*, 325 F. Supp. 3d 393, 399 (S.D.N.Y. 2018) (finding that Amazon is "not a distributor, [but] is better characterized as a provider of services," including "(1) maintaining an online marketplace, (2) warehousing and shipping goods, and (3) processing payments"); *Hendrickson v. Amazon.com, Inc.*, 298 F. Supp. 2d 914, 918 (C.D. Cal. 2003) ("While Amazon does provide transaction processing for credit card purchases, that additional service does not give Amazon control over the sale.").

77.     Finally, the act of processing product returns does not fall within the definition of "distribution in commerce" under the statute.  Indeed, processing product returns is a quintessential logistics activity and thus is ancillary to receiving, holding, and transporting the products.

78.     Ultimately, "[a]lthough Amazon's services were extensive in facilitating the sale, they are no more meaningful to the analysis than are the services provided by UPS Ground." *Erie*, 925 F.3d at 142.

79.     In short, in the context of the FBA logistics service, Amazon "solely receives, holds, or otherwise transports a consumer product in the ordinary course of business but . . . does

not take title to the product" and is therefore a third-party logistics provider and not a distributor. 15 U.S.C. § 2052(a)(16).

## VI.    The Commission Ordered Unwarranted and Duplicative Notice and Remedial Measures

80.    Even if Amazon were a distributor, the remedial measures ordered by the Commission are unjustified and exceed its statutory authority.  Although it is undisputed that Amazon has already notified all purchasers of the hazards posed by the Subject Products (through two separate channels) and provided them a full refund, the Commission ordered Amazon to (1) issue an additional round of direct notice to purchasers, using language dictated by the Commission; (2) provide public notice on its website, using language dictated by the Commission; (3) issue a second set of refunds to consumers, conditioned on proof of destruction; and (4) take other measures, such as filing periodic reports with the Commission regarding the status of the recall.  Final Order at 51–52.

81.    As Amazon showed during the administrative adjudication process, these burdensome measures would provide little or no benefit to customers in light of Amazon's robust and voluntary remedial efforts undertaken years ago, at the time the Subject Products were found hazardous.  The steps ordered by the Commission would also undermine consumer safety by contributing to recall fatigue,[13] contravene the public interest in other ways, and exceed the Commission's statutory authority.

---

[13] "Recall fatigue" refers to the concept that additional communications to consumers will make them less likely to respond to safety messaging as a whole, undermining efforts to tackle other hazards.

### A.    The Commission's Duplicative Notice Requirements

82.    The Commission may not order Amazon to issue additional notice unless it first determines that notice is "*required* in order to adequately protect the public."  15 U.S.C. § 2064(c)(1) (emphasis added).  If the Commission decides notice is required, it then must consider whether certain components of the notice are "unnecessary or inappropriate under the circumstances." *Id.* § 2064(i)(2).

83.    The Commission did not undertake either of those statutorily mandated inquiries when ordering Amazon to issue additional notice to purchasers.  The Commission quibbled over Amazon's wording of its voluntary direct notices, but it failed to show why additional notice is required—i.e., necessary—to "adequately protect the public."  Additional notice is not required to protect the public because Amazon already provided two forms of direct notice to each of the 376,009 purchasers of the Subject Products, via email and the Amazon Message Center.  Every purchaser of the Subject Product has been adequately notified of the product defects and no additional notice to those purchasers is necessary.

84.    Moreover, because Amazon has already twice notified 100 percent of purchasers of the Subject Products, public notice on Amazon's website is not necessary to "adequately protect the public." *Id.* § 2064(c)(1).  The Commission cites no evidence that such notice is necessary here.  For example, there is no evidence in the record that the Subject Products have been resold to consumers beyond the original purchasers.

### B.    The Commission's Order to Change the "Your Orders" Page

85.    The Final Order's requirement that Amazon post a notice of the recall at the top of the "Your Orders" webpage for each purchaser exceeds the Commission's statutory authority.

86.    The Commission's authority to order notice is limited.  As relevant here, it can order manufacturers, distributors, and retailers "[t]o give *public notice* of the defect or failure to

26

comply, including posting clear and conspicuous notice on its Internet website" and/or "[t]o mail notice to every person to whom the person required to give notice knows such product was delivered or sold." *Id.* § 2064(c)(1)(D), (c)(1)(F) (emphasis added).

87. The "Your Orders" page is a private, personalized page tailored to and accessible only by individual Amazon account holders after logging in. Thus, any notice on the "Your Orders" page is by definition private and not a "public notice" under 15 U.S.C. § 2064(c)(1)(D).

88. Nor is a banner at the top of a private webpage a "mail[ed] notice" under 15 U.S.C. § 2064(c)(1)(F), because it is not sent to the individual purchaser, but is only posted on a page that they might visit. The Commission therefore lacks authority to order such notice.

**C.     The Commission's Duplicative and Unlawful Refund Order**

89. The Final Order's requirement that Amazon issue another round of refunds to purchasers who submit evidence of the destruction of the Subject Products exceeds the Commission's statutory authority.

90. 15 U.S.C. § 2064 authorizes three forms of remedial measures. The Commission can order a manufacturer, distributor, or retailer to "take any one or more of the following actions:" "repair the defect," "replace [the] product," or "refund the purchase price." *Id.* § 2064(d)(1)(A)–(C). The Commission lacks authority to order any other measures, including what would amount to a double purchase price reimbursement windfall to purchasers. *See Akhtar v. Burzynski*, 384 F.3d 1193, 1199 (9th Cir. 2004) (Where Congress used the phrase "any of the following," it "explicitly enumerated circumstances by which [certain benefits could be terminated]," thus triggering "the presumption . . . that Congress purposely excluded all other possible means [for termination].")); *Peck v. U.S. Dep't of Lab., Admin. Rev. Bd.*, 996 F.3d 224, 232 (4th Cir. 2021) (applying *expressio unius* canon), *as amended* (June 21, 2021).

27

91.     Nowhere in that section of the CPSA did Congress authorize the Commission to order product destruction.  *See* 15 U.S.C. § 2064.  Where Congress has provided for product destruction pursuant to the Act, it has done so explicitly.  *See, e.g.*, *id.* § 2066(e) ("Products refused admission into the customs territory of the United States shall be destroyed unless . . . the Secretary of the Treasury permits the export.").  The Commission therefore lacks authority to condition refunds on destruction of the Subject Products.

92.     The Commission similarly lacks authority to order duplicative refunds.  Amazon already voluntarily refunded the purchase price of the Subject Products to all purchasers.  The statute limits refunds to "the purchase price of [the] product."  *Id.* § 2064(d)(1)(C); *see also Zen Magnets, LLC*, CPSC No. 12-2, 2017 WL 11672449, at *44–45 (Oct. 26, 2017).  The Commission could not order a firm to refund twice the purchase price of the product.  Nor can it order a company that has already issued a full refund of the purchase price to order a second, duplicative refund.

93.     Although the text of the statute is clear, the canon of constitutional avoidance, which directs courts to reject interpretations raising "serious constitutional doubts," also counsels in favor of interpreting the statute as precluding the Commission from ordering duplicative refunds.  *Clark v. Martinez*, 543 U.S. 371, 381–82 (2005).  Reading the statute to permit the Commission to order multiple refunds risks running afoul of the Fifth Amendment's Takings Clause because it would require Amazon not only to make purchasers whole but also to give them a net gain in the form of a second refund.  *See* U.S. Const. amend. V ("[N]or shall private property be taken for public use, without just compensation.").

94.     Finally, duplicative refunds conditioned on product destruction are not "in the public interest," a prerequisite to the Commission's exercise of its remedial authority.  15 U.S.C. § 2064(d)(1).  Further refunds are unnecessary and would not be in the public interest because

Amazon already refunded every purchaser of the Subject Products the full purchase price. Nor would requiring proof of destruction serve the public interest here because Amazon notified each purchaser more than two years ago that they should dispose of the products. Thus, even if the Commission did have general authority to order duplicative refunds, it would not be able to do so.

## CLAIMS FOR RELIEF

### Count I: Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
**(Action Not in Accordance with Law)**

95.     Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth in this count.

96.     The APA provides that a reviewing court "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

97.     The Commission's authority to order firms to issue notices and to undertake remedial measures is limited to "the manufacturer or any distributor or retailer of the product." 15 U.S.C. § 2064(c)(1). The CPSA excludes "third-party logistics provider[s]"—defined as "a person who solely receives, holds, or otherwise transports a consumer product in the ordinary course of business but who does not take title to the product," *id.* § 2052(a)(16)—from the definition of "distributor," *see id.* § 2052(b).

98.     In its Final Order, the Commission concluded that Amazon was a "distributor" of the Subject Products. That conclusion is incorrect and is not entitled to any deference. *See Loper Bright Enters.*, 144 S. Ct. at 2261, 2273.

99.    For the reasons explained above, under a proper interpretation of the statute, Amazon's activities under the FBA service fall within the third-party logistics provider definition of the CPSA.

100.    Because Amazon is a third-party logistics provider, not a distributor, with regard to the Subject Products, the Commission lacks authority to order Amazon to take remedial measures. Accordingly, the Final Order is not in accordance with law and should be vacated.

### Count II: Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2), and the First Amendment to the U.S. Constitution
**(Excess of Statutory Authority; Unconstitutional Compulsory Notice Requirements)**

101.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth in this count.

102.    The APA provides that the Court "shall . . . hold unlawful and set aside agency action" that is "not in accordance with law," "contrary to constitutional right," and "in excess of statutory . . . authority."  5 U.S.C. § 706(2)(A)–(C).

103.    The Final Order's notice requirement exceeds the Commission's statutory authority.

104.    The Commission may not order Amazon to issue additional notice unless it is "required in order to adequately protect the public."  15 U.S.C. § 2064(c)(1).

105.    Here, additional notice is not required to adequately protect the public because Amazon already provided two forms of direct notice to all purchasers of the Subject Products, via email and the Amazon Message Center.  Every consumer who purchased a Subject Product on Amazon.com has been adequately notified of the product defects and no additional notice is required.

106.    The Commission's notice requirements also violate Amazon's First Amendment rights.

107.    The First Amendment to the U.S. Constitution provides that "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I.

108.    The First Amendment protects against government attempts to both restrict and compel speech.  *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 634 (1943).

109.    Government attempts to compel commercial speech must satisfy the demanding intermediate scrutiny standard set out in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980).  For speech that concerns lawful activity and is not misleading, the government carries the burden of demonstrating a "substantial interest" in regulating the speech; that the regulation would "directly advance[]" that alleged interest; and that the regulation is no more extensive than necessary.  *Id.* at 564, 566.

110.    The Commission seeks to compel both the form and content of Amazon's speech by ordering Amazon to send additional direct notices to purchasers, post notices on Amazon's webpages, and include certain content in the notices.

111.    The Commission's attempts to compel Amazon's speech fail the *Central Hudson* standard in at least three ways.

112.    *First*, the Commission failed to demonstrate how its compulsory notice requirement would directly advance any public safety interest.  To compel Amazon's speech, the Commission may not rely on "speculation or conjecture," *Edenfield v. Fane*, 507 U.S. 761, 770 (1993), but "must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree," *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 188 (1999) (quoting *Edenfield*, 507 U.S. at 770–71).  The Commission offers no such evidence to support its notice requirement, relying only on bare assertions that its notice requirement will advance the agency's goals.  Amazon has already directly notified every purchaser of the Subject

Products via two different channels, and the Commission has failed to explain why additional notice is necessary.  Nor has the Commission sufficiently justified its decision to not only dictate the precise wording of Amazon's speech, but also proscribe Amazon's speech by prohibiting it from including accurate information in its notices.  Final Order at 21 (prohibiting Amazon from stating that sellers of the Subject Products "have not responded to the CPSC and have been uncooperative in the implementation of this recall").[14]

113.    *Second*, the Commission failed to show that its notice requirement is no more extensive than necessary.  The Commission presented no evidence that it could not advance its interest through less burdensome means, such as using its own website or social media accounts to provide public notice of the recall.  *See NIFLA v. Becerra*, 138 S. Ct. 2361, 2376 (2018).

114.    *Third*, the Commission's compulsory notice requirement violates the First Amendment by treating similarly situated speech inconsistently.  *See Greater New Orleans Broad. Ass'n*, 527 U.S. at 190–95.  Amazon's prior notices satisfied the purposes of Commission's guidelines and mirrored notices previously approved by the Commission.  The Commission deemed Amazon's notices insufficient without any supporting justification.  *See id.* at 195 (The government violated the First Amendment when it offered "no . . . convincing basis" for "permitting a variety of speech that pose[d] the same risks the Government purport[ed] to fear.").

115.    Because the compulsory notice requirement exceeds the Commission's statutory authority and violates the First Amendment, this Court should hold the notice requirement unlawful and set it aside.

---

[14] Although Amazon offered its own notice language in its Proposed Notification and Action Plan, as directed by the July 29 Order, Amazon submitted that Plan under protest and objected to the requirement that it issue any additional notice.

**Count III: Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(C)**
**(Agency Action Not in Accordance with Law)**

116.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth in this count.

117.    The APA provides that a reviewing court "shall . . . hold unlawful and set aside agency action" that is "not in accordance with law."  5 U.S.C. § 706(2).

118.    The Final Order is unlawful because it exceeds the Commission's statutory authority.

119.    The Commission exceeded its statutory authority in at least two distinct ways.

120.    *First*, the Final Order's requirement that Amazon issue another round of refunds to purchasers, conditioned on proof of destruction of the Subject Products, exceeds the Commission's authority.

121.    15 U.S.C. § 2064 allows the Commission to order a manufacturer, distributor, or retailer to do only three things: "repair the defect," "replace [the] product," or "refund the purchase price."  15 U.S.C. § 2064(d)(1).  The statute does not authorize the Commission to order product destruction, and so this remedy is beyond the Commission's authority.  Moreover, such remedy is not "in the public interest" because Amazon notified each purchaser more than two years ago that the purchaser should dispose of the products.  *Id.*

122.    In addition, the Commission is not authorized to order duplicative refunds because Amazon already refunded the full purchase price years ago.  For the same reason, such duplicative refunds are not "in the public interest." *Id.*

123.    *Second*, the Final Order's requirement that Amazon post a notice of the recall at the top of the "Your Orders" page for each individual purchaser exceeds the Commission's authority.

124.    The Commission's authority is limited to ordering manufacturers, distributors, and retailers "[t]o give public notice of the defect or failure to comply, including posting clear and conspicuous notice on its Internet website" and/or "[t]o mail notice to every person to whom the person required to give notice knows such product was delivered or sold."  *Id.* § 2064(c)(1).

125.    A banner on the "Your Orders" page—an individualized, private page accessible only by individual Amazon account holders—is neither a "public notice" under 15 U.S.C. § 2064(c)(1)(D), nor a "mail[ed] notice" under 15 U.S.C. § 2064(c)(1)(F), because it is not sent to the individual purchaser, but is only posted on a page that they might visit.  The Commission therefore lacks authority to order such notice.

**Count IV: Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**(Arbitrary and Capricious Agency Action; Departure from Past CPSC Practice)**

126.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth in this count.

127.    The APA authorizes a reviewing court to hold as unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

128.    The Commission's shortcomings in acknowledging its departures from past policy and practice were arbitrary and capricious, in violation of the APA.

129.    Among other things, the APA imposes a "basic procedural requirement[] . . .  that an agency must give adequate reasons for its decisions."  *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).  "Reasoned decision making . . . necessarily requires the agency to acknowledge and provide an adequate explanation for its departure from established precedent."  *Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1089–90 (D.C. Cir. 2009); *see FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

130.    Because the Commission does not make its prior adjudications publicly accessible, Amazon could only assess whether the Commission had complied with its obligation to explain departures from prior decisions by requesting such decisions through Freedom of Information Act requests over the course of two years.

131.    The Commission failed to acknowledge or provide a reasoned explanation for at least two departures from past policy and practice.

132.    *First*, the Commission has not articulated an adequate explanation for its requirement that repeat direct notifications be sent regarding recalled products.  The Commission invokes the 2021 version of an informal, staff-prepared document titled "Product Safety Planning, Reporting, and Recall Handbook" to support this requirement.  Yet an earlier version of the Recall Handbook, published in 2012, makes no reference to such a requirement.  The agency has made no effort to acknowledge or explain this apparent change in policy.  Nor has it provided any factual basis for its repeat direct notification requirement.

133.    *Second*, the Commission has failed to justify the inconsistency between the notices mandated by the Final Order and other notices as to similar products that the Commission issued or approved.  For instance, in July and October 2024, the Commission issued "Product Safety Warnings" regarding certain children's sleepwear and carbon monoxide detectors that posed similar hazards as the Subject Products.  The language used by the Commission in those warnings to describe the hazards associated with those products was comparable to the language used by Amazon in its voluntary direct safety notifications regarding the Subject Products.

134.    Moreover, a January 2025 recall notice regarding children's sleepwear products sold on Amazon.com—issued just two weeks after the Final Order—stated that the products "violate federal flammability regulations for children's sleepwear, posing a risk of burn injuries to

children." *See Cozchique Tebbis, and Beeziac Girls Pajamas Recalled Due to Burn Hazard; Violation of Federal Flammability Regulations; Sold Exclusively on Amazon by Tupop*, CPSC (Jan. 30, 2025), https://perma.cc/N97M-PRW2.  Amazon's voluntary notification regarding the children's sleepwear Subject Product used similar language, stating that the product "failed to meet the federal safety standard for the flammability of children's sleepwear, posing a risk of burn injuries to children."  Like Amazon's prior safety notification, the Commission's recent recall notice did not contain any reference to a risk of death.  Nor did the Commission require references to the risk of death in several other recent recall notices as to similar products.  Yet the Final Order requires Amazon to include the word "death" in its notices.  Final Order at 16–17.  However, the Commission has not identified—and Amazon is not aware of—a single instance of injury or death related to the stipulated hazards of the Subject Products.  The Commission has not provided any empirical basis for "tailor[ing]" different approaches to these similar "circumstances."

135.    For these reasons, the Court should set aside the Final Order insofar as it requires repeat direct notifications, or requires notices that are inconsistent with prior notices as to similar products that the Commission issued or approved.

### Count V: Violation of the Constitutional Separation of Powers
**(Unconstitutional For-Cause Removal Protections for Commissioners of the Consumer Product Safety Commission)**

136.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth in this count.

137.    Article II of the U.S. Constitution vests the President with "the 'executive Power'— all of it." *Seila Law*, 140 S. Ct. at 2191; *see also* U.S. Const. art. II, § 1, cl. 1.  The executive power includes "the ability to remove executive officials" from their offices at will.  *Seila Law*, 140 S. Ct. at 2197; *see id.* at 2206 ("[T]he President's removal power is the rule, not the exception."); *Myers v. United States*, 272 U.S. 52 (1926).

138.     Yet the CPSA provides that CPSC Commissioners "may be removed by the President for neglect of duty or malfeasance in office but for no other cause." 15 U.S.C. § 2053(a). This for-cause removal protection for the Commissioners—principal officers under the U.S. Constitution—violates the constitutional separation of powers.

139.     The Commissioners do not satisfy the narrow exception recognized in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), which applies to members of "a multimember body of experts, balanced along partisan lines, that perform[s] legislative and judicial functions and [i]s said not to exercise any executive power." *Seila Law*, 140 S. Ct. at 2199.

140.     To the contrary, the Commission exercises substantial executive power. *See id.* at 2193, 2200.   *First*, the Commission may issue subpoenas and conduct inspections and investigations of regulated entities.   15 U.S.C. §§ 1270, 2065, 2076(b)(3).   *Second*, the Commission may pursue both civil and criminal enforcement actions in federal district court, where it may seek significant fines and injunctive relief and enter into settlements. *Id.* §§ 2061, 2069, 2071, 2076(b)(7). *Third*, the Commission may conduct administrative adjudications like the underlying one, in which it may unilaterally order legal and equitable relief. *Id.* §§ 1274, 2064. *Fourth*, the Commission has broad authority to regulate consumer products, allowing it to promulgate safety standards for a major segment of the U.S. economy. *Id.* §§ 1262, 2056, 2057.

141.     Indeed, the Executive Branch has now taken the position that the Commissioners' for-cause removal protections are unconstitutional. *See* Letter from Sarah M. Harris, Acting Solicitor General, DOJ, to Hon. Mike Johnson, Speaker of the U.S. House of Reps. (Feb. 12, 2025), https://perma.cc/6N3G-P26A. The Executive Branch's position is that the exception recognized in *Humphrey's Executor* does not apply to the Commissioners and that, to the extent it does, the Supreme Court should overrule that decision. *Id.* at 2.

142.    Amazon has "an implied private right of action directly under the Constitution to challenge governmental action under . . . separation-of-powers principles." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010); *see Axon Enter., Inc. v. FTC*, 143 S. Ct. 890, 897 (2023) ("[T]he district courts have jurisdiction . . . to resolve the parties' constitutional challenges to [an agency's] structure.").

143.    Amazon is suffering, and will continue to suffer, irreparable harm from being subjected to an order issued by an unconstitutionally structured agency.

144.    Because the Commission's structure violates the constitutional separation of powers, this Court should hold the Final Order unlawful and set it aside.

**Count VI: Violation of Due Process and Administrative Procedure Act, 5 U.S.C. § 706(2)**
**(Unconstitutional Combination of Investigatory, Prosecutorial, and Judicial Functions)**

145.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint as though fully set forth in this count.

146.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "not in accordance with law," "contrary to constitutional right," and "without observance of procedure required by law."  5 U.S.C. § 706(2)(A)–(B), (D).

147.    The Fifth Amendment to the U.S. Constitution provides that no person shall be "deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  This guarantee includes the right to an impartial tribunal with an independent judge.  *See In re Murchison*, 349 U.S. 133, 134 (1955).  As a result of the combination of functions entrusted to the Commission by the CPSA, Amazon has been denied that right.

148.    An impartial tribunal requires the finders of fact not to have prejudged the questions of fact or law presented in a given case.  *See Amos Treat & Co. v. SEC*, 306 F.2d 260, 267 (D.C. Cir. 1962) ("[A]n administrative hearing of such importance and vast potential consequences must

be attended . . . with the very appearance of complete fairness.  Only thus can the tribunal conducting a quasi-adjudicatory proceeding meet the basic requirement of due process.").  The Commission's adjudication process fails that test, both facially and as applied to Amazon.

149.    The manifest partiality of the Commission has pervaded every stage of this adjudication.  First, the Commission investigated pursuant to its statutory powers.  Then, using information gathered in its investigation, the Commission approved the issuance of an administrative complaint seeking an order directing Amazon to take additional remedial steps. The Commissioners then ratified the appointment of the Presiding Officers who conducted the Commission's in-house adjudication.  The Commission then rendered its own determination in this matter, resolving disputed issues of fact and law.  Finally, the Commission unilaterally determined the remedy through the Final Order—thus ensuring that the Commissioners dictated every step of Amazon's fate during the Commission's in-house adjudication.

150.    Indeed, the Commission has expressed its prejudgment that Amazon's voluntary remedial actions are insufficient from the outset of these administrative proceedings, as well as its view that these proceedings would permit the Commission to assert previously unclaimed regulatory authority over online marketplaces.  This dynamic is evident in Acting Chairman Adler's statement that the proceeding is "a huge step forward" for the Commission with respect to regulation of "massive third-party platforms" like Amazon.[15]

151.    Because the Commissioners prejudged this adjudication from the beginning and have controlled each step of this proceeding, the Commission's adjudication against Amazon violates the Fifth Amendment's Due Process Clause.  *See, e.g.*, *Chrysafis*, 141 S. Ct. at 2482 (noting "the Court's longstanding teaching that ordinarily 'no man can be a judge in his own case'

---

[15] *CPSC Sues Amazon*.

consistent with the Due Process Clause"); U.S. Const. art. V; The Federalist No. 10 (Madison) ("No man is allowed to be a judge in his own cause; because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity."); *SEC v. Jarkesy*, 144 S. Ct. 2117, 2139 (2024) (reasserting right to be heard "before a neutral adjudicator").

152.    Because the Commission issued the Final Order without observance of procedures required by law, and because that order is both contrary to law and contrary to constitutional right, this Court should hold it unlawful and set it aside.

## PRAYER FOR RELIEF

WHEREFORE, Amazon respectfully requests that this Court enter judgment in its favor and against the Commission as follows:

A.    Vacate the Commission's January 16, 2025 Final Order (as well as all earlier orders incorporated therein, including the July 29 Order) as arbitrary and capricious, contrary to law, in excess of statutory authority, and contrary to constitutional right;

B.    Declare that Amazon is a third-party logistics provider, not a distributor, with regards to the FBA logistics service;

C.    Declare the Commissioners' statutory removal protections unconstitutional;

D.    Award Amazon reasonable fees and costs incurred in bringing this action; and

E.    Award such other and further relief the Court deems just and proper.

Respectfully submitted,


   */s/ Kevin F. King*
Sarah L. Wilson*
Stephen P. Anthony (D. Md. Bar No. 14854)
Kevin F. King (D. Md. Bar No. 29548)
Thomas R. Brugato*
Matthew J. Glover*
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Tel.: 202-662-5397
Fax: 202-778-5397
swilson@cov.com
santhony@cov.com
kking@cov.com
tbrugato@cov.com
mglover@cov.com

Jamie Dominique U. Magcale*
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, NY 10018-1405
Tel.: 212-841-1243
Fax: 646-441-9243
jmagcale@cov.com

*Attorneys for Plaintiff*

*Application for pro hac vice forthcoming

March 14, 2025