**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

AMAZON.COM, INC.,

      *Plaintiff*,

v.

CONSUMER PRODUCT SAFETY
COMMISSION, *et al.*,

      *Defendants*.

Civil Action No. 8:25-cv-00853-LKG

**MEMORANDUM IN SUPPORT OF AMAZON.COM, INC.'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 6

I.     The CPSA Delimits the Scope of the Commission's Regulatory Authority. ...................... 6

II.    The Commission Applies the Act to the FBA Logistics Service. ...................................... 7

    A.     Amazon Offers the "Fulfillment by Amazon" Logistics Service. .......................... 7

    B.     The Commission Notifies Amazon of Safety Issues and Amazon Swiftly Acts to Protect Consumers. ............................................................................................. 9

    C.     The Commission Initiates Mandatory Recall Proceedings Against Amazon. ...... 10

    D.     The Commission Issues the Final Order. ........................................................... 12

LEGAL STANDARD ..................................................................................................... 12

ARGUMENT ................................................................................................................ 13

I.     The Commission's Classification of Amazon as a Distributor of the Subject Products Is Contrary to Law. ....................................................................................................... 13

    A.     Amazon Is a Third-Party Logistics Provider, Not a Distributor, of the Subject Products. ........................................................................................................ 14

    B.     The Act's Use of the Word "Solely" Does Not Support the Commission's Decision. ......................................................................................................... 18

    C.     The Commission Erred in Focusing on Activities Beyond Distribution. ............. 20

II.    The Final Order's Requirement that Amazon Issue Additional Notifications to Purchasers Violates the CPSA, the APA, and the First Amendment. ................................................ 21

    A.     The Ordered Notice Is Arbitrary, Capricious, and Not in Accordance with Law.  22

    B.     The Notice Directed by the Commission Violates the First Amendment. ............ 27

III.   The Final Order Imposes Remedies That Exceed the Commission's Authority. ............. 33

    A.     The Commission May Not Order Multiple Refunds for the Same Product. ........ 33

    B.     The Commission Lacks Authority to Order Destruction of the Subject Products. 35

IV.    The Commission's Structure Is Unconstitutional. ......................................................... 37

    A.     The Commissioners' For-Cause Removal Protections Violate the Constitutional Separation of Powers. ...................................................................................... 37

    B.     The Combination of Investigatory, Prosecutorial, and Judicial Functions in This Proceeding Violated Amazon's Due Process Rights. .......................................... 41

CONCLUSION .............................................................................................................. 44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akhtar v. Burzynski*,
  384 F.3d 1193 (9th Cir. 2004) ............................................................... 36

*Allstate N.J. Ins. Co. v. Amazon.com, Inc.*,
  No. CV172738, 2018 WL 3546197 (D.N.J. Jul. 24, 2018) ................................ 16

*Am. Meat Inst. v. U.S. Dep't of Agric.*,
  760 F.3d 18 (D.C. Cir. 2014) ............................................................... 32

*Am. Wild Horse Pres. Campaign v. Perdue*,
  873 F.3d 914 (D.C. Cir. 2017) ............................................................. 24

*Amazon Servs. LLC v. U.S. Dep't of Agric.*,
  109 F.4th 573 (D.C. Cir. 2024) ............................................................ 16

*Amazon.com, Inc. v. McMillan*,
  625 S.W.3d 101 (Tex. 2021) ................................................................ 16

*Amos Treat & Co. v. SEC*,
  306 F.2d 260 (D.C. Cir. 1962) ............................................................. 42

*Bakalis v. Golembeski*,
  35 F.3d 318 (7th Cir.1994) ................................................................ 43

*Bhatti v. Fed. Hous. Fin. Agency*,
  97 F.4th 556 (8th Cir. 2024) ........................................................... 39, 41

*Boyle v. Trump*,
  No. 25-cv-1628, 2025 WL 1677099 (D. Md. June 13, 2025) ............................... 40

*Burlington N. & Santa Fe. Ry. Co. v. STB*,
  403 F.3d 771 (D.C. Cir. 2005) ............................................................. 27

*Casa De Md. v. DHS*,
  924 F.3d 684 (4th Cir. 2019) .............................................................. 24

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,
  447 U.S. 557 (1980) ................................................................ 5, 27, 28, 30

*Chrysafis v. Marks*,
  141 S. Ct. 2482 (2021) .................................................................. 5, 43

*Cinderella Career & Finishing Sch., Inc. v. FTC*,
    425 F.2d 583 (D.C. Cir. 1970) ........................................................................43

*City of Columbus v. Cochran*,
    523 F. Supp. 3d 731 (D. Md. 2021) ...............................................................13

*Collins v. Yellen*,
    594 U.S. 220 (2021) ........................................................................................39

*In re Collom & Carney Clinic Ass'n*,
    62 S.W.3d 924 (Tex. App. 2001) ....................................................................20

*CTIA – The Wireless Ass'n v. City of Berkeley*,
    928 F.3d 832 (9th Cir. 2019) ..........................................................................31

*Davidson v. United Auto Credit Corp.*,
    65 F.4th 124 (4th Cir. 2023) ...........................................................................18

*Deese v. Esper*,
    483 F. Supp. 3d 290 (D. Md. 2020) ................................................................12

*Def. Integrated Sols. v. United States*,
    165 Fed. Cl. 352 (2023) ..................................................................................20

*Dillmon v. Nat'l Transp. Safety Bd.*,
    588 F.3d 1085 (D.C. Cir. 2009) ................................................................25, 26

*Eberhart v. Amazon.com, Inc.*,
    325 F. Supp. 3d 393 (S.D.N.Y. 2018)..............................................................21

*EEOC v. Abercrombie & Fitch Stores, Inc.*,
    575 U.S. 768 (2015).........................................................................................19

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016)...............................................................................24, 25, 26

*Env't Health Tr. v. FCC*,
    9 F.4th 893 (D.C. Cir. 2021) ...........................................................................24

*Erie Ins. Co. v. Amazon.com, Inc.*,
    925 F.3d 135 (4th Cir. 2019) .............................................................14, 15, 21

*Exxon Corp. v. Heinze*,
    32 F.3d 1399 (9th Cir. 1994) ..........................................................................42

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009).......................................................................................4, 5

*FEC v. Cruz*,
   142 S. Ct. 1638 (2022)........................................................................................34

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
   561 U.S. 477 (2010)..........................................................................................38

*Fuentes v. Shevin*,
   407 U.S. 67 (1972)............................................................................................42

*Greater New Orleans Broad. Ass'n, Inc. v. United States*,
   527 U.S. 173 (1999)....................................................................................28, 30

*Greenwich Fin. Servs. Distressed Mortg. Fund 3 LLC v. Countrywide Fin. Corp.*,
   603 F.3d 23 (2d Cir. 2010).................................................................................17

*Gustafson v. Alloyd Co.*,
   513 U.S. 561 (1995)..........................................................................................34

*Hummel v. Heckler*,
   736 F.2d 91 (3d Cir. 1984).................................................................................43

*Humphrey's Ex'r v. United States*,
   295 U.S. 602 (1935)..........................................................................................38

*Int'l Dairy Foods Ass'n v. Amestoy*,
   92 F.3d 67 (2d Cir. 1996) .................................................................................27

*Jimenez-Cedillo v. Sessions*,
   885 F.3d 292 (4th Cir. 2018) ............................................................................26

*K & R Contractors, LLC v. Keene*,
   86 F.4th 135 (4th Cir. 2023) .......................................................................40, 41

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024)..........................................................................................34

*Marshall v. Cuomo*,
   192 F.3d 473 (4th Cir. 1999) ............................................................................42

*Marshall v. Jerrico, Inc.*,
   446 U.S. 238 (1980)..........................................................................................42

*Md. Shall Issue, Inc. v. Anne Arundel Count*,
   91 F.4th 238 (4th Cir. 2024) .............................................................................31

*Molzof v. United States*,
   502 U.S. 301 (1992)..........................................................................................19

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................................................. 24

*Myers v. United States*,
    272 U.S. 52 (1926) ................................................................................................. 38

*Nat. Res. Def. Council, Inc. v. EPA*,
    859 F.2d 156 (D.C. Cir. 1988) ........................................................................ 23, 37

*Nat'l Ass'n of Mfrs. v. SEC*,
    800 F.3d 518 (D.C. Cir. 2015) ........................................................................ 29, 31

*Nat'l Ass'n of Wheat Growers v. Becerra*,
    468 F. Supp. 3d 1247 (E.D. Cal. 2020) .................................................................. 29

*Nat'l Ass'n of Wheat Growers v. Bonta*,
    85 F.4th 1263 (9th Cir. 2023) ................................................................................ 30

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*,
    272 F.3d 104 (2d Cir. 2001) ................................................................................... 32

*Newport News Shipbuilding & Dry Dock Co. v. United States*,
    34 F.2d 100 (4th Cir. 1929) .................................................................................... 20

*NIFLA v. Becerra*,
    585 U.S. 755 (2018) ................................................................................................ 30

*Peck v. Dep't of Lab., Admin. Rev. Bd.*,
    996 F.3d 224 (4th Cir. 2021) .................................................................................. 36

*Plaskett v. Wormuth*,
    18 F.4th 1072 (9th Cir. 2021) ................................................................................ 34

*PSINet, Inc. v. Chapman*,
    362 F.3d 227 (4th Cir. 2004) .................................................................................. 29

*Roberts v. Sea-Land Servs., Inc.*,
    566 U.S. 93 (2012) ................................................................................................. 18

*Ross v. Blake*,
    578 U.S. 632 (2016) ............................................................................................... 17

*Rufo v. Inmates of Suffolk Cnty. Jail*,
    502 U.S. 367 (1992) ............................................................................................... 36

*Russello v. United States*,
    464 U.S. 16 (1983) ................................................................................................. 36

*Safelite Grp., Inc. v. Jepsen*,
   764 F.3d 258 (2d Cir. 2014).........................................................................29

*Seila L. LLC v. CFPB*,
   140 S. Ct. 2183 (2020)...............................................................................38

*State Farm Fire & Cas. Co. v. Amazon.com, Inc.*,
   528 F. Supp. 3d 686 (W.D. Ky. 2021)........................................................16

*Trump v. Boyle*,
   145 S. Ct. 2653 (2025).......................................................................5, 39, 40

*Trump v. Wilcox*,
   145 S. Ct. 1415 (2025)...............................................................................39

*Tumey v. Ohio*,
   273 U.S. 510 (1927)...................................................................................42

*United States v. Edge Broad. Co.*,
   509 U.S. 418 (1993)...................................................................................28

*United States v. Philip Morris USA, Inc.*,
   855 F.3d 321 (D.C. Cir. 2017)...................................................................30

*United States v. United Foods, Inc.*,
   533 U.S. 405 (2001)...................................................................................31

*Utah Licensed Beverage Ass'n v. Leavitt*,
   256 F.3d 1061 (10th Cir. 2001) .................................................................30

*Util. Air Regul. Grp. v. EPA*,
   573 U.S. 302 (2014)..............................................................................19, 35

*Witherspoon v. Stonebreaker*,
   30 F.4th 381 (4th Cir. 2022) .....................................................................20

*Withrow v. Larkin*,
   421 U.S. 35 (1975).....................................................................................42

*Zauderer v. Off. of Disciplinary Counsel*,
   471 U.S. 626 (1985).............................................................................31, 33

*Zepik v. Tidewater Midwest, Inc.*,
   856 F.2d 936 (7th Cir. 1998) .....................................................................16

**Statutes**

5 U.S.C. § 706.....................................................................................4, 5, 12, 33

15 U.S.C. § 1270 ........................................................................................................38

15 U.S.C. §§ 2051 *et seq.* ......................................................................................6, 14

15 U.S.C. § 2051 ..........................................................................................................6

15 U.S.C. § 2052 .............................................................................................. *passim*

15 U.S.C. § 2053 ....................................................................................5, 6, 37, 39

15 U.S.C. § 2061 ........................................................................................................38

15 U.S.C. § 2064 .............................................................................................. *passim*

15 U.S.C. § 2065 ........................................................................................................38

15 U.S.C. § 2066 ........................................................................................................36

15 U.S.C. § 2069 ........................................................................................................38

15 U.S.C. § 2070 ........................................................................................................38

15 U.S.C. § 2071 ........................................................................................................38

15 U.S.C. § 2076 ........................................................................................................38

15 U.S.C. § 2088 ........................................................................................................36

Consumer Product Safety Improvement Act of 2008, Pub. L. No. 110-314,
    122 Stat. 3016, 3074 (2008) ...........................................................................6, 18

**Regulations**

16 C.F.R. § 1115.23 ...................................................................................................22

16 C.F.R. § 1115.26 ............................................................................................10, 22

**Other Authorities**

49 Fed. Reg. 13820 (Apr. 6, 1984) ..........................................................................16

74 Fed. Reg. 11883 (Mar. 20, 2009) ........................................................................22

78 Fed. Reg. 69793 (Nov. 21, 2013) ........................................................................27

83 Fed. Reg. 29102 (June 22, 2018) .........................................................................10

90 Fed. Reg. 9065 (Jan. 31, 2025) ...........................................................................40

*AMACO Potter's Choice High Fire Glazes Class Pack Set 4*, Amazon .........................................7

*Amazon Basics AA & AAA High-Performance Alkaline Batteries Value Pack*,
Amazon ...................................................................................................................7

*Boyle v. Trump*, No. 25-1687 (4th. Cir. 2025) ............................................................40

*But*, Cambridge Dictionary ........................................................................................20

*Children's Pajama Sets Recalled Due to Burn Hazard and Violation of Federal
Flammability Standards; Sold Exclusively on Temu.com by JUVENNO KIDS*,
CPSC Recall No. 24-301 (July 11, 2024) .............................................................26

*Children's Sleepwear Recalled Due to Violation of Federal Flammability
Standards and Burn Hazard; Imported by Kids Tales; Sold Exclusively at
Amazon.com*, CPSC Recall No. 22-177 (June 30, 2022) ......................................23

*Cozchique Tebbis, and Beeziac Girls Pajamas Recalled Due to Burn Hazard;
Violation of Federal Flammability Regulations; Sold Exclusively on Amazon
by Tupop*, CPSC (Jan. 30, 2025) .........................................................................24

CPSC General Counsel Advisory Opinion No. 6 (July 6, 1973) ..................................15

CPSC General Counsel Advisory Opinion No. 8 (July 12, 1973) ................................15

*CPSC Sues Amazon to Force Recall of Hazardous Products Sold on Amazon.com*,
CPSC (July 14, 2021) ...................................................................................11, 33

*Duracell Coppertop AAA Batteries* ..............................................................................8

*Forever 21 Recalls Children's Pajamas Due to Burn Hazard; Violation of
Federal Flammability Regulations; Sold Exclusively by Forever 21*, CPSC
Recall No. 25-158 (Feb. 27, 2025) .....................................................................24

Letter from Sarah H. Harris, Acting Solic. Gen., DOJ, to Richard J. Durbin,
Ranking Member, Comm. on the Judiciary, U.S. Senate (Feb. 12, 2025).............40

Memorandum of Law in Support of Plaintiffs' Expedited Motion for Summary
Judgment, *Boyle v. Trump*, No. 25-cv-1628 (D. Md. May 30, 2025) ...................41

Opposition to Plaintiffs' Motion for a Temporary Restraining Order, *Boyle v.
Trump*, No. 25-cv-1628 (D. Md. May 26, 2025) ..................................................39

*Refund*, *Oxford English Dictionary* (3d ed. 2009) .......................................................34

Sam Kandel, *To Expand, Make Use of Outsourcing*, Poughkeepsie J. (July 22,
2007) ...................................................................................................................14

Statement of Acting Chairman Robert S. Adler on the Vote to Approve Filing of
an Administrative Complaint Against Amazon.com, CPSC (July 14, 2021) ...............3, 11, 43

U.S. Const. amend. V...............................................................................................................41

*Zen Magnets and Neoballs Magnets Recalled Due to Ingestion Hazard*,
   CPSC Recall No. 21-179 (Aug. 17, 2021)...............................................................................23

## INTRODUCTION

Federal agencies must abide by statutory limitations even when they discharge important public obligations.  Amazon.com, Inc. ("Amazon") brings this suit because the Consumer Product Safety Commission ("CPSC" or the "Commission") failed to adhere to that duty in a recent product recall proceeding.

The Commission plays a vital role in protecting the public from hazardous consumer products.  However, the Consumer Product Safety Act ("CPSA" or the "Act"), along with the Constitution and the Administrative Procedure Act ("APA"), imposes carefully crafted limits on the Commission's authority.  The Commission may issue recall orders to the manufacturers, distributors, and retailers of a product, but not to third-party logistics providers who store the product in their warehouses and transport it to customers.  The Commission's remedial authority is circumscribed in similar fashion: Although the Act grants the Commission discretion in fashioning recall orders, it also restricts the agency to specifically enumerated remedial measures (such as replacement or purchase price refunds for defective products) and provides that the agency may only require public notices that are necessary to adequately protect the public.

The Commission exceeded its authority when it issued an order directing Amazon to recall products manufactured, owned, and sold by third parties.  The agency exacerbated that error by disregarding the prompt and effective measures Amazon voluntarily took in response to safety concerns about those products.  The Commission's order requires Amazon to duplicate these efforts—more than four years after the products were last sold.  As described below, that order was not necessary to protect consumers or consistent with governing law; instead, it was a solution in search of a problem.

Amazon operates an online store in which some products are sold by Amazon itself, while others are sold by independent businesses, known as "third-party sellers."  Amazon does not

1

dispute that it is subject to the Commission's recall authority as a retailer (and sometimes a manufacturer) with respect to the products that Amazon itself sells on Amazon.com—including, for example, products that it sells under the "Amazon Basics" brand. But this case does not concern products that Amazon manufactures, owns, or sells.

Rather, the Commission recall order at the heart of this suit involves three categories of products—carbon monoxide detectors, children's sleepwear, and hair dryers (the "Subject Products")—that were all sold by third parties on Amazon.com using the Fulfillment by Amazon ("FBA") service. Third-party sellers who opt in to the FBA service engage Amazon's logistics services to store, pack, ship, and deliver their products to purchasers for a fee. These third-party sellers set the prices for their products and earn the revenue when a customer buys them. Amazon does not sell or take title to any of the products sold by third-party sellers using the FBA service.

In 2020 and 2021, the Commission notified Amazon that it had safety concerns regarding the Subject Products. In response, Amazon voluntarily took prompt corrective action. It removed all listings of the Subject Products from Amazon.com and quarantined all units stored in its fulfillment centers. Amazon, using language approved by the Commission in recalls of similar products, directly notified each of the 376,009 purchasers of the Subject Products of the hazards both by email and through a messaging portal on Amazon.com, instructing them to immediately stop using and dispose of the products and to inform any other known users of the hazards. Amazon also made all purchasers whole by automatically issuing full purchase price refunds to their accounts.

By the Commission's own metrics, Amazon's remedial action was 100% effective. But in July 2021 the Commission nonetheless initiated a mandatory recall proceeding against Amazon, seeking to force it to recall the Subject Products a second time, but on Commission-dictated terms.

The Commission's administrative complaint rested on the legal theory that Amazon, in its capacity as an online marketplace and logistics provider through the FBA service, is a "distributor" under the CPSA and is thus subject to the Commission's mandatory recall authority. That theory was unprecedented: No court or agency decision had previously concluded that an online marketplace or logistics service provider qualifies as a "distributor" under the CPSA.

The Commission's novel interpretation does not comport with the text of the CPSA, which provides that third-party logistics providers like Amazon's FBA service are not classified as distributors for recall purposes. Indeed, when the administrative complaint was filed, the Acting CPSC Chairman admitted that the "statute is not perfectly clear on" whether the Commission's authority extends to the FBA service "because these types of platforms did not exist when the agency was formed or when [the] statute was updated in 2008."[1] The Commission nevertheless celebrated the complaint as "a huge step forward" in its push to "deal with these massive third-party platforms,"[2] thus revealing the true objective of its complaint: to expand the agency's authority over online marketplaces without congressional action.

Following several years of proceedings before two administrative law judges and the Commission on appeal, the Commission ruled in its own favor in a pair of orders issued on July 29, 2024 (the "July Order"), and January 16, 2025 (the "Final Order"). These orders classify Amazon as a distributor of the Subject Products and instruct it to conduct a belated and duplicative recall of those products. The Final Order requires Amazon, among other things, to send a new round of

---

[1] AR12394; Statement of Acting Chairman Robert S. Adler on the Vote to Approve Filing of an Administrative Complaint Against Amazon.com, CPSC (July 14, 2021) [hereinafter Adler Statement], https://perma.cc/Y422-66SD (last visited Aug. 20, 2025).

[2] *CPSC Sues Amazon to Force Recall of Hazardous Products Sold on Amazon.com*, CPSC (July 14, 2021) [hereinafter *CPSC Sues Amazon*], https://www.cpsc.gov/Newsroom/News-Releases/2021/CPSC-Sues-Amazon-to-Force-Recall-of-Hazardous-Products-Sold-on-Amazon-com (last visited Aug. 20, 2025).

notices to consumers using different, Commission-dictated language (despite having already twice notified every individual who purchased the products though Amazon.com) and issue new refunds to purchasers (despite having already provided a full refund to every customer).

The Final Order violates the APA and the U.S. Constitution in several ways.[3]  *First*, the Final Order is "not in accordance with law," 5 U.S.C. § 706(2)(A), because Amazon is a third-party logistics provider, not a distributor, with respect to the Subject Products.  Under the CPSA, the Commission may order only a "manufacturer," "distributor," or "retailer" to conduct a recall.  15 U.S.C. § 2064(c)(1), (d)(1).  The statute excludes from those categories "third-party logistics provider[s]," defined as a "person who solely receives, holds, or otherwise transports a consumer product in the ordinary course of business but who does not take title to the product."  *Id.* § 2052(a)(16).  Amazon is a third-party logistics provider with respect to products sold through the FBA service because Amazon does not manufacture, own, or sell those products; instead, it stores and ships them on behalf of third-party sellers who retain title throughout the transaction.

*Second*, the Final Order's notice requirements are unlawful.  *See* 5 U.S.C. § 706(2)(A).  The CPSA requires the Commission to demonstrate that notice is "required in order to adequately protect the public," 15 U.S.C. § 2064(c)(1), but the Commission has not shown that a third round of notices, issued several years after consumers purchased the products, meets that standard.  The Final Order likewise fails to comply with the APA's requirement that agencies give a reasoned justification when departing from past practice.  *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  Although the Commission has repeatedly approved recall notices materially identical to the ones issued by Amazon, the Final Order does not acknowledge that contrary

---

[3] Because the July Order did not constitute final agency action, *see* Administrative Record ("AR") 17424, and the Final Order incorporates the July Order's conclusions, *see* AR17673–75, this brief refers to the Final Order in describing the Commission's determinations.

precedent or give "good reasons for" abandoning it here. *Id.* Compounding these flaws, the Final Order violates Amazon's First Amendment rights because the additional consumer notices would not "directly advance" a substantial government interest and are "more extensive than necessary." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 564, 591 (1980).

*Third*, the remedies set forth in the Final Order exceed the Commission's statutory authority. *See* 5 U.S.C. § 706(2)(C). Under the CPSA, the Commission may order firms to "repair," "replace," or "refund the purchase price of" a product. 15 U.S.C. § 2064(d)(1). The Act does not allow the Commission to mandate duplicative refunds for the same products, or to make those refunds contingent on proof of destruction.

*Fourth*, the Final Order should be set aside because the Commission's structure violates the Constitution, as applied to this proceeding. By providing that Commissioners "may be removed . . . for neglect of duty or malfeasance in office but for no other cause," *id.* § 2053(a), the CPSA impermissibly intrudes on the President's Article II removal authority, as the government itself has acknowledged. Indeed, the Supreme Court recently stayed a court order that enjoined the President's removal of three Commissioners—a majority of the group that issued the Final Order. *Trump v. Boyle*, 145 S. Ct. 2653 (2025). Because the CPSA's unconstitutional removal restriction distorted the Commission proceedings, vacatur of the Final Order is warranted. Finally, the proceedings against Amazon "violated the Court's longstanding teaching that ordinarily no man can be a judge in his own case consistent with the Due Process Clause." *Chrysafis v. Marks*, 141 S. Ct. 2482, 2482 (2021) (cleaned up). The Commission overstepped that line by acting as judge, jury, and prosecutor—approving the claims against Amazon, resolving factual disputes, and then ruling on the validity of its own allegations. That one-sided scheme cannot be reconciled with the due process protections provided by the Fifth Amendment.

As illustrated by the prompt remedial action that it took years ago with respect to the Subject Products, Amazon supports the Commission's mission to protect consumers from harmful products. And Amazon does not deny the Commission's power to take remedial actions that are within its statutory and constitutional authority. But because the Final Order strays beyond the scope of that authority and conflicts with the Commission's obligations under the APA, Amazon respectfully requests that the Court grant summary judgment in its favor and issue the relief requested in its Complaint, ECF No. 1, including vacatur of the Final Order.

## BACKGROUND

## I.     The CPSA Delimits the Scope of the Commission's Regulatory Authority.

In 1972, Congress enacted the CPSA, 15 U.S.C. §§ 2051 *et seq*., "to protect the public against unreasonable risks of injury associated with consumer products," *id.* § 2051(b)(1), and established the Commission to enforce it within defined boundaries, *see id*. § 2053. At issue in this case is the scope of the Commission's authority under 15 U.S.C. § 2064 to order public notice and remedial action after finding that a consumer product presents a "substantial product hazard." *Id*. § 2064(c)–(d).

Congress carefully cabined the Commission's authority under § 2064 in four key respects:

*First*, the Commission may issue a recall order only to a "manufacturer," "distributor," or "retailer" of consumer products. *Id*. § 2064(c)(1), (d)(1); *id*. § 2052(a)(8), (11), (13). In 2008, Congress amended the CPSA to clarify that "third-party logistics provider[s]" are excluded from these categories. Consumer Product Safety Improvement Act of 2008, Pub. L. No. 110-314, § 235, 122 Stat. 3016, 3074 (2008) (hereinafter "CPSIA"). An excepted third-party logistics provider is "a person who solely receives, holds, or otherwise transports a consumer product in the ordinary course of business but who does not take title to the product." 15 U.S.C. § 2052(a)(16), (b).

*Second*, the Commission may order a regulated company to issue notice to consumers and take other remedial actions only if the Commission determines that a product "presents a substantial product hazard," *id*. § 2064(c)(1), (d)(1), meaning either a failure to comply with an applicable consumer product safety rule, or a product defect that "creates a substantial risk of injury to the public," *id.* § 2064(a).[4]

*Third*, the Commission may order a subject company to issue certain notices of product hazards only if it determines that a particular "notification is required in order to adequately protect the public." *Id.* § 2064(c)(1)(A). In determining the content of such notice, the Commission must assess whether certain default notice elements enumerated in the statute are "unnecessary or inappropriate under the circumstances." *Id.* § 2064(i)(2).

*Fourth*, the Commission may order remedial action only if it is "in the public interest." *Id.* § 2064(d)(1). And the Act expressly limits the Commission's remedial authority: It may order a manufacturer, retailer, or distributor to "repair the defect," "replace [the] product with a like or equivalent product," or "refund the purchase price." *Id.* § 2064(d)(1)(A)–(C).

## II.    The Commission Applies the Act to the FBA Logistics Service.

### A.    Amazon Offers the "Fulfillment by Amazon" Logistics Service.

Amazon began selling products on its Amazon.com website in 1995. These include private brand products labeled by Amazon (such as Amazon Basics products) and products manufactured by third parties but owned and sold by Amazon.[5] Amazon is a manufacturer or retailer with respect to these products for purposes of the CPSA. *See* AR29, 205.

---

[4] The parties stipulated, for purposes of this dispute, that the Subject Products satisfy the test for a substantial product hazard determination under § 2064. AR462, 467.

[5] For example, Amazon sells batteries under the "Amazon Basics" brand. *See, e.g., Amazon Basics AA & AAA High-Performance Alkaline Batteries Value Pack*, Amazon, https://www.amazon.com/Amazon-Basics-Count-High-Performance-
(continued…)

In 2000, Amazon began to allow third parties to sell their products by posting them on Amazon.com, much as third parties sell their goods on other online marketplaces. Subject to basic ground rules set by Amazon, these third-party sellers set the prices for their products, own the products throughout the sale transaction, earn the revenue when customers buy the products, and are responsible for shipping the products to purchasers (unless they opt into the FBA service). *See* AR245–46, 252, 255–56, 335.

In 2006, Amazon launched its FBA logistics service. AR165. By opting in to the FBA service, third-party sellers who list products for sale on Amazon.com can, for a fee, send their products to Amazon's fulfillment centers (i.e., warehouses), where they are stored until they are sold by the third-party seller. AR204, 337. When a customer orders a product sold by a third-party seller using the FBA service, Amazon processes payment on behalf of the third-party seller and then packs, ships, and delivers the product (or arranges for another company to deliver it) to the customer. AR337. The listings for these FBA products explain that the products are "sold by" third-party entities and "shipped by Amazon." AR214, 220, 336.

Amazon's role in the FBA service is limited. Like on other online marketplaces, third-party sellers who use the FBA service control the prices for their products and craft the content of their product listings, subject to basic ground rules that, for instance, discourage unfair pricing practices and require product descriptions to be accurate and free of obscene material. AR32–33, 245. Under the FBA Service Terms, third-party sellers are the sellers of record and retain title to their products until they pass to the purchaser at the point of sale. AR335. Amazon does not take

---

Batteries/dp/B094D3JGLT?th=1 (last visited Aug. 20, 2025). Amazon also sells products manufactured by other companies. *See, e.g.*, *Duracell Coppertop AAA Batteries*, https://www.amazon.com/Duracell-CopperTop-Batteries-All-Purpose-Household/dp/B004K95PBQ (last visited Aug. 20, 2025). For both categories of products, the relevant webpage notes that the product "ships from" and is "sold by" Amazon.

title to products sold to customers using the FBA service.  AR336.[6]  Third-party sellers who use

the FBA logistics service may at any time stop using the service and withdraw their products from

Amazon's warehouses.  AR254.  Moreover, a third-party seller is not required to use the FBA

service and may instead elect to handle logistics and shipping itself or through its own preferred

shipper.  AR246–47.[7]

All of the products at issue in this case were sold by third-party sellers and fulfilled through

the FBA service in accordance with these policies.  AR336–37.

### B.    The Commission Notifies Amazon of Safety Issues and Amazon Swiftly Acts to Protect Consumers.

On separate occasions between January 2020 and March 2021, the Commission notified

Amazon that the Subject Products did not comply with mandatory or voluntary safety standards

and should be recalled.  AR10161, 10174, 10182, 10194, 10204, 10215–16.  As part of its

commitment to protecting consumers, independent of any legal obligations, and consistent with

actions taken in response to similar Commission notifications in the past, Amazon took prompt,

voluntary action in response to the Commission's outreach.  Amazon removed the Subject Products

from Amazon.com (making it impossible for consumers to buy them through Amazon's online

marketplace), quarantined any units that remained in its warehouses, and began destroying the

quarantined products.  AR10159, 10161–63, 10165, 10174–76, 10180–82, 10184, 10192–96,

10204–07, 10215–17.

---

[6] Amazon takes title to third-party products when a third-party seller requests disposal of such products.  *See* AR257–58.

[7] For example, United Art and Education, a retailer founded in Fort Wayne, Indiana, in 1960, sells AMACO Potter's Choice High Fire pottery glazes through the Amazon.com store and handles its own shipping.  *See AMACO Potter's Choice High Fire Glazes Class Pack Set 4*, Amazon, https://perma.cc/FGF5-J2LA (last visited Aug. 20, 2025) (stating that the glazes "Ship[] from" and are "Sold by" United).

Amazon also contacted all 376,009 purchasers of the Subject Products, notifying them of the hazards identified by the Commission. AR10225–26. The notices were sent both by email and through the Amazon Message Center, a messaging portal on Amazon.com through which users can communicate with Amazon and third-party sellers. AR135–37. The direct notices included an attention-grabbing subject line ("Important Safety Notice"), provided identifying information about the Subject Product purchased by the customer, and described the hazards posed by the Subject Product. AR10165–68, 10184–87, 10196–97, 10207–10, 10218–22, 10259–62. The notices also included clear instructions for the customer to immediately stop using and dispose of the Subject Product and to advise any other users (e.g., family members) to do the same. *Id*. Amazon also provided full, automatic refunds to all purchasers at its own expense, totaling over $21 million, in the form of Amazon credit. AR10171, 10178, 10189–90, 10201–02, 10213, 10223.

The Commission's regulations recognize that such direct notice to consumers is "the most effective form of a recall notice." 16 C.F.R. § 1115.26(a)(4); *see* 83 Fed. Reg. 29102, 29102 (June 22, 2018) ("Direct notice recalls have proven to be the most effective recalls"). Further, under the Commission's metric for measuring the effectiveness of a recall, corrective action is considered successful when one of the three statutorily prescribed remedies—refund, repair, or replacement— is provided to a consumer. AR1801. Because Amazon notified and refunded every purchaser, Amazon carried out a 100% successful corrective action, and on a speedy timeline. *Id*.

### C. The Commission Initiates Mandatory Recall Proceedings Against Amazon.

Notwithstanding Amazon's prompt corrective action, the Commission filed an administrative complaint against Amazon on July 14, 2021, seeking to force Amazon to undertake a mandatory recall of the Subject Products. AR1–24. The complaint sought to classify Amazon as a "distributor" of products sold on Amazon.com using the FBA service, even though the Commission had never designated *any* online marketplace as a distributor of products sold by third

parties.  The complaint also sought to impose burdensome and duplicative remedial measures on Amazon, such as requiring a second round of refunds and third round of notices.  AR18–20.

The Commissioners approved the complaint by a vote of 3 to 1.  AR18481.  Notably, the Commission authorized the complaint despite doubts among the Commissioners about whether the novel classification of Amazon as a "distributor" of products sold by third parties using the FBA service satisfies the statutory classification under the CPSA.  Indeed, then-Acting Chairman Adler publicly acknowledged that the "statute is not perfectly clear on" whether the Commission's authority extended to Amazon in its fulfillment role under the FBA service.[8]

Amazon opposed the Commission's allegations.  Amazon explained that it is not subject to the Commission's remedial authority as a "distributor" for products sold by third parties through the FBA service because Amazon, in its fulfillment capacity, operates as a "third-party logistics provider" under the Act.  Even assuming that it could be subject to the Commission's remedial authority as a "distributor," Amazon showed that the notice and remedies sought by the Commission are not available under the CPSA, Commission precedent, or the Constitution, and that Amazon's prior actions were more than sufficient to remediate the safety hazard.

Two different administrative law judges issued separate initial orders (1) finding that Amazon is a distributor of the Subject Products and (2) ordering Amazon to undertake some (but not all) of the remedial actions sought by the Commission's enforcement staff.  AR380–408, 12027–86.  Amazon and the enforcement staff appealed these rulings to the Commission in 2023. *See* AR12101, 12380.

---

[8] Adler Statement, *supra* note 1.

D.    **The Commission Issues the Final Order.**

On January 16, 2025, the Commission issued the Final Order.  The Final Order incorporates the July Order's conclusion that Amazon is a distributor of the Subject Products because the third-party sellers "delivered their products to Amazon for the purposes of distribution to customers who ordered through Amazon.com."  AR17365, 17673–75.  Having concluded that the Act applies to Amazon in its fulfillment capacity, the Final Order requires additional remedial actions notwithstanding Amazon's prompt remedial actions several years prior.  The Final Order directs Amazon to, among other things, issue an additional round of direct email notices to purchasers and post public notice of the recalls on its website, using language prescribed by the Commission in each case. AR17723.  In addition, the Final Order requires Amazon to provide a duplicative set of refunds to consumers potentially totaling more than $21 million.  AR17724.

Amazon then requested that the Commission stay the Final Order pending judicial review. On February 28, 2025, the Commission granted Amazon's motion and stayed the Final Order pending resolution of the dispute in federal district court.  *See* AR17790.  Amazon filed the Complaint initiating this action on March 14, 2025.  ECF No. 1.

## LEGAL STANDARD

Amazon's claims arise under the APA, which provides that a reviewing court "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right," "in excess of statutory . . . authority," "without observance of procedure required by law," or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A)–(E).

"The standard set forth in Rule 56 of the Federal Rules of Civil Procedure governing summary judgment . . . does not apply [in APA actions] because of the limited role of a court reviewing the administrative record."  *Deese v. Esper*, 483 F. Supp. 3d 290, 304 (D. Md. 2020).

"Rather, summary judgment is the mechanism by which the court decides as a matter of law whether" the agency action complied with the standards established by the APA. *Id*.; *see also City of Columbus v. Cochran*, 523 F. Supp. 3d 731, 742–43 (D. Md. 2021).

## ARGUMENT

## I. The Commission's Classification of Amazon as a Distributor of the Subject Products Is Contrary to Law.

There is no dispute that Amazon is not a manufacturer or retailer of the Subject Products. Thus, the threshold question in this suit is whether Amazon qualifies as a distributor of products sold by third parties through the FBA service. The answer is "no."

The Commission lacked authority to issue the Final Order because Amazon operated as a "third-party logistics provider," rather than a distributor, of the Subject Products. Under 15 U.S.C. § 2064, the Commission has remedial authority over only "the manufacturer or any distributor or retailer of" a hazardous consumer product. *Id.* § 2064(c)(1), (d)(1). A "third-party logistics provider"—i.e., "a person who solely receives, holds, or otherwise transports a consumer product in the ordinary course of business but who does not take title to the product"—is not a distributor and thus is outside the Commission's remedial authority. *Id.* § 2052(a)(16), (b).[9] Because Amazon satisfies the statutory definition of a "third-party logistics provider" in its fulfillment role under the FBA service, the Commission erred in classifying Amazon as a distributor of the Subject Products. The Commission's contrary reasoning does not withstand scrutiny.

---

[9] Holding that Amazon is a third-party logistics provider would not disturb the Commission's authority regarding the manufacturers and retailers of the Subject Products, or regarding Amazon's sales of its own products (of which it serves as a manufacturer or retailer).

### A.     Amazon Is a Third-Party Logistics Provider, Not a Distributor, of the Subject Products.

The CPSA defines a "distributor" as "a person to whom a consumer product is delivered or sold for purposes of distribution in commerce."  15 U.S.C. § 2052(a)(8).  "Distribution in commerce" is in turn defined as "to sell in commerce, to introduce or deliver for introduction into commerce, or to hold for sale or distribution after introduction into commerce."  *Id*. § 2052(a)(7).  Amazon's activities regarding the Subject Products do not fall within that definition.[10]

*First*, Amazon did not "sell in commerce" the Subject Products because it never took title to those products, which are instead sold by third parties.  The Fourth Circuit recognized as much in a recent product liability case involving an FBA product.  *See Erie Ins. Co. v. Amazon.com, Inc.*, 925 F.3d 135, 141 (4th Cir. 2019).  In that case, the plaintiff sought to hold Amazon liable under Maryland product liability law as a "seller" of a headlamp sold by a third party, Dream Light, through the FBA service.  Although Amazon never took title to the headlamp, the plaintiff nonetheless alleged that Amazon had "so much control over the transaction that it effectively became the seller."  *Id.* at 140.

The Fourth Circuit disagreed.  The court recognized that a "sale" requires "the transfer of ownership of and the title to property from one person to another for a price."  *Id.* at 141 (quoting *Merriam-Webster's Collegiate Dictionary* 1129, 1097 (11th ed. 2007)).  Thus, parties "who do not take title to property during the course of a distribution but rather render services to facilitate that distribution or sale, are not sellers."  *Id*.  The Fourth Circuit accordingly held that Amazon, which

---

[10] The CPSA was enacted in 1972, decades before the rise of online marketplace services like Amazon's FBA service.  *See* Pub. L. 92–573, § 2, *codified at* 15 U.S.C. §§ 2051 *et seq.*; Sam Kandel, *To Expand, Make Use of Outsourcing*, Poughkeepsie J. (July 22, 2007) (discussing Amazon's entry into the market of the "many [third-party logistics] companies who warehouse, fill orders, track orders, accept returns and provide basic customer service functions").

does not take title to FBA products, is not a "seller" of FBA products within the term's ordinary meaning. *Id*. at 141–42.[11]  In so holding, the court further emphasized that, just like the third-party sellers at issue in this case, "Dream Light set the price for the sale of the product to purchasers, designed the product description for the website, paid Amazon for its fulfillment services, and ultimately received the purchase price paid by the purchaser.  In these circumstances, as Amazon explicitly posted on its site, Dream Light was the seller." *Id.* at 142.  For the same reasons, Amazon did not "sell in commerce" the Subject Products.

*Second*, as longstanding Commission guidance recognizes, "the phrase 'introduced into interstate commerce' was intended to mean 'the first shipment of an individual finished product in interstate commerce.'"  CPSC General Counsel Advisory Opinion No. 6 (July 6, 1973), https://perma.cc/X7U6-JUGR (last visited Aug. 20, 2025); *see also* CPSC General Counsel Advisory Opinion No. 8 (July 12, 1973), https://perma.cc/KS6J-JJ6M (last visited Aug. 20, 2025) (same).  Here, it is undisputed that the third-party sellers, not Amazon, first shipped the Subject Products (by sending them to Amazon's warehouses).

*Third*, holding a product for sale or distribution is expressly permitted without qualifying as a distributor when the terms of the third-party logistics provider definition are met.  Reading the definitions of "distribution in commerce" and "third-party logistics provider" together, the CPSA provides that a firm that "hold[s] [a product] for sale or distribution" is a distributor *unless* it "solely holds . . . [the] consumer product in the ordinary course of business but . . . does not take title to the product," in which case the firm is a third-party logistics provider.

---

[11] The Fourth Circuit distinguished third-party sellers' products from Amazon's own products, noting that, "[w]hile Amazon does in fact sell products that it owns on its website and thus would be considered a seller of *those* products, in this case it facilitated the sale for Dream Light under its fulfillment program." *Id.* at 142.  As noted above, Amazon does not dispute that the CPSC has authority to order Amazon to recall its own products.

15 U.S.C. § 2052(a)(7), (16). As discussed below, Amazon's fulfillment activities regarding the Subject Products fall within the "third-party logistics provider" definition.

In sum, Amazon is not a "distributor" of the Subject Products under the CPSA. Numerous courts have similarly concluded that Amazon is not a distributor under the common law of products sold by third parties on Amazon.com. *See Allstate N.J. Ins. Co. v. Amazon.com, Inc.*, No. CV172738, 2018 WL 3546197, at *8 (D.N.J. Jul. 24, 2018) (Amazon did not "exercise[] control over the product" to be "part of the chain of distribution," including because "Amazon never held title to the product"); *Amazon.com, Inc. v. McMillan*, 625 S.W.3d 101, 112 (Tex. 2021) (under the FBA service, "Amazon did not make the ultimate consumer sale because Amazon did not hold title to the" product and "was not 'engaged in the business of distributing or otherwise placing' the [product] into the stream of commerce"); *State Farm Fire & Cas. Co. v. Amazon.com, Inc.*, 528 F. Supp. 3d 686, 695 (W.D. Ky. 2021) (noting "Amazon's role for purposes of this matter was that of a marketplace"); *see also Zepik v. Tidewater Midwest, Inc.*, 856 F.2d 936, 942 (7th Cir. 1998) (analyzing CPSA in context of "conventional notions of causation . . . [at] common law" "in the absence of any indication that Congress intended to depart from" them); 49 Fed. Reg. 13820, 13825 (Apr. 6, 1984) (considering "the case law in the area of products liability" as relevant to CPSA defect determinations); *Amazon Servs. LLC v. U.S. Dep't of Agric.*, 109 F.4th 573, 578 (D.C. Cir. 2024) ("'We generally presume that such common-law terms "bring the old soil with them"'" when used in statutes." (quoting *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 484–85 (2023))).

Rather, Amazon is a third-party logistics provider with respect to the Subject Products. The CPSA defines a "third-party logistics provider" as "a person who solely receives, holds, or otherwise transports a consumer product in the ordinary course of business but who does not take title to the product." 15 U.S.C. § 2052(a)(16). The Act provides that a "common carrier, contract

carrier, third-party logistics provider, or freight forwarder shall not ... be deemed to be a manufacturer, distributor, or retailer of a consumer product solely by reason of receiving or transporting a consumer product in the ordinary course of its business as such a carrier or forwarder."  *Id*. § 2052(b).  Amazon's FBA service, which was established two years before Congress created the third-party logistics provider exception, falls within the Act's definition of an exempt third-party logistics provider.  It is undisputed that Amazon never owned or took title to the Subject Products.  *See* AR4, 335–36; 15 U.S.C. § 2052(a)(16).  Instead, as the Commission has acknowledged, Amazon received, held, and transported the Subject Products through the FBA service.  *See* AR17345–46 (observing that Amazon "receives, holds, or otherwise transports" the Subject Products).  That role causes Amazon to be a third-party logistics provider, and not a distributor subject to the Commission's mandatory recall authority.

The Commission contends that the exemption in § 2052(b) does not apply to Amazon, or any other similarly situated logistics provider, because the exemption only applies to businesses acting "as such a carrier or forwarder."  AR17374.  But that interpretation would nullify Congress's 2008 addition of "third-party logistics providers" to § 2052(b), which already contained exemptions for carriers and forwarders.  *See Ross v. Blake*, 578 U.S. 632, 641–42 (2016) ("When Congress amends legislation, courts must presume it intends the change to have real and substantial effect." (cleaned up)).  Equally unconvincing is the Commission's argument that § 2052(b) does not apply to Amazon because it refers only to "receiving or transporting," not "holding."  AR17375.  This reading, which suggests that companies can only receive and instantaneously ship products without keeping them in storage, would render the third-party logistics provider exception so narrow as to be meaningless.  *See Greenwich Fin. Servs. Distressed Mortg. Fund 3 LLC v.*

*Countrywide Fin. Corp.*, 603 F.3d 23, 32 (2d Cir. 2010) (rejecting an interpretation that would make a statutory exception "essentially meaningless").

>   **B.    The Act's Use of the Word "Solely" Does Not Support the Commission's Decision.**

The Commission nevertheless determined that Amazon is not a third-party logistics provider because it did not "solely" receive, hold, or transport the Subject Products. 15 U.S.C. § 2052(a)(16).  The Commission conceded that the term "solely" does not preclude a third-party logistics provider from performing activities that are "strictly ancillary to receiving, holding, or transporting products, such as taking inventory or checking on the contents of a damaged box."  AR17373.  But the Commission then cursorily concluded that "this is not a close case" because, in its view, Amazon "does considerably more than is allowed by the definition of 'third-party logistics provider.'"  AR17373–74.

The Commission's reading of "solely" is inconsistent with the statutory text and context.  "Solely" is appropriately construed by recognizing the third-party logistics provider exemption's "place in the overall statutory scheme."  *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)).  Congress fashioned the "third-party logistics provider" category as a carve-out from the broader "distributor" designation.  *See* CPSIA, Pub. L. No. 110-314, § 235(c), 122 Stat. 3016, 3074 (2008) (excluding the new category of "third-party logistics provider" from the definition of manufacturer, retailer, and distributor).  In this context, the term "solely" is most naturally read to exclude from the definition of third-party logistics providers only entities that engage in *distribution* activities other than receiving, holding, or transporting products (i.e., selling in commerce or introducing or delivering for introduction into commerce).  *See Davidson v. United Auto Credit Corp.*, 65 F.4th 124, 128–30 (4th Cir. 2023) (interpreting an exception within the

context of the provision). Indeed, it would make little sense if "solely" meant that engaging in activities beyond distribution would transform a third-party logistics provider into a distributor. If this were the case, no company could qualify as a third-party logistics provider because it could not engage in basic activities necessary to run its business (e.g., renting office space, running a website, hiring employees, billing, and other administrative paperwork).

Perhaps recognizing the impracticality of such a restrictive interpretation of "solely," the Commission seeks to amend the statute by adding an exception for activities that are "strictly ancillary to receiving, holding, or transporting products." AR17373. But an agency cannot "add words to the law to produce what is thought to be a desirable result. That is Congress's province." *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015); *see also Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014) ("[A]n agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate."). Moreover, because the extra-textual term "ancillary" is undefined, firms would be forced to speculate whether their activities qualify as "ancillary" and thus whether the Commission would classify them as third-party logistics providers or distributors. Indeed, the Commission does not even try to define the bounds of the term "ancillary" here, noting only that it "need not . . . quibble over the permissible scope of such ancillary services" because "this is not a close case." AR17373–74. The Commission's "ancillary" amendment would thus render the third-party logistics provider definition so unclear as to be unworkable. *See Molzof v. United States*, 502 U.S. 301, 309 (1992) (rejecting a statutory interpretation that "would be difficult and impractical to apply").

In contrast, reading the term "solely" to mean sole *distribution* activities is both a workable interpretation and one that aligns with the statutory text and context. Indeed, the statute's use of the coordinating conjunction "but" further illustrates Congress's intention to define "solely" as

sole distribution activities.  The term "but" contrasts the clauses in a sentence.  *But*, *Cambridge Dictionary*, https://dictionary.cambridge.org/us/dictionary/english/but (last visited Aug. 20, 2025) ("used to introduce an added statement, usually something that is different from what you have said before"); *Witherspoon v. Stonebreaker*, 30 F.4th 381, 394 (4th Cir. 2022) ("The word 'but,' means, 'on the contrary' or shows contrast."); *Newport News Shipbuilding & Dry Dock Co. v. United States*, 34 F.2d 100, 106 (4th Cir. 1929) (noting that the term "but" serves to "contrast the two obligations").  By using the term "but" to separate "solely receives, holds, or otherwise transports a consumer product in the ordinary course of business" from "who does not take title to the product," Congress highlighted the contrast between these two clauses.  *See Def. Integrated Sols. v. United States*, 165 Fed. Cl. 352, 377 (2023) ("The word 'but' implies a contrast or exception."); *In re Collom & Carney Clinic Ass'n*, 62 S.W.3d 924, 927 (Tex. App. 2001) (applying this principle to a similarly worded statute).  And the clauses each describe activities related to distribution: receiving, holding, and transporting on the one hand, and taking title (which can transform an entity into a seller) on the other.  By contrasting two clauses describing distribution-related activities with the word "but," Congress reinforced that "solely," read in context, means sole distribution activities.

Because receiving, holding, and transporting are the sole distribution activities in which Amazon engages as part of the FBA service—i.e., it does not "sell in commerce" or "introduce or deliver for introduction into commerce," as explained above—Amazon falls within the third-party logistics provider definition.

## C.    The Commission Erred in Focusing on Activities Beyond Distribution.

In nevertheless finding Amazon to be a distributor, the Commission focused on Amazon's (1) separate operation of Amazon.com, on which consumers can buy products; (2) administration of a fair pricing policy and ability to delist products from its website that violate FBA policies;

(3) provision of "live customer support" to consumers who purchase products, and (4) processing of payments and product returns.  AR17371–73.  But these activities are not distribution activities as defined by the CPSA.

Activities such as operating a marketplace, governing the use of that marketplace with certain policies, providing customer support, and processing payments do not introduce products into commerce or give Amazon title to the products, and thus are not distribution activities.  *See, e.g.*, *Eberhart v. Amazon.com, Inc.*, 325 F. Supp. 3d 393, 399 (S.D.N.Y. 2018) (finding that Amazon is "not a distributor, [but] is better characterized as a provider of services," including "(1) maintaining an online marketplace, (2) warehousing and shipping goods, and (3) processing payments").  Moreover, processing product returns is the opposite of selling or introducing those products into commerce; rather, it is a quintessential logistics activity that, even under the Commission's own modified version of the statute, is ancillary to receiving, holding, and transporting.  Indeed, Complaint Counsel conceded that a party could "deal with recalls and take possession of products and destroy them" and still qualify as a third-party logistics provider.  AR17883.  At bottom, "[a]lthough Amazon's services were extensive in facilitating the sale, they are no more meaningful to the analysis than are the services provided by UPS Ground."  *Erie*, 925 F.3d at 142.

Viewed, as it must be, under the text and structure of the CPSA, the Commission's classification of Amazon as a distributor of the Subject Products is not in accordance with law.

## II.  The Final Order's Requirement that Amazon Issue Additional Notifications to Purchasers Violates the CPSA, the APA, and the First Amendment.

Even if Amazon did qualify as a distributor of the Subject Products, the Final Order would still need to be set aside because its notice requirements are unlawful.  Amazon sent two separate safety notifications to every purchaser of the Subject Products, using language that the

Commission has repeatedly approved in other proceedings.  Given that proactive measure and the absence of evidence showing the necessity of additional notifications (many years after the purchases), the Commission erred by ordering Amazon to transmit yet another round of notices.

### A.    The Ordered Notice Is Arbitrary, Capricious, and Not in Accordance with Law.

The CPSA requires the Commission to satisfy two requirements before ordering notice. *First*, the Commission must determine that a particular notice is "required in order to adequately protect the public."  15 U.S.C. § 2064(c)(1).  *Second*, even if the Commission determines that notice is required, it must consider whether certain default components of the notice enumerated in the statute are "unnecessary or inappropriate under the circumstances."  *Id.* § 2064(i)(2).[12]

The Commission failed to satisfy either requirement.  Additional notice is not required to "adequately protect the public" because Amazon already issued two forms of direct notice to every purchaser of the Subject Products.  Indeed, Commission regulations recognize that direct notice is "the most effective form of a recall notice," 16 C.F.R. § 1115.26(a)(4), as compared to notices transmitted by newspaper or broadcast means that reach only a portion of their intended audiences, 74 Fed. Reg. 11883, 11884 (Mar. 20, 2009) ("[M]ost recall notices are disseminated to broad or, on occasion, partially-targeted audiences.").  Amazon sent these notices directly to all purchasers of the products via email and the Amazon Message Center, and the notices satisfied the Commission's guidelines in every relevant respect:  the notices "effectively help[ed]" the purchasers (1) identify the subject product; (2) understand the potential hazard; and (3) understand the available remedies.  16 C.F.R. § 1115.23(b).  Amazon's direct notices identified the customer's order identification number, the product name, and the product's Amazon Standard Identification

---

[12] This includes, e.g., a description of the hazard and injuries or deaths associated with the product.

Number ("ASIN")[13]—a level of detail absent from most Commission-approved notices.[14]  They included attention-grabbing language—"Important Safety Notice"—in the subject line, and identified the potential hazards associated with each Subject Product.  *See, e.g.*, AR10165, 10184, 10195–96, 10206–07, 10217.  And the email notices contained a link to a page where purchasers could verify that their account had been credited.  *See, e.g.*, AR2534–37.

The Commission nonetheless concluded that a new round of notice is necessary to inform secondhand purchasers of the Subject Products.  AR17713.  But the Final Order does not cite any evidence that these secondhand purchasers exist.  Nor is there any record evidence that the Subject Products, which were last sold in 2020 and 2021, remain in use.  Notice cannot be "required" to protect the public against such theoretical risks.  *Cf. Nat. Res. Def. Council, Inc. v. EPA*, 859 F.2d 156, 210 (D.C. Cir. 1988) ("[M]ere speculation" does not constitute "adequate grounds upon which to sustain an agency's action.").  The Final Order's notice requirement was thus arbitrary, capricious, and not in accordance with law.

That Amazon's direct notices did not contain the precise wording now belatedly preferred by the Commission does not demonstrate that Amazon's notice was insufficient under the Act.[15]

---

[13] *See* AR10165–67, 10184–85, 10196–97, 10207–08, 10218–19, 10259–60.

[14] *See, e.g.*, AR11889–90 (discussing *Children's Sleepwear Recalled Due to Violation of Federal Flammability Standards and Burn Hazard; Imported by Kids Tales; Sold Exclusively at Amazon.com*, CPSC Recall No. 22-177 (June 30, 2022), https://www.cpsc.gov/Recalls/2022/Childrens-Sleepwear-Recalled-Due-to-Violation-of-Federal-Flammability-Standards-and-Burn-Hazard-Imported-by-Kids-Tales-Sold-Exclusively-at-Amazon-com (last visited Aug. 20, 2025); *Zen Magnets and Neoballs Magnets Recalled Due to Ingestion Hazard*, CPSC Recall No. 21-179 (Aug. 17, 2021), https://www.cpsc.gov/Recalls/2021/Zen-Magnets-and-Neoballs-Magnets-Recalled-Due-to-Ingestion-Hazard (last visited Aug. 20, 2025)).

[15] For instance, the Commission insists that the notifications regarding the Subject Product hair dryers must use the term "lack" instead of "may lack" and that notifications for all Subject Products must contain references to "death."  AR17673; *see also* AR17725–65 (showing Commission's track changes to Amazon's proposed notices).

While the CPSA requires the Commission to consider whether each component of the notice is appropriate under the circumstances—i.e., whether certain components are "unnecessary or inappropriate," 15 U.S.C. § 2064(i)(2)—the Commission neglected that analysis here, *see Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency action is arbitrary and capricious if the agency "failed to consider an important aspect of the problem"). Viewed in context, Amazon's prior notices sufficiently informed the public of the products, hazards, and remedies, thus rendering "unnecessary" and "inappropriate" the additional notice mandated by the Commission. Indeed, Amazon's prior notices mirrored notices previously issued or approved by the Commission, including as recently as January 2025, in recalls of similar products in similar circumstances. *See Cozchique Tebbis, and Beeziac Girls Pajamas Recalled Due to Burn Hazard; Violation of Federal Flammability Regulations; Sold Exclusively on Amazon by Tupop,* CPSC (Jan. 30, 2025) [hereinafter Jan. 2025 Sleepwear Recall Notice], https://perma.cc/N97M-PRW2 (last visited Aug. 20, 2025); *see also* AR1739–40, 4220–24, 4225–30. While the Commission contends that its prior use of "alternative language in other, non-mandatory contexts" was "of no consequence" here, AR17688, such "cursory analysis of material record evidence [is] insufficient as a matter of law," *Env't Health Tr. v. FCC*, 9 F.4th 893, 914 (D.C. Cir. 2021).

The Commission's failure to grapple with these prior recall notices is itself a ground to set aside the Final Order. One of the APA's most "basic procedural requirement[s]" is that an agency must give "adequate reasons for its decisions." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). That principle "appl[ies] with equal force to a change in agency position." *Casa De Md. v. DHS*, 924 F.3d 684, 703 (4th Cir. 2019). Thus, when an agency departs from its past practice, it "must at a minimum acknowledge the change" and "offer a reasoned explanation for

24

it." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017); *see also Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1089–90 (D.C. Cir. 2009).

The Commission violated that rule here by failing to justify the inconsistencies between the notices mandated by the Final Order and other notices regarding similar products that the Commission has issued.  For example, the Commission issued "Product Safety Warnings" in 2024 regarding certain children's sleepwear and carbon monoxide detectors that posed similar hazards as the Subject Products.  *See* AR17652–66.  The language used in those warnings was comparable to the language Amazon used in its prior messages to purchasers of the Subject Products. *See* AR17653–54, 2534–37.  For instance, the 2024 Product Safety Warning regarding a children's sleepwear product stated that the product "can catch fire, posing a risk of burn injuries to children. The children's robes fail to comply with federal safety regulations for children's sleepwear." AR17661–65.  Amazon's prior notification used similar language, stating that the children's sleepwear Subject Products "failed to meet the federal safety standard for the flammability of children's sleepwear, posing a risk of burn injuries to children." AR2535.  And yet the Final Order concludes that Amazon's prior notices were inadequate and directs Amazon to issue new notices with different language—without explaining why the language used by the Commission in its *own* notices, regarding similarly situated products, is inadequate.  That "unexplained inconsistency" is arbitrary and capricious.  *Encino Motorcars*, 579 U.S. at 221.

The Commission's insistence on including references to death in the notices regarding the Subject Products also conflicts with language used in other Commission-approved notices. *See* AR17688–89.  A recall notice regarding children's sleepwear products sold on Amazon.com— issued just two weeks after the Final Order—stated that the products "violate federal flammability regulations for children's sleepwear, posing a risk of burn injuries to children."   Jan. 2025

Sleepwear Recall Notice, *supra*. Amazon's prior notices similarly stated that the sleepwear "failed to meet the federal safety standard for the flammability of children's sleepwear, posing a risk of burn injuries to children." AR2535. Like Amazon's prior safety notification, the Commission's recent recall notice did not reference a risk of death. Nor did the Commission require references to the risk of death in several other recent recall notices as to similar products.[16] The Commission has not identified—and Amazon is not aware of—a single instance of injury or death related to the hazards of the Subject Products. Yet the Final Order requires Amazon to include the word "death" in its notices. *See* AR17688–89. The APA does not permit such an "unexplained inconsistency" in agency practice. *Encino Motorcars*, 579 U.S. at 221; *see Jimenez-Cedillo v. Sessions*, 885 F.3d 292, 297–98 (4th Cir. 2018).

The Commission's arguments to the contrary fall short. According to the Final Order, some of the prior notices cited above were issued as part of a "voluntary give-and-take between CPSC staff and individual firms, without litigation," rather than in a mandatory recall. AR17388 n.34. This argument is inapplicable as to the Commission's *own* unilateral Product Safety Warnings described above. But even as to the notices issued as part of a voluntary recall, the Final Order provides no reasoned explanation why notice language that was adequate to protect the public from substantially similar hazards in a voluntary recall context is somehow inadequate in the mandatory recall context. The Commission cannot justify the inconsistency in its approach to recall notices

---

[16] *See, e.g.*, *Children's Pajama Sets Recalled Due to Burn Hazard and Violation of Federal Flammability Standards; Sold Exclusively on Temu.com by JUVENNO KIDS*, CPSC Recall No. 24-301 (July 11, 2024), https://www.cpsc.gov/Recalls/2024/Childrens-Pajama-Sets-Recalled-Due-to-Burn-Hazard-and-Violation-of-Federal-Flammability-Standards-Sold-Exclusively-on-Temu-com-by-JUVENNO-KIDS (last visited Aug. 20, 2025); *Forever 21 Recalls Children's Pajamas Due to Burn Hazard; Violation of Federal Flammability Regulations; Sold Exclusively by Forever 21*, CPSC Recall No. 25-158 (Feb. 27, 2025), https://www.cpsc.gov/Recalls/2025/Forever-21-Recalls-Childrens-Pajamas-Due-to-Burn-Hazard-Violation-of-Federal-Flammability-Regulations-Sold-Exclusively-by-Forever-21 (last visited Aug. 20, 2025).

based on the existence of litigation alone. *See Dillmon*, 588 F.3d at 1089–90 (requiring an agency

to "provide an *adequate* explanation for its departure from established precedent" (emphasis

added)). As the Commission has acknowledged, "whether a product hazard is addressed in the

context of a mandatory recall or a voluntary recall, the need to inform and encourage affected

consumers to act is similar." 78 Fed. Reg. 69793, 69794 (Nov. 21, 2013). The Commission

contravened the APA by failing to explain why it seeks to impose different notice obligations

regarding similar products that present similar hazards. *See Burlington N. & Santa Fe. Ry. Co. v.*

*STB*, 403 F.3d 771, 777 (D.C. Cir. 2005) ("Where an agency applies different standards to similarly

situated entities and fails to support this disparate treatment with a reasoned explanation and

substantial evidence in the record, its action is arbitrary and capricious and cannot be upheld.").

### B.      The Notice Directed by the Commission Violates the First Amendment.

The Final Order's notice requirements also violate the First Amendment. Promptly after

the Commission informed Amazon of the safety hazards presented by the Subject Products,

Amazon sent notice of the hazards to every single purchaser through two separate channels. Those

notices went out over three years ago. AR10164, 10176, 10183, 10195-96, 10206-07, 10217; *see*

*also* AR2534–37. The Final Order nevertheless requires Amazon to send additional direct notices

to these customers and serve as a mouthpiece for the Commission's desired message by posting

additional public notices on Amazon.com. Even more intrusively, the Final Order dictates nearly

every word for each form of notice, requiring Amazon to use language with which the company

disagrees. *See* AR17725–65.[17] The Commission's directives conflict with the First Amendment

under the "demanding" test prescribed by *Central Hudson*, 447 U.S. at 566. *See Int'l Dairy Foods*

---

[17] Although Amazon offered its own notice language in its Proposed Notification and Action Plan, as directed by the July Order, Amazon submitted that Plan under protest and objects to the requirement that it issue any additional notice. AR17431–32.

*Ass'n v. Amestoy*, 92 F.3d 67, 72–73 (2d Cir. 1996) (applying *Central Hudson* to compelled commercial speech).

*Central Hudson* requires the Commission to show (1) that its notice mandate would "directly advance" a substantial government interest and (2) that the mandate is "not more extensive than is necessary to serve that interest." 447 U.S. at 564, 566. In other words, the Commission bears the burden of demonstrating a sufficient "fit" between the "ends and the means chosen to accomplish those ends." *United States v. Edge Broad. Co.*, 509 U.S. 418, 427–28 (1993) (citation and quotation marks omitted). To carry that burden, the Commission cannot rely on "mere speculation or conjecture"; it must offer evidence "demonstrat[ing] that the harms it recites are real and that its [order] will in fact alleviate them to a material degree." *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 188 (1999) (quoting *Edenfield v. Fane*, 507 U.S. 761, 770 (1993)). The Commission has failed both steps of the *Central Hudson* test.

*First*, the Final Order offers no evidence to suggest that *any* additional notice—much less notice whose specific content and form is dictated by the Commission—would "directly advance" the Commission's interest in promoting public safety. To the contrary, Amazon's prior notifications adequately informed every purchaser of the Subject Products of the relevant safety hazards and instructed purchasers to inform any secondary users of the hazards. Amazon sent these direct notices through two channels—email and the Amazon Message Center—and they contained detailed information about the steps consumers should take to avoid the hazards flagged by the Commission. *See supra* at 22–23. Amazon's notices thus served the same purpose as the notices typically ordered by the Commission—but went out to consumers immediately, rather than after a lengthy mandatory recall proceeding. It has now been more than four years since any of the Subject Products were sold on Amazon.com. Consumers would not benefit from, and indeed

28

might be confused or frustrated by, redundant additional notices issued years after they were initially told to dispose of the product.  AR3447.

The Commission speculates that a new round of notices is necessary to inform secondhand purchasers of the Subject Products.  AR17713.  But as noted above, the Final Order points to no record evidence that these secondhand purchasers exist or that the Subject Products remain in use. The Commission must "do more than simply posit the existence of" harms to these consumers to "defend" the Final Order's "regulation of speech."  *PSINet, Inc. v. Chapman*, 362 F.3d 227, 238 (4th Cir. 2004) (cleaned up).

Courts have rejected agency attempts to compel speech based on similarly threadbare evidentiary records.  *See, e.g.*, *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 526–27 (D.C. Cir. 2015) (SEC disclosure requirement unconstitutional where the agency "was unable to quantify any benefits of the forced disclosure" or show how the compelled speech would alleviate alleged harms "to a material degree" (quotation marks omitted)); *Nat'l Ass'n of Wheat Growers v. Becerra*, 468 F. Supp. 3d 1247, 1264 (E.D. Cal. 2020) (compelled warning unconstitutional where government lacked evidence that chemical caused cancer).  Any purported necessity here is equally speculative. And, in practice, the Commission took several years to issue the Final Order.  At this late stage, after two previous notices to purchasers, the additional notices mandated by the Final Order would at most have the type of "indiscernible or *de minimis*" effect courts have held insufficient to justify compelled commercial speech.  *Safelite Grp., Inc. v. Jepsen*, 764 F.3d 258, 265 (2d Cir. 2014).

Nor could the Commission justify its notice mandate on the ground that Amazon's original notices to customers were insufficient.  As Amazon demonstrated, its prior notices mirror those previously approved by the Commission in recalls of similar products posing similar hazards. *See supra* at 24–26.  The Commission dismissed this point by arguing that its prior use of

"alternative language in other, non-mandatory contexts" was "of no consequence" here.  AR17688.

That conclusory assertion fails because it is impermissible under *Central Hudson* to treat similar

speech differently.  The Commission has provided "no . . . convincing basis" for treating Amazon's

speech differently from the "variety of" Commission-sanctioned notices regarding products "that

pose[d] the same risks the [Commission] purport[ed] to fear" in this proceeding.  *Greater New

Orleans Broad. Ass'n*, 527 U.S. at 195; *see Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d

1061, 1075 (10th Cir. 2001) (enjoining a law restricting advertising for some forms of alcohol but

not others because the state failed to establish that different forms of alcohol posed different risks).

    *Second*, the Final Order fails to demonstrate that available "less restrictive means would

fail" to advance public safety.  *United States v. Philip Morris USA, Inc.*, 855 F.3d 321, 327 (D.C.

Cir. 2017); *see also Cent. Hudson*, 447 U.S. at 564 (speech requirements must not be more

extensive than necessary).  For example, the Commission could use its own website to notify the

public of the potential hazards posed by the Subject Products.  *See NIFLA v. Becerra*, 585 U.S.

755, 775 (2018) (finding that the state was required to consider whether it could have achieved its

interest itself, such as through its own public information campaign, before "co-opt[ing]" private

speech).  Indeed, the Final Order contemplates that the Commission will publish such "recall

releases" on its website.  AR17680.  But the Final Order does not show that such notice would fail

to adequately inform the public, as it must to justify commandeering Amazon's speech on

Amazon's own website.  *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1283 (9th Cir.

2023).  Nor has the Commission established that the level of control it seeks to exercise over

Amazon's speech is necessary.  As noted above, the language in Amazon's prior notices—which

accurately described the product hazards, explained the role of third-party sellers, noted that no

known incidents had occurred for certain products, and stated that the customer had already

received a refund—mirrors prior Commission-approved notices and would be a sufficient, less restrictive alternative to advance the Commission's interest.  *See* AR17725–65 (showing Commission's track changes to Amazon's proposed notices).  Even if it were permissible for the Commission to order some additional notices, the Commission has failed to demonstrate a sufficient fit between its notice order and its asserted interest here.

The Final Order attempts to sidestep these First Amendment violations by contending that the relaxed standard outlined in *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985), applies here because "the Commission is not suppressing Amazon's speech, but rather is requiring Amazon to make certain disclosures."  AR17706.  But *Zauderer* does not immunize all compelled disclosures; instead, it recognizes that "compulsion to speak may be as violative of the First Amendment as prohibitions on speech."  471 U.S. at 650.  Moreover, *Zauderer*'s standard applies only where a speaker's "constitutionally protected interest in *not* providing any particular factual information *in his advertising* is minimal."  *Id.* at 651 (second emphasis added); *see also United States v. United Foods, Inc.*, 533 U.S. 405, 416 (2001) (finding *Zauderer* inapplicable in a case involving compelled commercial speech because the speech did not involve "voluntary advertising").

In other words, *Zauderer*'s reach is limited to compelled disclosures in "advertising or product labeling at the point of sale."  *Nat'l Ass'n of Mfrs.*, 800 F.3d at 521–22.  Despite the Commission's contention to the contrary, AR17707, every case cited in the Final Order as applying *Zauderer* involved point-of-sale advertising or product disclosures, *see Md. Shall Issue, Inc. v. Anne Arundel Count*, 91 F.4th 238, 248 (4th Cir. 2024) (warnings by gun retailers about safe storage and suicide prevention to purchasers "at the point of sale"); *CTIA – The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 838 (9th Cir. 2019) (cell phone retailers informing purchasers

about federal radio-frequency exposure guidelines); *Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 20–21 (D.C. Cir. 2014) (en banc) (labeling meat products' country of origin); *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104 (2d Cir. 2001) (labeling mercury-containing products as such and informing consumers about proper disposal). That is not the case here. The Final Order does not mandate advertising or product disclosures at the point of sale; it dictates communications from Amazon to its customers about products that were last sold *over four years ago* and about which Amazon has already communicated the relevant hazards through its own clear and effective notices. *Central Hudson* applies to these duplicative notices.

The Commission asserts that "there is no principled reason to treat mandatory disclosures at the time of a product's sale differently from similar disclosures later in the product's life." AR17707. But there is a meaningful difference between requiring safety disclosures at the point of sale and mandating such speech to customers years after the sale has occurred. The First Amendment burden of compelled speech is lower at the point of sale because at this stage of the transaction, where there is ongoing communication between the seller and purchaser, the seller can contextualize safety disclosures with other information about the product. Moreover, customers are accustomed to receiving information about a product, including safety disclosures, at the point of sale, and weighing this information in deciding whether to buy the product in the first instance. By contrast, duplicative and belated safety notices made years after the sale do not provide the same value. Rather, such unexpected notices are more likely to confuse customers and to negatively color their view of both the product and the company. AR3447. Further, the notices compelled here are not limited to communications with customers: Amazon has been ordered to communicate the Commission's words to the entire world via a public post on its website. These compelled statements thus impose far more than a "minimal" burden on the speaker, as compared

32

to the type of routine point-of-sale advertising or product disclosures discussed in *Zauderer*. 471 U.S. at 651.

### III.   The Final Order Imposes Remedies That Exceed the Commission's Authority.

In its eagerness to take "a huge step forward" to regulate online marketplaces,[18] the Commission overstepped its remedial authority by ordering Amazon to issue a *second* refund to purchasers of the Subject Products conditioned on the destruction of the products. Amazon refunded the purchasers of the Subject Products in full—more than $21 million in total—more than three years ago. For that reason, the first administrative law judge concluded that "Amazon can't be ordered to issue refunds." AR400. Nevertheless, the Commission ordered Amazon to issue a second round of refunds for those same products, and to condition the refunds on proof of destruction or disposal of the Subject Products. AR174410–11, 17724. Because the Commission lacks authority to issue such an order, it must be set aside under the APA. *See* 5 U.S.C. § 706(2)(C).

### A.   The Commission May Not Order Multiple Refunds for the Same Product.

The Commission's directive to issue multiple refunds for the same product is contrary to the plain language of the CPSA.

The Act limits the Commission's refund authority to, at most, "the purchase price of such product." 15 U.S.C. § 2064(d)(1)(C). Under the plain text of the statute, the Commission may not order a firm to issue a full refund multiple times for the same unit of a product—i.e., more than "the purchase price." Indeed, the Act only contemplates a *downward* adjustment of the refund for used products, not an *upward* adjustment above the purchase price. *See id*. (allowing a refund "less a reasonable allowance for use"). Once a full purchase price refund has been issued for a

---

[18] *CPSC Sues Amazon*, *supra* note 2.

product—a step Amazon has already taken—the Commission cannot order further refunds.[19]  *See FEC v. Cruz*, 142 S. Ct. 1638, 1649 (2022) ("[A]n agency, after all, 'literally has no power to act'— including under its regulations—unless and until Congress authorizes it to do so by statute." (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 374 (1986))); *Plaskett v. Wormuth*, 18 F.4th 1072, 1087 (9th Cir. 2021) (Because an agency "possesses no . . . inherent equitable power," it "has no powers except those specifically conferred upon it by statute.").

For its part, the Commission concluded that Amazon's prior refunds do not count as "refunds" for the purposes of § 2064(d)(1)(C) because they were "voluntary."  AR17716, 17352 n.15.  That reading cannot square with the statute, or with common sense.

First, the Commission's interpretation—which is not entitled to any deference, *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392, 412 (2024)—conflicts with the statutory text.  The ordinary meaning of the term "refund" is to "reimburse or repay."  *Refund*, *Oxford English Dictionary* (3d ed. 2009).  Here, there is nothing left to "reimburse" or "repay": the full purchase price has already been reimbursed.  Congress would not have used the term "refund" if it intended to authorize the Commission to order payments beyond reimbursement of the purchase price.

Moreover, the term "refund" must be read in context.  *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995) (applying principle "that a word is known by the company it keeps (the doctrine of noscitur a sociis) . . . to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress" (quotations marks omitted)).  Each of the statutory remedies outlined in § 2064(d)(1)—"repair the

---

[19] The Commission suggests that there are "consumers who were not initial purchasers and who received nothing."  AR17716.  Even if the Commission had authority to order multiple refunds for the same product, the Final Order does not show that any secondhand purchasers exist or limit its refund mandate to such purchasers.

defect," "replace such product," and "refund the purchase price"—can be performed only once. Just as it would be nonsensical for the Commission to order a firm to "repair" or "replace" a product that it has already repaired or replaced, it would be illogical for the Commission to order a firm to "refund" a customer who has already received a refund.

Nor are duplicative refunds "in the public interest." *Id.* Indeed, if the CPSA were construed to permit the Commission to order duplicative refunds, firms would be deterred from remedying product safety concerns promptly and voluntarily (as Amazon did here) due to the risk of paying twice. In other words, under the Commission's approach consumers will have to wait until a recall proceeding is fully adjudicated—a process that often takes years—to receive a refund. The Commission's interpretation thus undermines the CPSA's purpose. *See Util. Air Regul. Grp.* 573 U.S. at 321 (rejecting an "agency interpretation that is inconsistent with the design and structure of the statute as a whole" (cleaned up)).

The Commission nonetheless contends that additional refunds are in the public interest because Amazon's prior refunds failed to incentivize customers to destroy or return the products. AR17716. But nowhere does the CPSA suggest that refunds must incentivize product return or destruction; indeed, as explained below, the Commission lacks authority to mandate product destruction. The Commission "has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms," and thus cannot read into the statute a requirement that reimbursements incentivize product destruction. *Util. Air Regul. Grp.*, 573 U.S. at 325.

**B.    The Commission Lacks Authority to Order Destruction of the Subject Products.**

The CPSA does not authorize the Commission to make a refund contingent on proof of destruction. The Commission's remedial authority is limited to ordering companies to undertake "one or more of the following actions": "repair the defect" in a product, "replace" the product

"with a like or equivalent product," or "refund the purchase price" of the product. 15 U.S.C. § 2064(d)(1).  It is well established that the statutory phrase "one or more of the following actions" authorizes only the enumerated actions.  *See, e.g.*, *Akhtar v. Burzynski*, 384 F.3d 1193, 1199 (9th Cir. 2004); *Peck v. Dep't of Lab., Admin. Rev. Bd.*, 996 F.3d 224, 232 (4th Cir. 2021), *as amended* (June 21, 2021) (applying *expressio unius* canon).  Thus, anything beyond the three enumerated remedies is beyond the scope of the Commission's delegated powers.[20]

Because the statute does not state that the Commission may condition refunds on product destruction (or otherwise require product destruction), the Commission lacks authority to impose that requirement here.  The statutory context reinforces that conclusion:  Although § 2064(d) omits any mention of product destruction, Congress has expressly provided for destruction of products in other statutes, including in other parts of the CPSA.  *See, e.g.*, 15 U.S.C. § 2066(e) ("Products refused admission into the customs territory of the United States shall be destroyed"); *id.* § 2088(a).  The absence of any reference to product destruction in § 2064 confirms the absence of Commission authority.  *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (cleaned up)).

The Commission suggests that 15 U.S.C. § 2064(i)(2)(H), which states that a recall notice should provide a "description" of "any action a consumer must take to obtain a remedy," grants it authority to mandate product destruction.  AR17395.  But that provision clarifies that the "action"

---

[20] Companies and the Commission at times agree to include product returns or destruction as part of *voluntary* recalls, but it does not follow that the Commission has authority to *order* such returns or destruction.  *Cf. Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 389 (1992) (parties may agree to a settlement that does "more than what a court would have ordered absent a settlement").

contemplated by Congress is clerical in nature, i.e., contacting the firm to obtain the refund.  *See* 15 U.S.C. § 2064(i)(2)(H) (firm must provide "information a consumer needs in order to obtain a remedy or information about a remedy, such as mailing addresses, telephone numbers, fax numbers, and email addresses.").  It would be nonsensical if this clerical provision, which covers the content of recall notices, allowed the Commission to circumvent the remedial limits of § 2064(d)(1) and order any conceivable "action" as long as it is a condition for a refund.  Taking the Commission's position to its logical conclusion, the Commission could require consumers not only to destroy the products, but also to do so in public, thereby damaging the reputation of the sellers.

Even if the Commission had statutory authority to mandate product destruction, the Commission has failed to establish that conditioning refunds on product destruction is in the "public interest."  *Id.* § 2064(d)(1).  The Commission contends that product destruction will prevent the Subject Products from being gifted or resold on secondary marketplaces.  AR17716–17.  But the Commission has provided no evidence that any secondary market exists for the Subject Products and "mere speculation" does not constitute "adequate grounds upon which to sustain an agency's action."  *Nat. Res. Def. Council*, 859 F.2d at 210.

## IV.    The Commission's Structure Is Unconstitutional.

### A.    The Commissioners' For-Cause Removal Protections Violate the Constitutional Separation of Powers.

The Final Order also should be vacated because the Commission's structure violates the constitutional separation of powers by impermissibly intruding on the President's removal power.  Under the CPSA, Commissioners "may be removed . . . for neglect of duty or malfeasance in office but for no other cause."  15 U.S.C. § 2053(a).  Such restrictions on the President's removal authority are presumptively unconstitutional, and the CPSA's provision does not fit into any of the

narrow exceptions to the constitutional presumption of unfettered presidential removal authority.

Article II provides the President with "general administrative control of those executing the laws, including the power of appointment *and removal* of executive officers." *Myers v. United States*, 272 U.S. 52, 163–64 (1926) (emphasis added); *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492 (2010). Plenary presidential removal power is thus the default rule. In *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), the Supreme Court recognized a narrow exception to that default rule for members of "a multimember body of experts, balanced along partisan lines, that perform[s] legislative and judicial functions and [is] said *not to exercise any executive power*." *Seila L. LLC v. CFPB*, 140 S. Ct. 2183, 2199 (2020) (emphasis added). At issue in *Humphrey's Executor* was the Federal Trade Commission, which the Supreme Court described at the time as "an agency of the legislative or judicial departments of the government." 295 U.S. at 628.

The Commission does not fall within the *Humphrey's Executor* exception because it is no mere appendage of Congress or the federal courts. Unlike the FTC in 1935, the Commission exercises substantial executive authority in carrying out its functions. Among other things*,* the Commission may initiate civil and criminal enforcement actions in district court and seek broad injunctive relief. *See* 15 U.S.C. § 2076(b)(7)(A) (civil actions); *id*. § 2076(b)(7)(B) (criminal actions); *id*. § 2069 (civil penalties); *id*. § 2070 (criminal penalties); *id*. §§ 2061, 2071 (injunctive relief). The Commission also may issue subpoenas and conduct inspections and investigations of regulated entities. *See* 15 U.S.C. §§ 1270, 2065, 2076(b)(3); *see also id.* § 2076(b)(9) (Commission may "delegate to the general counsel of the Commission the authority to issue subpoenas solely to Federal, State, or local government agencies for evidence").

Recent Supreme Court rulings reinforce that conclusion. *See Seila L.*, 140 S. Ct.

at 2199–200 (describing the *Humphrey's Executor* exception as involving "multimember expert agencies *that do not wield substantial executive power*" (emphasis added)). Indeed, the Supreme Court recently stayed a court order enjoining the President's removal of three CPSC Commissioners. *Boyle*, 145 S. Ct. at 2654. In so doing, the Court stated that its decision was "squarely controlled" by *Trump v. Wilcox*, 145 S. Ct. 1415 (2025), in which the Court stayed an order enjoining the removal of Commissioners of two other multimember agencies, the National Labor Relations Board ("NLRB") and Merit Systems Protection Board ("MSPB"). The *Wilcox* stay "reflect[ed]" the Court's "judgment that the Government is likely to show that both the NLRB and MSPB exercise considerable executive power." *Id.* at 1415. The Court concluded in *Boyle* that "the Consumer Product Safety Commission exercises executive power in a similar manner as the National Labor Relations Board, and the case does not otherwise differ from *Wilcox* in any pertinent respect." *Boyle*, 145 S. Ct. at 2654.

Accordingly, the CPSA's provisions restricting Commissioner removal to "neglect of duty or malfeasance in office," 15 U.S.C. § 2053(a), are unconstitutional. The government agrees. *See* Opposition to Plaintiffs' Motion for a Temporary Restraining Order at 2, *Boyle v. Trump*, No. 25-cv-1628 (D. Md. May 26, 2025) ("[T]he Commissioners' statutory removal protections are unconstitutional.").

The Court should vacate the Final Order because that constitutional violation distorted the Commission's proceedings in multiple ways. When, as here, a statute unconstitutionally insulates agency officials from presidential removal, a party to proceedings before the agency may obtain relief if there is "some nexus" or "connect[ion]" between the removal restriction and harm to the party. *Bhatti v. Fed. Hous. Fin. Agency*, 97 F.4th 556, 561 (8th Cir. 2024); *see also Collins v. Yellen*, 594 U.S. 220, 259–60 (2021). Relief is warranted when there is "reason to believe that the

unconstitutional removal provision itself inflicted harm," which could include an indication that the President "attempted or desired to" change agency leadership. *K & R Contractors, LLC v. Keene*, 86 F.4th 135, 149 (4th Cir. 2023).

There is such a nexus here. Mere weeks into President Trump's second term, the Department of Justice announced the executive's new position that "certain for-cause removal provisions that apply to members of multi-member regulatory commissions are unconstitutional." Letter from Sarah H. Harris, Acting Solic. Gen., DOJ, to Richard J. Durbin, Ranking Member, Comm. on the Judiciary, U.S. Senate (Feb. 12, 2025). The Department's letter listed the Commission as one of three agencies subject to unconstitutional removal restrictions. *See id.* And just three months later, the President removed three of the five Commissioners who voted for the Final Order. *See Boyle v. Trump*, No. 25-1628, 2025 WL 1677099, at *1 (D. Md. June 13, 2025).[21]

The Commission's and Trump administration's recent actions illustrate the nexus between the for-cause removal restrictions and the Final Order. The Commission voted for the Final Order in January 2025, just four days before President Trump took office. After taking office, President Trump directed federal agencies to reduce the regulatory burden on businesses, a direction at odds with the Commission's expansion of distributor liability through this proceeding. *See* Exec. Order No. 14192, 90 Fed. Reg. 9065 (Jan. 31, 2025) (calling on agencies to "reduc[e] the private expenditures required to comply with Federal regulations"). In early February, the Department of Justice issued its letter concluding the Commissioners' removal protections are unconstitutional. Shortly thereafter, the Commission stayed its Final Order. Then, after the President removed a

---

[21] Litigation regarding the legality of President Trump's removal of the Commissioners is ongoing before the Fourth Circuit. *See Boyle v. Trump*, No. 25-1687 (4th Cir. 2025). Although the district court granted summary judgment for the Commissioners and ordered the administration to permit them to resume their duties, the Supreme Court stayed the district court's injunction pending appeal. *Boyle*, 145 S. Ct. at 2654.

majority of the Commissioners in May, they sued for reinstatement, arguing that the removal restrictions are necessary "to ensure the CPSC's independence."  Memorandum of Law in Support of Plaintiffs' Expedited Motion for Summary Judgment at 16, *Boyle v. Trump*, No. 25-cv-1628 (D. Md. May 30, 2025).  This series of events—and the stay order in particular—supports an inference that the removal restrictions influenced the Commission's action, and that aspects of the Final Order may have come out differently if the Commissioners had not been insulated from presidential oversight.  *See K & R Contractors*, 86 F.4th at 149.

Moreover, the fact that President Trump removed all the Democratic-appointed Commissioners three months after the Department of Justice concluded that he had authority to do so reflects an additional nexus between the removal restriction and the initiation of the administrative adjudication itself.  *See Bhatti*, 97 F.4th at 561.  That is, the President's recent actions suggest that, had he understood in his first term that he had authority to remove Commissioners without cause, he would have removed the Democratic-appointed Commissioners then.  The Commissioners nominated by President Trump split 1–1 in their votes to issue the administrative complaint (an outcome that itself could have been different), such that issuance of the complaint depended on the votes of the Democratic-appointed Commissioners.  *See* AR18481.

Because there is reason to believe that Amazon incurred actual rather than abstract harm from the Commission's unconstitutional structure, declaratory relief and vacatur of the Final Order is appropriate.  *See K & R Contractors*, 86 F.4th at 149.  However, Amazon does not contest the authority of a properly constituted Commission to conduct further proceedings on remand.

### B.    The Combination of Investigatory, Prosecutorial, and Judicial Functions in This Proceeding Violated Amazon's Due Process Rights.

The Fifth Amendment guarantees Amazon the right to an impartial tribunal with an independent judge.  *See* U.S. Const. amend. V (no person shall be "deprived of life, liberty, or

property, without due process of law"); *Withrow v. Larkin*, 421 U.S. 35 (1975) (a fair trial in a fair tribunal is a basic requirement of due process, applicable to courts and administrative agencies). In particular, due process requires an "impartial and disinterested" adjudicator, *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980), and prohibits structures that might lead the adjudicator "not to hold the balance nice, clear and true," *Tumey v. Ohio*, 273 U.S. 510, 532 (1927); *see Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) (due process includes the right to "a fair process of decisionmaking"); *Exxon Corp. v. Heinze*, 32 F.3d 1399, 1403 (9th Cir. 1994) (the "Constitution is concerned not only with actual bias but also with 'the appearance of justice'"). The Commission's combination of investigatory, prosecutorial and judicial functions denied Amazon due process here.[22]

To comply with the Fifth Amendment's guarantee, finders of fact must not prejudge the questions of fact or law presented in a given case. *See Amos Treat & Co. v. SEC*, 306 F.2d 260, 267 (D.C. Cir. 1962) ("[A]n administrative hearing of such importance and vast potential consequences must be attended . . . with the very appearance of complete fairness. Only thus can the tribunal conducting a quasi-adjudicatory proceeding meet the basic requirement of due process."). The Commission's in-house adjudication process failed that test here.

First, the Commissioners directed staff to investigate third-party products sold on Amazon.com for compliance with federal safety requirements. Then, using information gathered in the investigation, the Commission approved the issuance of an administrative complaint, seeking an order directing Amazon to take additional remedial steps. The Commissioners then ratified the appointment of the administrative law judges who conducted the adjudication that

---

[22] To the extent that there is caselaw in this circuit holding that a showing of actual bias is necessary to establish a due process violation, *Marshall v. Cuomo*, 192 F.3d 473, 484 (4th Cir. 1999), Amazon preserves its right to challenge this holding on appeal, on the ground that it conflicts with Supreme Court precedent and the procedural protections guaranteed by the Due Process Clause.

found Amazon liable.  Finally, the Commissioners judged the validity of their own allegations, upholding the claims set forth in the complaint—thus securing Amazon's fate from beginning to end of the in-house adjudication.  *See Chrysafis*, 141 S. Ct. at 2482 (noting the "longstanding teaching that ordinarily 'no man can be a judge in his own case' consistent with the Due Process Clause"); *Hummel v. Heckler*, 736 F.2d 91, 93 (3d Cir. 1984) ("[T]he absence in the administrative process of procedural safeguards normally available in judicial proceedings has been recognized as a reason for even stricter application of the requirement that administrative adjudicators be impartial.").

The Commission's public statements further illustrate that the combination of investigatory, prosecutorial, and adjudicative powers prejudiced the outcome in this case.  From the outset, the Commission expressed its prejudgment that Amazon's voluntary remedial actions were insufficient and that the proceeding would serve the separate policy goal of permitting the Commission to assert previously unclaimed authority over online marketplaces.  Indeed, Acting Chairman Adler called the proceeding "a huge step forward" toward Commission regulation of "massive third-party platforms" like Amazon.  Adler Statement; *see Bakalis v. Golembeski*, 35 F.3d 318, 326 (7th Cir.1994) (a decision-making body "that has prejudged the outcome cannot render a decision that comports with due process"); *Cinderella Career & Finishing Sch., Inc. v. FTC*, 425 F.2d 583, 592 (D.C. Cir. 1970) ("The rationale for remanding the case despite the fact that former Chairman Dixon's vote was not necessary for a majority is well established . . . there is no way which we know of whereby the influence of one upon the others can be quantitatively measured." (quotations and citation omitted)).  A body that initiates an adjudication to achieve a policy goal cannot fairly decide the outcome of that proceeding, yet that is exactly what the Commission did here.

The Commission's disparate treatment of the similar alleged hazards posed by the products at issue in certain Product Safety Warnings[23] and the Subject Products similarly underscores the absence of a fair decision-making process in this adjudication, as required under the Fifth Amendment. *See* Section II.A, *supra*.

## CONCLUSION

For the foregoing reasons, Amazon respectfully requests that this Court issue summary judgment in favor of Amazon; vacate the Commission's January 16, 2025 Final Order (as well as all earlier orders incorporated therein, including the July Order); and declare that Amazon is not a distributor with respect to products sold through the FBA logistics service.

---

[23] *See* AR17652–665.

Respectfully submitted,


____*/s/ Kevin F. King*____
Sarah L. Wilson*
Stephen P. Anthony (D. Md. Bar No. 14854)
Kevin F. King (D. Md. Bar No. 29548)
Thomas R. Brugato*
Matthew J. Glover*
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Tel.: 202-662-5488
Fax: 202-778-5488
swilson@cov.com
kking@cov.com
santhony@cov.com
tbrugato@cov.com
mglover@cov.com

Jamie Dominique U. Magcale*
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, NY 10018-1405
Tel.: 212-841-1243
Fax: 646-441-9243
jmagcale@cov.com

*Attorneys for Plaintiff*

* Admitted *pro hac vice*

August 20, 2025