**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| AMAZON.COM, INC., | |
| Plaintiff, | |
| v. | Civil Action No. 8:25-cv-00853-LKG |
| CONSUMER PRODUCT SAFETY COMMISSION *et al.*, | |
| Defendants. | |

**Memorandum in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendants' Cross-Motion for Summary Judgment**

BRETT A. SHUMATE
Assistant Attorney General

YAAKOV M. ROTH
Principal Deputy Assistant Attorney
General

SARMAD M. KHOJASTEH
Acting Deputy Assistant Attorney General
Civil Division

LISA K. HSIAO
Acting Director

JAMES W. HARLOW
Acting Assistant Director

ISAAC C. BELFER (D.C. Bar No. 1014909)
OLIVER MCDONALD (N.Y. Bar No. 5416789)
Trial Attorneys
Consumer Protection Branch
Civil Division
U.S. Department of Justice
P.O. Box 386
Washington, DC 20044-0386
(202) 305-7134 (Belfer)
(202) 305-0168 (McDonald)
(202) 514-8742 (fax)
Isaac.C.Belfer@usdoj.gov
Oliver.J.McDonald@usdoj.gov

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 4

I.  Statutory and Regulatory Background ............................................................ 4

II.  Factual Background ......................................................................................... 6

    A.  The FBA Program ..................................................................................... 6

    B.  Amazon Distributed Hundreds of Thousands of Hazardous FBA Products................... 8

    C.  Amazon's Response to the Product Hazards ............................................ 9

III.  The Administrative Proceeding..................................................................... 10

LEGAL STANDARD ..................................................................................................... 12

ARGUMENT ................................................................................................................. 13

I.  The Final Order Properly Deemed Amazon a Distributor
    Under the CPSA ............................................................................................ 13

    A.  Amazon Meets the Statutory Definition of "Distributor".......................... 13

    B.  Amazon Does Not Meet the Statutory Exception for a Third-Party
       Logistics Provider...................................................................................... 16

        1.  Amazon Does Not Meet the Definition of Third-Party
           Logistics Provider.............................................................................. 16

        2.  Even If Amazon Were a Third-Party Logistics Provider, It Does Not
           Satisfy the Narrow Exception in Section 3(b) of the CPSA...................... 20

II.  The Final Order Properly Required Amazon to Provide .................................................
    Notice to Purchasers ..................................................................................... 22

    A.  The Final Order's Notice Requirement Was Lawful and Reasonable........................ 23

    B.  The Final Order's Notice Requirement Does Not Violate the First Amendment........ 31

        1.  The Remedial Notice Should Be Upheld Under *Zauderer* .................................... 31

        2.  Applying *Central Hudson* Yields the Same Result ................................................. 34

III.  The Commission Had Statutory Authority to Order Refunds .................................... 37

IV.  Amazon Is Not Entitled to Vacatur of the Final Order Based on the Removal
    Protection for CPSC Commissioners ............................................................... 41

V.  The Final Order Did Not Deprive Amazon of Due Process......................... 43

CONCLUSION................................................................................................................ 45

i

## TABLE OF AUTHORITIES

**Cases**

*Am. Power & Light Co. v. SEC*,
    329 U.S. 90 (1946) ........................................................................................... 23, 31

*Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*,
    524 F. Supp. 2d 642 (D. Md. 2007) ............................................................... 12

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
    591 U.S. 610 (2020) ........................................................................................ 43

*Bd. of Trustees of State Univ. of NY v. Fox*,
    492 U.S. 469 (1989) ........................................................................................ 36

*Burgess v. United States*,
    553 U.S. 124 (2008) ........................................................................................ 15

*Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*,
    447 U.S. 557 (1980) ............................................................................... 3, 31, 34

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ........................................................................................ 23

*Collins v. Yellen*,
    594 U.S. 220 (2021) .................................................................................. 41, 42

*CTIA—The Wireless Ass'n v. City of Berkeley, Cal.*,
    928 F.3d 832 (9th Cir. 2019) ......................................................................... 35

*Deese v. Esper*,
    483 F. Supp. 3d 290 (D. Md. 2020) ......................................................... 12, 13

*Digital Realty Tr., Inc. v. Somers*,
    583 U.S. 149 (2018) ........................................................................................ 15

*Doolin Sec. Sav. Bank, F.S.B. v. FDIC*,
    53 F.3d 1395 (4th Cir. 1995) .................................................................... 23, 31

*Eberhart v. Amazon.com, Inc.*,
    325 F. Supp. 3d 393 (S.D.N.Y. 2018) ........................................................... 15

*Educ. Media Co. at Va. Tech v. Insley*,
    731 F.3d 291 (4th Cir. 2013) ..................................................................... 36, 37

*Erie Insurance Co. v. Amazon.com, Inc.*,
    925 F.3d 135 (4th Cir. 2019) ......................................................................... 18

*Esteras v. United States*,
    145 S. Ct. 2031 (2025) .................................................................................... 21

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021) ........................................................................... 23, 24, 31

*Fla. Bar v. Went For It, Inc.*,
    515 U.S. 618 (1995) ................................................................................. 35, 37

*44 Liquormart, Inc v. Rhode Island,*
  517 U.S. 484 (1996) ............................................................................ 33

*Free Enter. Fund v. PCAOB,*
  561 U.S. 477 (2010) ............................................................................ 43

*FTC v. Cement Inst.,*
  333 U.S. 683 (1948) ............................................................................ 45

*Greater New Orleans Broad. Ass'n, Inc. v. United States,*
  527 U.S. 173 (1999) ..................................................................... 36, 37

*Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.,*
  700 F. App'x 251 (4th Cir. 2017) ................................................. 33, 34

*ICC v. Transcon Lines,*
  513 U.S. 138 (1995) ............................................................................ 23

*Johnson v. United States,*
  559 U.S. 133 (2010) ............................................................................ 39

*K & R Contractors, LLC v. Keene,*
  86 F.4th 135 (4th Cir. 2023) ......................................................... 41, 43

*La. Pub. Serv. Comm'n v. FERC,*
  174 F.3d 218 (D.C. Cir. 1999) ........................................................... 23

*Loper Bright Enters. v. Raimondo,*
  603 U.S. 369 (2024) ............................................................................ 13

*Lorillard Tobacco Co. v. Reilly,*
  533 U.S. 525 (2001) ............................................................................ 35

*Marshall v. Cuomo,*
  192 F.3d 473 (4th Cir. 1999) ............................................................. 44

*Martin v. Hadix,*
  527 U.S. 343 (1999) ............................................................................ 40

*Md. Shall Issue, Inc. v. Anne Arundel Cnty. Md.,*
  91 F.4th 238 (4th Cir. 2024) ................................................... 31, 32, 33

*Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ..................................................................23, 32, 33

*Mourning v. Fam. Publications Serv., Inc.,*
  411 U.S. 356 (1973) ............................................................................ 23

*N. Carolina v. United States,*
  7 F.4th 160 (4th Cir. 2021) ................................................................ 20

*Nasdaq Stock Mkt. LLC v. SEC,*
  38 F.4th 1126 (D.C. Cir. 2022) .......................................................... 25

*Nat'l Ass'n of Mfrs. v. SEC,*
  800 F.3d 518 (D.C. Cir. 2015) ........................................................... 35

*Nat'l Ass'n of Wheat Growers v. Becerra,*
  468 F. Supp. 3d 1247 (E.D. Cal. 2020)................................................................. 36

*Nat'l Elec. Mfrs. Ass'n v. Sorrell,*
  272 F.3d 104 (2d Cir. 2001)............................................................... 32, 33, 35

*Nat'l Weather Serv. Emps. Org. v. Fed. Lab. Rels. Auth.,*
  966 F.3d 875 (D.C. Cir. 2020)................................................................. 28, 29

*Neder v. United States,*
  527 U.S. 1 (1999)........................................................................... 15, 35

*NIFLA v. Becerra,*
  585 U.S. 755 (2018)............................................................................. 37

*PSINet, Inc. v. Chapman,*
  362 F.3d 227 (4th Cir. 2004) ................................................................... 37

*Rubin v. Coors Brewing Co.,*
  514 U.S. 476 (1995)............................................................................. 35

*Russello v. United States,*
  464 U.S. 16 (1983)......................................................................... 40, 41

*Sacora v. Thomas,*
  628 F.3d 1059 (9th Cir. 2010) .................................................................. 25

*Safelite Group., Inc. v. Jepsen,*
  764 F.3d 258 (2d Cir. 2014)..................................................................... 36

*Schlesinger v. Reservists Comm. to Stop the War,*
  418 U.S. 208 (1974)............................................................................. 43

*Seila L. LLC v. CFPB,*
  591 U.S. 197 (2020)............................................................................. 43

*United States v. Edge Broad. Co.,*
  509 U.S. 418 (1993)......................................................................... 36, 37

*United States v. Philip Morris USA Inc.,*
  855 F.3d 321 (D.C. Cir. 2017)................................................................... 37

*Withrow v. Larkin,*
  421 U.S. 35 (1975)......................................................................... 44, 45

*Zauderer v. Office of Disciplinary Counsel,*
  471 U.S. 626 (1985)...................................................................... 3, 31, 34

**Statutes**

5 U.S.C. § 554(d) ............................................................................... 44

15 U.S.C. §
  2051(b)(1) .............................................................................. 4, 35, 37, 38
  2052(a)(7) ........................................................................... 2, 13, 15, 22
  2052(a)(8) ..................................................................................... passim
  2052(a)(16) .................................................................................... passim

2052(b) .......................................................................................................... passim
2053(a) ....................................................................................................... 4, 41, 43
2064 ................................................................................................................... 24
2064(a) ............................................................................................................... 4
2064(c) ....................................................................................................... 29, 35
2064(c)(1) ................................................................................................. 4, 5, 24
2064(c)(1)(D) .................................................................................................. 24
2064(c)(1)(F) ................................................................................................... 24
2064(d)(2) ......................................................................................................... 6
2064(d)(1) .................................................................................................. passim
2064(d)(1)(C) ................................................................................................... 38
2064(d)(2) ............................................................................................ 38, 39, 40
2064(d)(3)(B) ................................................................................................... 39
2064(f)(1) ................................................................................................... 4, 24
2064(i)(1) .................................................................................................... 5, 29
2064(i)(1)(B) ................................................................................................... 26
2064(i)(2) ............................................................................................... 5, 28, 29
2064(i)(2)(A)(iii) ............................................................................................. 27
2064(i)(2)(B) ................................................................................................... 26
2064(i)(2)(C) ................................................................................................... 27
2064(i)(2)(D) ................................................................................................... 26
2064(i)(2)(H) ................................................................................................... 40
2064(i)(2)(H)(iii) ............................................................................................. 27
2064(i)(2)(I) .................................................................................................... 27
2066(e) ............................................................................................................. 40

Pub. L. No. 92-573, 86 Stat. 1207 ..................................................................... 4

**Regulations**

16 C.F.R. §
1025.11(a) .......................................................................................................... 4
1025.51 ............................................................................................................... 4
1025.53 ............................................................................................................... 5
1025.55 ............................................................................................................... 5
1115.23 ..................................................................................................... 5, 29, 30
1115.23(a) ................................................................................................. 28, 29
1115.24 ..................................................................................................... 5, 29, 30
1115.25 ..................................................................................................... 5, 29, 30
1115.26 ..................................................................................................... 28, 29, 30
1115.26(a)(1) ............................................................................................. 27, 30
1115.27 ................................................................................................. 5, 28, 29, 30
1115.27(a) ........................................................................................................ 26
1115.27(c)(6) ................................................................................................... 27
1115.27(d) ........................................................................................................ 26
1115.27(e) ........................................................................................................ 27

1115.27(f)..............................................................................................................26, 30

1115.27(n)(3)...............................................................................................................27

1115.27(o)...................................................................................................................27

1115.28...........................................................................................................5, 29, 30

1115.29...........................................................................................................5, 29, 30

1115.29(a)......................................................................................................................5

1115.29(b)..........................................................................................................5, 28, 29

1115.29(c)......................................................................................................................5

**Other Authorities**

74 Fed. Reg. 11883 (Mar. 20, 2009) ................................................................................. 26

75 Fed. Reg. 3355 (Jan. 21, 2010) ............................................................................. 25, 36

## INTRODUCTION

Amazon.com, Inc. does not dispute that over 400,000 hazardous products were sold on its e-commerce website through its Fulfillment by Amazon ("FBA") program. These products (collectively, the "Subject Products") were flammable children's sleepwear, faulty carbon monoxide detectors that fail to alarm, and hair dryers without electrocution protection. The Consumer Product Safety Commission ("CPSC" or the "Commission") informed Amazon about the products' defects or non-compliance with applicable safety standards and the corresponding hazards they posed to the public. In response, Amazon sent purchasers a message and provided a store credit.

The Commission authorized the filing of an administrative complaint against Amazon alleging that these actions were insufficient and that an order requiring Amazon to take additional actions was necessary for public safety. After a formal adjudicative proceeding, the Commission determined that these voluntary measures were inadequate to protect the public. For example, the Commission found that Amazon's messages lacked information that the Consumer Product Safety Act ("CPSA") and CPSC regulations require recall notices to include, were not distributed widely enough, and provided insufficient incentive for consumers to remove the hazardous products from the stream of commerce. Accordingly, the Commission exercised its authority under the CPSA to order Amazon to undertake specific remedial actions to mitigate the risk to the public.

Amazon now brings this suit to evade all responsibility under the CPSA for recalling these products, as the Commission ordered. It cannot do so. Each of its challenges to the Commission's thorough and well-reasoned orders is meritless.

*First*, the Commission had authority to require Amazon to take remedial measures under the CPSA because Amazon was a "distributor" of the Subject Products. It is undisputed that the

1

Subject Products were "delivered" to Amazon's fulfillment centers so Amazon could "hold" them until their "sale" and "distribution" to customers. 15 U.S.C. § 2052(a)(7)–(8). Amazon claims its activities nevertheless fall under the narrow statutory exception under which a "common carrier, contract carrier, third-party logistics provider, or freight forwarder" shall not "be deemed to be a . . . distributor . . . of a consumer product solely by reason of receiving or transporting a consumer product in the ordinary course of its business." *Id.* § 2052(b). The Commission rejected this claim, finding that Amazon held the Subject Products for purposes beyond simply transporting them, such as to retain stock for managing returns and replacements. The Commission properly concluded that because Amazon exercised pervasive control over the pricing, sale, return, and customer service processes for the Subject Products, it was not a "third-party logistics provider" that "solely receive[d], [held], or otherwise transport[ed]" the products "in the ordinary course of business." *Id.* § 2052(a)(16).

***Second***, the remedial notice ordered by the Commission is authorized by statute and well within the zone of reasonableness. The Commission adhered to the CPSA's procedural requirements. After an administrative proceeding, it determined the Subject Products presented a substantial product hazard and notice was necessary because Amazon's prior messages were insufficient to protect the public. Not only does the Commission's remedial assessment receive heightened deference on review, but the record proves it was eminently reasonable. The Commission ordered notice because Amazon had failed to provide notice to the public and its prior messages to initial purchasers had numerous deficiencies, including failing to use the term "recall" and to communicate accurately the Subject Products' actual hazards, as required by the CPSA and CPSC regulations.

*Third*, the notices ordered by the Commission comport with the First Amendment. The Commission properly determined that the notices satisfy the standard for mandatory commercial disclosures in *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985), because they merely require Amazon to disclose factual and uncontroversial information about the safety of the Subject Products. However, as the Commission also found, the ordered notices comport too with the higher standard from *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980). The notices directly advance the Commission's substantial interest in protecting consumers' health and safety by informing consumers about the hazardous Subject Products, and there is a reasonable fit between that interest and the specific notices ordered here.

*Fourth*, the other remedial actions ordered by the Commission are authorized by statute. Amazon erroneously contends that the Commission has ordered multiple refunds for the same product, but in fact, the Commission ordered Amazon to issue only *one* refund per product tendered or with proof of destruction. Whatever voluntary credits Amazon provided earlier do not preempt or supplant the CPSC's statutory authority to order that refund. Likewise, the Commission has authority to place conditions on refunds, including destruction of the product so it no longer poses a public danger.

*Fifth*, Amazon is not entitled to relief on its Article II and due process claims. Regarding Article II, Amazon is not entitled to vacatur of the Commission's order, which the Commissioners had undisputed authority to issue, based on the existence of a removal restriction that itself caused Amazon no harm. At most, the proper remedy is severance of the removal protection provision from the rest of the CPSA, *not* vacatur of the Commission's order. As for Amazon's due process claim, binding precedent squarely holds that an agency's combination of

3

investigative, prosecutorial, and adjudicative functions does not violate due process. And there is no evidence that the Commission's order was based on prejudgment.

Because all of Amazon's claims are meritless, the Court should deny Amazon's motion for summary judgment and grant CPSC's cross-motion for summary judgment.

BACKGROUND

## I.    Statutory and Regulatory Background

In 1972, Congress passed the CPSA, Pub. L. No. 92-573, 86 Stat. 1207, for the purpose of "protect[ing] the public against unreasonable risks of injury associated with consumer products." 15 U.S.C. § 2051(b)(l). To administer the CPSA, Congress established the Commission, which consists of up to five commissioners each appointed by the President and confirmed by the Senate. *Id.* § 2053(a). This case involves one of several statutory tools Congress provided the Commission to address the risks of hazardous consumer products.

Under Section 15 of the CPSA, the Commission may order the mandatory recall of a consumer product that it determines presents a "substantial product hazard." 15 U.S.C. § 2064(c)(1), (d)(1). A "substantial product hazard" exists if a product "fail[s] to comply with an applicable consumer product safety rule under [the CPSA] or a similar rule, regulation, standard, or ban under any other Act enforced by the Commission which creates a substantial risk of injury to the public" or if "a product defect . . . creates a substantial risk of injury to the public." *Id.* § 2064(a). The Commission determines that a product presents a "substantial product hazard" through a formal administrative adjudication. *Id.* § 2064(c)(1), (d)(1), (f)(1).

The administrative proceeding begins when the Commission authorizes the issuance of an administrative complaint. 16 C.F.R. § 1025.11(a). The matter is prosecuted by agency staff, known as "Complaint Counsel," and is heard by an administrative law judge ("ALJ"). After discovery and a hearing, the ALJ issues an Initial Decision. *Id.* § 1025.51. The Initial Decision is

4

appealable to the Commission, *id.* § 1025.53, which may "exercise all the powers which it could have exercised if it had made the Initial Decision" and "shall adopt, modify, or set aside the findings, conclusions, and order contained in the Initial Decision," *id.* § 1025.55.

If the Commission determines "that a product distributed in commerce presents a substantial product hazard and that notification is required in order to adequately protect the public from such substantial product hazard," it "may order the manufacturer or any distributor or retailer of the product to take any one or more of" several remedial actions. 15 U.S.C. § 2064(c)(1). These include "ceas[ing] distribution of the product," notifying recipients of the product "to cease immediately distribution of the product," "giv[ing] public notice of the defect or failure to comply," and "mail[ing] notice to every person to whom the person required to give notice knows such product was delivered or sold." *Id.* The Commission's "order shall specify the form and content of any notice required to be given under such order." *Id.* The CPSA identifies several items that must be included in any ordered notice "[e]xcept to the extent that the Commission determines with respect to a particular product that one or more of the [listed] items is unnecessary or inappropriate under the circumstances." *Id.* § 2064(i)(2).

Pursuant to the CPSA's directive, *id.* § 2064(i)(1), the Commission promulgated Guidelines and Requirements for Mandatory Recall Notices, 16 C.F.R. §§ 1115.23–.29. These regulations specify what information must be included in "every recall notice" unless the Commission "determine[s] that one or more of the recall notice requirements set forth in this subpart is not required, and will not be included, in a recall notice." 16 C.F.R. §§ 1115.27, 1115.29(b). Ultimately, "[t]he Commission will make the final determination as to the form and content of the recall notice" and "must review and agree in writing to all aspects of the notice" before a firm may disseminate it. *Id.* § 1115.29(a), (c).

In addition to ordering notice, the Commission "may order the manufacturer or any distributor or retailer of [a] product" that presents a substantial product hazard to take other remedial actions that "it determines to be in the public interest." 15 U.S.C. § 2064(d)(1). These actions include "bring[ing] such product into conformity with [applicable] requirements" or "repair[ing] the defect in such product," "replac[ing] such product with a like or equivalent product which complies with the applicable [requirements] or which does not contain the defect," and "refund[ing] the purchase price of such product." *Id.* The Commission "shall also require the [firm] to submit a plan, for approval by the Commission, for taking" the required remedial actions. *Id.* § 2064(d)(2).

## II.    Factual Background

### A.    The FBA Program

Amazon "is a $575 billion company that operates the e-commerce website, Amazon.com." AR17345. It "sells some consumer products on Amazon.com as a retailer." *Id.* It "also allows what it calls 'third-party sellers' to list and sell consumer products on Amazon.com through" the FBA program. *Id.* FBA "participants deliver their products to Amazon's fulfillment centers, not directly to consumers." AR17345–46 (citing AR206) (footnote omitted). Upon "'confirm[ing] receipt of delivery' at a fulfillment center, Amazon will store the product, until sold, for 'deliver[y] to customers.'" AR17346 (quoting AR206; AR224; AR254–56). Amazon charges FBA participants fees for the services that it provides, including "monthly and long-term storage fees." AR17345–46 (citing AR208).

When "a customer purchases the product on Amazon.com, Amazon locates the product in its fulfillment centers so that it can fulfill the order and ship the product to the customer." AR17346 (citing AR30–31; AR206). Amazon "may combine multiple products ordered by a customer from different [FBA] participants in one shipment from Amazon" and "also may

commingle inventory from [FBA] participants and move the products among its facilities." *Id.* (citing AR206–07; AR224; AR255–56). If "a particular [FBA] product is not being held in an Amazon distribution center, Amazon does not allow that product to be purchased on Amazon.com." *Id.* (citing AR18371–72).

Amazon "directs and controls payment and pricing of [FBA] products." AR17347. It "processes customer payments by charging the payment instrument designated in its customer's account and remits the agreed-upon monies to the [FBA] participant minus its program fees." *Id.* (citing AR208–09). It also enforces the "so-called Fair Pricing Policy," in which Amazon may "take action against [FBA] participants whose pricing practices may, in Amazon's view, harm customer trust," such as by "setting a price on a product or service [on Amazon.com] that is significantly higher than recent prices offered on or off Amazon." *Id.* (citing AR209).

Amazon handles customer service, too. It "controls communications with its customers, mandating that [FBA] participants contact customers exclusively through the Amazon platform," and "requires program participants to agree that Amazon will handle all aspects of customer service." *Id.* (citing AR207). Amazon controls "customer returns, refunds, and adjustments," including "determin[ing] whether a customer will receive a refund, adjustment, or replacement for any" FBA product and requiring program participants to reimburse Amazon if Amazon determines they "have responsibility in accordance with the [FBA] Agreement." *Id.* (quoting AR224; AR2358). Moreover, "if the customer returns a [FBA] product to Amazon, [then] Amazon, not the program participant, determines whether to dispose of the product or place it back in the participant's inventory." AR17348 (citing AR259). Amazon may also choose to

"transfer a returned product to its 'Amazon Warehouse' program for later sale by Amazon."[1] *Id.* (citing AR31–32). Finally, "Amazon requires [FBA] participants to coordinate with and reimburse Amazon for product recalls." *Id.*

### B.    Amazon Distributed Hundreds of Thousands of Hazardous FBA Products

The Subject Products comprise "three categories of products" purchased on Amazon.com "between approximately 2018 and 2021." AR17349. "[A]pproximately 418,818 units of these products were sold on Amazon.com through the [FBA] program to approximately 376,009 Amazon.com purchaser accounts." *Id.*

The first category is "children's sleepwear garments, specifically nightgowns and bathrobes." *Id.* CPSC staff tested samples of these products and "found that they do not meet the flammability requirements for children's sleepwear." *Id.* If "the garments ignite while being worn by children," that can cause "[s]erious injuries or death." *Id.*

The second category of products is "carbon monoxide (CO) detectors equipped with alarms intended to alert consumers to the presence of deadly carbon monoxide," an odorless and colorless gas. AR17350. Agency "testing of samples of the CO detectors revealed that the detectors 'fail to detect carbon monoxide gas and fail to alarm in its presence.'" *Id.* "When CO detectors fail to operate or alarm, consumers relying on those detectors risk exposure to dangerous levels of CO accumulation," which "may cause severe injury, including tissue damage and death." *Id.*

Finally, the third category is "hair dryers that lack integral immersion protection, which protects the user from electrocution if the hair dryer is immersed in water." *Id.* These products

---

[1] Through the "'Amazon Warehouse' program, 'Amazon sells used, pre-owned, or open box products.'" AR17348 n.7 (quoting AR1777).

"present a significant electric shock and electrocution hazard to users and can ultimately lead to death." AR17351.

### C.    Amazon's Response to the Product Hazards

CPSC staff issued letters to Amazon regarding these product defects and violations. AR17351 (citing AR5396–402; AR5442). Instead of recalling the products, Amazon "sent messages by email and through the 'Message Center' of a purchaser's Amazon.com account to each customer who purchased a relevant product."[2] *Id.* (citing AR112; AR135–37; AR10164–226). These messages advised customers of "a potential safety issue that may impact your Amazon purchase(s)." AR17352 (quoting AR10165–218). Using more conditional language, the messages stated that the children's sleepwear "may fail" to meet the federal flammability requirements, that the hair dryers "may fail" to have mandatory immersion protection, and that the CO detector "may fail" to alarm on time. *Id.* (quoting AR10196–218).

Amazon's messages did not provide a mechanism for customers "to return the product or show proof of destruction but instead instructed them that '[t]here is no need to return the product' and that they should 'dispose' of it." *Id.* (quoting AR10165–218). Amazon told its customers who "purchased [the product] for someone else" to "notify the recipient immediately and let them know they should dispose of it." AR17353 (quoting AR10165–218). The messages stated that "Amazon is providing a 'gift card' to consumers through their Amazon.com accounts."[3] AR17352 (quoting AR10165–218).

---

[2] Amazon "did not track the number of messages that were opened." AR17354 (citing AR18272).

[3] Although Amazon claims it paid purchasers "at its own expense," ECF No. 22-1 ("Pl.'s Mem.") at 10, it has the right to seek reimbursement from FBA participants, and it sought and received some reimbursement here, AR5417–18; AR17347 (quoting AR224; AR258).

Amazon removed the items from "Amazon.com and quarantined all units in its fulfillment centers." AR17354. It "sold approximately 28 units of the CO detectors and approximately four units of the hair dryers through the 'Amazon Warehouse' program." *Id.* (citing AR47).

## III.    The Administrative Proceeding

On July 14, 2021, "the Commission authorized Complaint Counsel to file an administrative complaint against Amazon." AR17355 (citing AR18481). The administrative complaint alleged that Amazon was a distributor of FBA products, the Subject Products presented substantial product hazards, and Amazon's unilateral actions of messaging customers and issuing gift cards were insufficient to address those hazards. AR1–24. The complaint requested that the Commission determine that Amazon is a distributor of consumer products and order Amazon to, among other things, cease distribution of the products, issue CPSC-approved notices, and refund purchasers upon return of the products or proof of destruction. AR18–20.

On January 19, 2022, ALJ Grimes issued an Order on Motion to Dismiss and Motion for Summary Decision. AR380–408. ALJ Grimes found that Amazon was a "distributor" of the Subject Products because it "holds" FBA products both "for sale" and "for distribution." AR403–06. Then, on July 10, 2023, ALJ Patil issued the Initial Decision and Order on Remedies. AR12027–86. The ALJ found that the Subject Products present a substantial product hazard (consistent with the parties' stipulation to that fact, AR17358) and that Amazon's messages to purchasers and crediting of their Amazon.com accounts were deficient. AR11784–85; AR11793; AR12039. As a remedy, the ALJ ordered Amazon to take several actions, including ceasing

distribution of the products, providing notice, and refunding consumers upon receipt of the product or verification of product destruction.[4] AR12039–43.

Both parties appealed the ALJ's Initial Decision and Order on Remedies to the Commission. AR12087–88; AR12089–91; AR12101–25; AR12380–469. The Commission heard oral argument on December 14, 2023. AR18222–382. In unanimous orders dated July 29, 2024, and January 16, 2025 (collectively, the "Final Order"), the Commission resolved the issues of liability and remedies. AR17339–412; AR17673–765.

In the July 2024 Order, the Commission found that Amazon "acted as a distributor under the CPSA when it received, stored, and delivered the Subject Products through its [FBA] program" and that the Subject Products "present a substantial product hazard" under the CPSA. AR17410 (citation omitted). It also found that "Amazon's messages were insufficient to protect the public" from those hazards and thus that "direct notice to purchasers" and "public notice" are "required in order to adequately protect the public." *Id.* Additionally, "because Amazon did not seek to remove the Subject Products from commerce and from consumers' possession, . . . it is in the public interest that Amazon issue full refunds for the [Subject Products], conditioned upon return or proof of destruction or, for the carbon monoxide detectors, replacement products upon return." AR17410–11. The Commission directed Amazon to prepare a "Proposed Notification Plan and Proposed Action Plan" to implement the Commission's order, and it set a schedule for the parties to brief any disputed issues with the plans. AR17411–12.

In January 2025, the Commission approved Amazon's Proposed Notification and Action Plan with certain modifications. AR17673–765. It ordered Amazon to, among other things, provide specified forms of direct notice to purchasers and public notice and "issue a full refund

---

[4] For CO Detectors, Amazon could replace the product upon return. AR12042.

in the amount of the purchase price to any consumer who submits proof of destruction or disposal of a Subject Product." AR17722–24. The Commission stated that its order would be effective "January 26, 2025, unless Amazon files a motion to stay th[e] Order by January 24, 2025, in which case this Order shall be effective on the date the Commission resolves Amazon's motion, unless the Commission orders otherwise." AR17722.

On January 24, 2025, Amazon filed a motion to stay the Final Order. AR17766–77. The Commission granted the motion on February 28, 2025, explaining that "[t]his matter raises important issues" and that "[i]f Amazon seeks judicial review of the [Final Order] and stipulates to an expedited briefing schedule for motions for summary judgment, as Amazon claims it intends to do, it would be in the interest of justice for those issues to be briefed by the parties and decided by the district court in an orderly fashion, rather than in the context of a motion for emergency relief." AR17791. Accordingly, the Commission stated that "[i]f Amazon files a lawsuit in federal district court challenging the [Final Order] by March 14, 2025, that Order will be effective 14 days after the district court enters final judgment in that lawsuit." *Id.*

Amazon filed its Complaint in this matter on March 14, 2025, ECF No. 1 ("Compl."), and thus the effective date of the Final Order is stayed until 14 days after this Court enters final judgment.

## LEGAL STANDARD

Claims under the Administrative Procedure Act "are adjudicated without a trial or discovery[] on the basis of an existing administrative record" and accordingly "are properly decided on summary judgment." *Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*, 524 F. Supp. 2d 642, 660 (D. Md. 2007). However, the "standard set forth in Rule 56 of the Federal Rules of Civil Procedure governing summary judgment . . . does not apply because of the limited role of a court reviewing the administrative record." *Deese v. Esper*, 483

F. Supp. 3d 290, 304 (D. Md. 2020) (quotation omitted). Instead, the court "decides as a matter of law whether the administrative record permitted the agency to make the decision it did." *Id.* (quotation omitted).

ARGUMENT

I.    **The Final Order Properly Deemed Amazon a Distributor Under the CPSA**

Amazon contends that "[t]he Commission lacked authority to issue the Final Order because Amazon operated as a 'third-party logistics provider.'" Pl.'s Mem. 13; *see* Compl. ¶¶ 95–100 (Count I). Courts "must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). "In exercising such judgment though, courts may . . . seek aid from the interpretations of those responsible for implementing particular statutes." *Id.* at 394. Here, the Commission itself employed the "relevant interpretive tools" and followed "the best reading of" the CPSA, *id.* at 400, in properly determining that Amazon was a distributor of the Subject Products.

A.    **Amazon Meets the Statutory Definition of "Distributor"**

The CPSA defines a "distributor" as "a person to whom a consumer product is delivered or sold for purposes of distribution in commerce." 15 U.S.C. § 2052(a)(8). The statute further provides that the phrase "distribution in commerce" means "to sell in commerce, to introduce or deliver for introduction into commerce, or to hold for sale or distribution after introduction into commerce." *Id.* § 2052(a)(7). Applying these definitions, the Commission found that by receiving, storing, and delivering the Subject Products through its FBA program, Amazon fell

squarely within the CPSA's definition of a distributor.[5]

The Commission based its decision on record evidence showing that FBA program participants sent their products to Amazon's fulfillment centers, whereupon Amazon "confirm[ed] receipt of delivery." AR17365–66 (quoting AR224; AR254–56). Amazon then "store[d] the [Subject Products] in its fulfillment centers until a customer purchase[d] the product on Amazon.com, at which point Amazon fulfill[ed] the order and ship[ped] the product to the customer." AR17366 (citing AR30–31; AR206). Program "participants pa[id] Amazon monthly and long-term storage fees for Amazon to store their products in its fulfillment centers," and "[i]f Amazon d[id] not hold the product (*e.g.*, it [was] out of stock), customers [could not] complete the transaction, indicating that Amazon must have [had] the product in its warehouse—to hold for sale—before the sales transaction [could] occur." AR17366–67 (citing AR208; AR18371–72). The evidence also showed Amazon held the Subject Products "in anticipation of delivery": it "store[d] [them] in its fulfillment centers; use[d] technology to track, move, and ship products to customers; and deliver[ed] or arrange[d] for delivery to customers." AR17367 (citing AR30–31; AR224; AR255–56). The Commission thus found that because the Subject Products were delivered to Amazon for it "to hold" them "for sale or distribution" to customers after "introduction into commerce," the Subject Products were delivered to Amazon "for purposes of distribution in commerce." 15 U.S.C. § 2052(a)(8); *see* AR17366–67.

Amazon disputes the Commission's conclusion in two ways. First, Amazon argues that it does not meet the definition of "distribution in commerce" because it did not "sell in commerce" the Subject Products or "introduce [them] into interstate commerce." Pl.'s Mem. 14–15. This

---

[5] The Commission did not address whether Amazon was a "retailer," and thus Amazon is incorrect that "[t]here is no dispute that Amazon is not a . . . retailer of the Subject Products." Pl.'s Mem. 13.

14

argument ignores that the statutory definition includes a third way that a firm may engage in "distribution in commerce"—i.e., to "hold for sale or distribution after introduction into commerce." 15 U.S.C. § 2052(a)(7). That was the Commission's basis for finding Amazon was a distributor. That is, the Commission found that FBA participants delivered the Subject Products to Amazon for Amazon to hold them for sale or distribution.[6] AR17366–67.

Second, Amazon argues that some courts have "concluded that Amazon is not a distributor under the common law" with respect to "products sold by third parties on Amazon.com." Pl.'s Mem. 16. But the common law is irrelevant because the CPSA expressly defines "distributor." 15 U.S.C. § 2052(a)(8). "As a rule, a definition which declares what a term 'means' excludes any meaning that is not stated." *Burgess v. United States*, 553 U.S. 124, 130 (2008) (cleaned up); *see Digital Realty Tr., Inc. v. Somers*, 583 U.S. 149, 160 (2018). Here, the statutory definitions state what "distributor" and "distribution in commerce" "mean." 15 U.S.C. § 2052(a)(7)–(8). Thus, those definitions replace any other meaning, including from the common law. Moreover, courts do not read common-law meanings into statutory terms when "the statute otherwise dictates," as the CPSA does by expressly defining "distributor" and "distribution in commerce." *Neder v. United States*, 527 U.S. 1, 21 (1999).[7]

---

[6] The Commission did not find that Amazon sold the Subject Products or introduced them into interstate commerce, and those issues are not presented here.

[7] Even if the Court considered the common law, the cases Amazon cites, Pl.'s Mem. 16, are inapposite because they addressed whether Amazon was a "seller," not a "distributor." Although *Eberhart v. Amazon.com, Inc.*, 325 F. Supp. 3d 393, 399 (S.D.N.Y. 2018), Pl.'s Mem. 21, addressed the meaning of "distributor" under New York products liability law, it is still inapposite. Whereas New York law requires a distributor to "own the defective product," 325 F. Supp. 3d at 398, the CPSA defines "distributor" as "a person to whom a consumer product is *delivered or sold* for purposes of distribution in commerce," 15 U.S.C. § 2052(a)(8) (emphasis added), without requiring a distributor to take title to the product.

**B.** **Amazon Does Not Meet the Statutory Exception for a Third-Party Logistics Provider**

Because it cannot effectively contest that it meets the definition of a "distributor" under the CPSA, Amazon seeks refuge in the statutory exception for certain common carriers, contract carriers, third-party logistics providers, and freight forwarders. Pl.'s Mem. 15–16. In Section 3(b) of the CPSA, Congress provided that "[a] common carrier, contract carrier, third-party logistics provider, or freight forwarder shall not, for purposes of this chapter, be deemed to be a manufacturer, distributor, or retailer of a consumer product ***solely by reason of receiving or transporting*** a consumer product in the ordinary course of its business." 15 U.S.C. § 2052(b) (emphasis added). The statute defines a "third-party logistics provider" as "a person who solely receives, holds, or otherwise transports a consumer product in the ordinary course of business but who does not take title to the product." *Id.* § 2052(a)(16). The exception in Section 3(b) reflects that the CPSA's definition of "distributor" is broad and could capture entities such as package delivery companies whose only connection to the product is to receive or transport a package, often without any knowledge of the product contained therein.

Amazon does not claim it is a common carrier, contract carrier or freight forwarder. Thus, to fall within Section 3(b)'s exception, Amazon must show both (1) it meets the definition of a "third party logistics provider," and (2) it is deemed to be a distributor "solely by reason of receiving or transporting a consumer product." 15 U.S.C. § 2052(b). As discussed below, Amazon cannot satisfy either requirement because the activities Amazon undertook for the Subject Products went far beyond simply receiving and transporting them.

**1. Amazon Does Not Meet the Definition of Third-Party Logistics Provider**

The CPSA defines a third-party logistics provider as "a person who solely receives, holds, or otherwise transports a consumer product in the ordinary course of business but who

does not take title to the product." 15 U.S.C. § 2052(a)(16). The Commission determined that "the comprehensive package of services" Amazon provided for the Subject Products, AR17371, meant Amazon did not "solely receive[], hold[], or otherwise transport[]" the products "in the ordinary course of business," 15 U.S.C. § 2052(a)(16). As the Commission explained, "Amazon's role in moving [FBA] products through the stream of commerce extends well beyond that of a 'third-party logistics provider.'" AR17371. Most notably, Amazon imposed constraints on the price of the Subject Products. Through its "Fair Pricing Policy," Amazon "may penalize sellers who set prices that are 'significantly higher than recent prices offered on or off Amazon.'" AR17372–73 (quoting AR209). Amazon also received product returns and "determine[d] whether a customer will receive a credit or a replacement unit and, for units that are returned, whether to dispose of the product, place the product back into the program participants' inventory for another sale, or transfer the product to Amazon for sale by Amazon itself through the Amazon Warehouse program." AR17372 (citing AR31–32; AR258–59). Even apart from Amazon's many other functions in the FBA program, its role in product pricing and return determinations placed it squarely outside the role of a "third-party logistics provider" that "solely receives, holds, or otherwise transports a consumer product." 15 U.S.C. § 2052(a)(16).

The Commission also identified many other functions Amazon performed for the Subject Products through the FBA program that go beyond transportation logistics. For example, "Amazon screens products for program eligibility," "communicates directly with its customers regarding their [FBA] purchases, including sending a 'Dear Amazon Customer' message when Amazon learns of a 'potential safety issue' involving a product, and it provides live customer support." AR17371–72 (citing AR207; AR224; AR254; AR10165–97) (citations omitted). Amazon also "controls communications between participants and customers, requiring the sellers

to use Amazon's online platform," and controls the payment process. AR17372 (citing AR207). Amazon "charges customers, processes their payments, and then pays program participants after deducting its own [FBA] program fees." AR17373 (citing AR208–09). In sum, "Amazon controls the entire sale process, from the initial listing on Amazon.com, through ordering and delivery, to product returns, disposition of returned products, and the processing of refunds or Amazon credits." *Id.* Amazon's pervasive control of the sale and return process for the Subject Products patently exceeds the definition of a third-party logistics provider under the CPSA.[8]

Amazon argues that the word "solely" in the definition of "third-party logistics provider" means that a firm that does more than just receive, hold, or transport a product is still a third-party logistics provider so long as its other activities do not meet the definition of "distribution in commerce" under the statute. Pl.'s Mem. 18. But there is no basis in the text for such a limitation. The definition of "third-party logistics provider" does not mention "distributor" or "distribution in commerce." Nor does it cross-reference the provisions defining those terms. Under the plain language of the statute, a firm that receives, holds, or transports a product while also doing things outside of the "distribution in commerce" definition, such as manufacturing the product, would not meet the definition of a third-party logistics provider.

Amazon also argues that under the Commission's interpretation, an entity would lose its status as a third-party logistics provider simply by "engag[ing] in basic activities necessary to run its business (e.g., renting office space, running a website, hiring employees, billing, and other

---

[8] Amazon quotes the statement in *Erie Insurance Co. v. Amazon.com, Inc.*, 925 F.3d 135, 142 (4th Cir. 2019), that "[a]lthough Amazon's services were extensive in facilitating the sale, they are no more meaningful to the analysis than are the services provided by UPS Ground." Pl.'s Mem. 21. But "the analysis" in *Erie* was whether Amazon was a "seller" under Maryland products liability law, not whether it was a distributor under the CPSA. *See Erie Insurance*, 925 F.3d at 142.

administrative paperwork)." Pl.'s Mem. 19. This is a red herring. First, it is undisputed that Amazon did much more than these basic administrative activities. The record shows that Amazon controlled the entire sales process for the Subject Products, from their initial listing on Amazon.com, through ordering and delivery, to product returns, disposition of returned products, and the processing of refunds. AR17373. Second, the definition of "third-party logistics provider" focuses on what a firm does with the consumer product and provides that the only activities the firm may do with respect to that product are to "receive[], hold[], or otherwise transport[]" it. 15 U.S.C. § 2052(a)(16). The definition does not restrict a firm's activities unrelated to the consumer product at issue, such as renting office space, performing human resources functions, or other general operational tasks.

Finally, Amazon is wrong to claim that CPSC "seeks to amend the statute by adding an exception for [ancillary] activities," which would "render the third-party logistics provider definition so unclear as to be unworkable." Pl.'s Mem. 19. In discussing "ancillary" activities, the Commission responded to—and rejected—Complaint Counsel's argument that "a third-party logistics provider within the meaning of the CPSA cannot perform *any* activities with respect to a consumer product beyond purely receiving, holding, or transporting." AR17373. Rather, the Commission explained, a third-party logistics provider may also "perform activities that are strictly ancillary to receiving, holding, or transporting products, such as taking inventory or checking on the contents of a damaged box." *Id.*

Although the Commission declined to determine the precise "scope of such ancillary services," *id.*, Amazon does not now contend that it solely received, held, or transported the Subject Products or engaged in activities strictly ancillary thereto. That is because, as the Commission found, "[u]nder any plausible view of the facts and the statutory language, Amazon

does considerably more than is allowed by the definition of 'third-party logistics provider.'" AR17373–74. Thus, the Court may uphold the Commission's determination without deciding whether a third-party logistics provider can perform activities "strictly ancillary" to those listed in the definition. *Cf. N. Carolina v. United States*, 7 F.4th 160, 167 (4th Cir. 2021) (the court did not need to determine the "precise scope" of a provision of the Clean Air Act because, regardless of that scope, the Act "plainly reache[d]" the civil penalties at issue).

### 2. Even If Amazon Were a Third-Party Logistics Provider, It Does Not Satisfy the Narrow Exception in Section 3(b) of the CPSA

Even if Amazon could meet the definition of "third-party logistics provider" under the statute (it cannot), it would still have to show that it meets the criteria for the narrow exception in Section 3(b) of the CPSA. That section provides that "[a] common carrier, contract carrier, third-party logistics provider, or freight forwarder shall not . . . be deemed to be a manufacturer, distributor, or retailer of a consumer product solely by reason of receiving or transporting a consumer product in the ordinary course of its business . . . ." 15 U.S.C. § 2052(b). Here, the Commission determined that the Subject Products were delivered to Amazon to hold for sale or distribution after introduction into commerce, AR17366–67, and that Amazon held them in its fulfillment centers "for purposes beyond simply transporting them." AR17375. For example, the Commission explained that Amazon "(1) warehouses products until a consumer purchases the products on Amazon.com; (2) commingles inventory from Fulfilled by Amazon participants and moves them among distribution centers; and (3) retains stock for managing returns and replacements."[9] *Id.* (citing AR206; AR224; AR255–56; AR258–59). Thus, the Commission did

---

[9] In addition, moreover, Amazon "control[led] the entire sale process, from the initial listing on Amazon.com, through ordering and delivery, to product returns, disposition of returned products, and the processing of refunds or Amazon credits." AR17373.

not deem Amazon a distributor of the Subject Products "solely by reason of receiving or transporting" those products, as would be required to trigger the narrow exception in Section 3(b). 15 U.S.C. § 2052(b).

Amazon's arguments to the contrary fail. Amazon starts with the mistaken presumption that third-party logistics providers and distributors are mutually exclusive categories—that is, that a third-party logistics provider cannot be a distributor. *See* Pl.'s Mem. 15. That is incorrect. The CPSA provides only that a "third-party logistics provider . . . shall not . . . be deemed to be a . . . distributor . . . of a consumer product ***solely by reason of*** receiving or transporting a consumer product in the ordinary course of its business . . . ." 15 U.S.C. § 2052(b) (emphasis added). Under the statute's plain language, a third-party logistics provider may still be deemed a distributor of a consumer product for reasons other than receiving or transporting the product. Accordingly, even if Amazon could qualify as a third-party logistics provider, the CPSA still permitted the Commission to determine that Amazon was a distributor of the Subject Products.

The CPSA contains further evidence refuting Amazon's claim that "the third-party logistics provider category'" is "a carve-out from the broader 'distributor' definition." Pl.'s Mem. 18. In defining a distributor, Congress included several carve-outs. For example, it said "such term does not include a manufacturer or retailer of such product." 15 U.S.C. § 2052(a)(8). But it did not include third-party logistics providers in the list of entities carved out from the "distributor" definition, which "necessarily bespeaks [the] negative implication" that third-party logistics providers are not carved out. *Esteras v. United States*, 145 S. Ct. 2031, 2041 (2025) (quotation omitted). Rather than add third-party logistics providers to the list of entities carved out from the definition, Congress added them to the exception in Section 3(b). As discussed above, however, that exception is limited and applies only when "[a] common carrier, contract

carrier, third-party logistics provider, or freight forwarder" would be "be deemed to be a manufacturer, distributor, or retailer of a consumer product solely by reason of receiving or transporting a consumer product in the ordinary course of its business . . . ." 15 U.S.C. § 2052(b).

Amazon contends that giving "solely by reason of receiving or transporting a consumer product" its plain meaning would render the exception "so narrow as to be meaningless" because the exception would apply only to firms that "receive and instantaneously ship products without keeping them in storage." Pl.'s Mem. 17. Not so. Simply keeping products in storage does not disqualify a firm from being covered by the exception. Instead, a firm may not be covered by the exception if it qualifies as "a manufacturer, distributor, or retailer of a consumer product" under the CPSA for reasons other than "receiving or transporting a consumer product in the ordinary course of its business." 15 U.S.C. § 2052(b). Here, for example, Amazon qualified as a distributor of the Subject Products because those products were delivered to Amazon "to hold [them] for sale or distribution after introduction into commerce," and Amazon held the products in its fulfillment centers for many purposes "beyond simply transporting them." 15 U.S.C. § 2052(a)(7)–(8); AR17366–67; AR17375; *supra* pp. 20–21. Because Amazon therefore qualified as a distributor for reasons other than "receiving or transporting" the Subject Products, 15 U.S.C. § 2052(b), it did not meet the narrow exception in Section 3(b).

## II.    The Final Order Properly Required Amazon to Provide Notice to Purchasers

Amazon argues that the notice required by the Commission violated the CPSA and was arbitrary and capricious, Pl.'s Mem. 22–27; Compl. ¶¶ 101–05 (Count II), 126–35 (Count IV), and violated the First Amendment, Pl.'s Mem. 27–33; Compl. ¶¶ 106–15 (Count II). These claims are meritless.

### A.  The Final Order's Notice Requirement Was Lawful and Reasonable

Amazon first argues that the notice ordered by the Commission was contrary to the CPSA and arbitrary and capricious. In arbitrary-and-capricious review, the reviewing court may not "substitute its judgment for that of the agency," *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977), but must uphold the agency's action if it is "rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute," *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42–43 (1983). This review "is deferential," and "[a] court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

Agencies receive heightened deference in choosing remedies: "An administrative agency is entitled to considerable deference in selecting the remedies to enforce the policy of a statute it administers." *Doolin Sec. Sav. Bank, F.S.B. v. FDIC*, 53 F.3d 1395, 1408 (4th Cir. 1995). Courts "thus may not overturn an agency's choice of remedy unless [they] find it 'unwarranted in law or . . . without justification in fact.'" *Id.* (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 112–13 (1946)). This follows from the Supreme Court's guidance that "the relation of remedy to policy is peculiarly a matter for administrative competence," *ICC v. Transcon Lines*, 513 U.S. 138, 145 (1995) (quotations omitted), and that "where reasonable minds may differ as to which of several remedial measures should be chosen, courts should defer to the informed experience and judgment of the agency to whom Congress delegated appropriate authority," *Mourning v. Fam. Publications Serv., Inc.*, 411 U.S. 356, 371–72 (1973); *see La. Pub. Serv. Comm'n v. FERC*, 174 F.3d 218, 224–25 (D.C. Cir. 1999) ("the breadth of agency discretion is, if anything,

at [its] zenith when the action assailed relates primarily . . . to the fashioning of policies, remedies and sanctions" (quotations omitted)).

The notice ordered by the Commission was lawful and reasonable. Under Section 15(c) of the CPSA, if the Commission determines after a hearing "that a product distributed in commerce presents a substantial product hazard and that notification is required in order to adequately protect the public from such substantial product hazard," it "may order . . . any distributor . . . of the product to" notify purchasers and the public generally of the defect. 15 U.S.C. § 2064(c)(1), (f)(1).[10] The statute further states that any order "shall specify the form and content of any notice required." 15 U.S.C. § 2064(c)(1). Here, the Commission complied with the CPSA to a tee. At the conclusion of the administrative proceeding, the Commission found in the Final Order that the Subject Products "present a substantial product hazard" under 15 U.S.C. § 2064 and that, "because Amazon's messages were insufficient to protect the public, under Section 15(c)(1) of the CPSA, 15 U.S.C. § 2064(c)(1), direct notice to purchasers, pursuant to 15 U.S.C. § 2064(c)(1)(F), and public notice, pursuant to 15 U.S.C. § 2064(c)(1)(D), are required in order to adequately protect the public from the substantial product hazards presented by the Subject Products." AR17410.

The Commission's determinations about what notice was required in order to adequately protect the public were well "within a zone of reasonableness." *Prometheus Radio Project*, 592 U.S. at 423. The Final Order identified four reasons why "Amazon's actions were insufficient to

---

[10] Section 15(d)(1) of the CPSA provides an independent basis for the Commission to order a distributor "to provide the notice required by subsection (c)" where, as here, the Commission has determined that a product "presents a substantial product hazard" and that a repair, replacement, or refund is in the public interest. 15 U.S.C. § 2064(d)(1). The notice ordered by the Commission here was reasonable under both Section 15(c) and Section 15(d).

24

adequately protect the public and [why] remedial actions are in the public interest." AR17382; *contra* Pl.'s Mem. 24.

*First*, Amazon messaged only the initial purchasers and "made no direct attempt to reach consumers who obtained the hazardous products as gifts, hand-me-downs, donations, or on the secondary market." AR17385. Amazon argues that it is speculative whether "secondhand purchasers exist." Pl.'s Mem. 23. But the Final Order noted that Amazon "acknowledge[d] that it resold at least a small number of the Subject Products," which "is evidence that a resale market for such products exists." AR17385–86 (quoting AR11781). Moreover, through its experience regulating consumer products, the Commission knows that consumer products commonly are gifted, donated, or resold. For example, the Commission cited the preamble to the Final Rule, *Guidelines and Requirements for Mandatory Recall Notices*, in which it responded to a comment about "consumers that purchase products second-hand or receive them as gifts," 75 Fed. Reg. 3355, 3360 (Jan. 21, 2010), by agreeing that "[s]ole reliance on direct recall notices ignores the fact that other persons may benefit from receiving recall notices," AR17386 (quoting 75 Fed. Reg. at 3360). The Commission was entitled to rely on its knowledge and experience regulating consumer products and was not required to adduce evidence of the specific secondary market for the Subject Products. *See Nasdaq Stock Mkt. LLC v. SEC,* 38 F.4th 1126, 1142 (D.C. Cir. 2022); *Sacora v. Thomas,* 628 F.3d 1059, 1069 (9th Cir. 2010).

Amazon also claims it is speculative whether the Subject Products "remain in use." Pl.'s Mem. 23. But the Commission explained that "many of the Subject Products may still be in consumers' hands" given "the lack of evidence that any of the approximately 418,818 Subject Products identified in the Complaint that were purchased by consumers were Destroyed." AR17385 (citing AR5318; AR10232). And Amazon "did not track the number of messages that

were opened," AR17354 (citing AR18272), so does not know how many purchasers saw, let alone acted on, its messages. Thus, it was reasonable for the Commission to find Amazon's messages deficient because they notified only initial purchasers.

*Second*, the Final Order noted that Amazon failed to "alert[] its customers to a 'recall' in its messages," AR17386 (citing AR10165–217); *see* 15 U.S.C. § 2064(i)(2)(B); 16 C.F.R. § 1115.27(a), (d), and that "Amazon's messages to its customers lacked other content necessary for consumers to understand the significant risks of injury associated with the products, including personal injury or death, and the need for immediate action." AR17387; *see* 15 U.S.C. § 2064(i)(1)(B), (i)(2)(D); 16 C.F.R. § 1115.27(f). Although Amazon's messages bore the subject line "Important Safety Notice," Pl.'s Mem. 23, they indisputably did not include the term "recall," as required by 16 C.F.R. § 1115.27(a). That omission was material: the Commission explained that the term "recall" "draws media and consumer attention to the notice and to the information contained in the notice . . . more effectively than omitting the term or using an alternative term," which "increases the likelihood that [the recall notice] will be read." AR17386–87 (quoting *Guidelines and Requirements for Mandatory Recall Notices: Notice of Proposed Rulemaking*, 74 Fed. Reg. 11883, 11884 (Mar. 20, 2009)).

Amazon further argues that it "identified the potential hazards associated with each Subject Product." Pl.'s Mem. 23. But CPSC regulations require a description of the product's "actual" hazards so consumers can accurately understand the risks. AR17387 (citing 16 C.F.R. § 1115.27(f)). Here, the Subject Products "failed their respective tests": "the children's sleepwear garments failed applicable flammability requirements, the CO detectors failed to detect carbon monoxide, and the hair dryers lacked integral immersion protection." AR17387–88. Yet Amazon did not communicate these "actual" hazards; instead, it "advised purchasers merely of a

'*potential* safety issue that *may impact* your Amazon purchase(s),' in that the garments and CO detectors '*may fail*' to meet the requirements, and the hair dryers '*may fail*' to have mandatory immersion protection." AR17387 (quoting AR5402–32; AR10165–218; AR10958). Because Amazon failed to advise consumers of the Subject Products' actual hazards, consumers "were not adequately informed of the substantial risk of injury" and thus "may have continued to use the hazardous products." AR17387–88.

*Third*, Amazon's messages omitted still more required information, including "readily-accessible photographs of the relevant products" to help consumers identify the products, AR17388 (citing AR10948–49); *see* 15 U.S.C. § 2064(i)(2)(A)(iii); 16 C.F.R. § 1115.27(c)(6), and information to "enable[] consumers to understand the scope of products affected, including the number of units being recalled and the contact information regarding the remedy," AR17388–89; *see* 15 U.S.C. § 2064(i)(2)(C), (i)(2)(H)(iii); 16 C.F.R. § 1115.27(e), (n)(3). Amazon does not dispute that its messages omitted this required information.

*Fourth*, Amazon's messages "failed to incentivize its customers or other consumers to stop using the hazardous products and, importantly, to remove them—and the continuing hazard they pose—from their homes" because purchasers' accounts were credited "without any requirement that they return or destroy the Subject Products to receive the credit." AR17389 (citing AR11792–93); *see* 16 C.F.R. § 1115.26(a)(1) ("A recall notice should provide sufficient information and motivation for consumers and other persons . . . to respond and take the stated action."); *see also* 15 U.S.C. § 2064(i)(2)(I) (in addition to the items listed in the statute, a notice must include any "[o]ther information the Commission deems appropriate"); 16 C.F.R. § 1115.27(o). The Commission found that "Amazon's messages downplayed the severity of the

hazard . . . and advis[ed] purchasers that '[t]here is no need for [them] to return the product.'" AR17389 (citing AR10165–66; AR11761).[11]

Amazon's arguments are meritless. Amazon argues that "the CPSA requires the Commission to consider whether each component of the notice is appropriate under the circumstances" yet it did not do so. Pl.'s Mem. 24. The CPSA, however, contains no such requirement. On the contrary, a notice "shall include" a host of information "[e]xcept to the extent that the Commission determines with respect to a particular product that one or more of [such] items is unnecessary or inappropriate under the circumstances." 15 U.S.C. § 2064(i)(2); *see* 16 C.F.R. §§ 1115.23(a), 1115.27, 1115.29(b). So the CPSA *permits* the Commission to determine that certain items listed in the statute are "*unnecessary or inappropriate* under the circumstances," 15 U.S.C. § 2064(i)(2) (emphasis added), but does not "require[] the Commission" to make the opposite determination: that "each component of the notice is appropriate under the circumstances." Pl.'s Mem. 24. The default under the statute, which applies unless the Commission determines otherwise, is that each listed item is required. AR17389 n.35.

Amazon argues that the Commission acted inconsistently with its practice in other cases, Pl.'s Mem. 24–27, but the safety notices Amazon cites were materially different from Amazon's messages to consumers, *see Nat'l Weather Serv. Emps. Org. v. Fed. Lab. Rels. Auth.*, 966 F.3d 875, 884 (D.C. Cir. 2020) ("[W]here the circumstances of the prior cases are sufficiently different from those of the case before the court, an agency is justified in declining to follow

---

[11] Similarly, because Amazon did not track how many of the Subject Products were removed from the stream of commerce, such as by being returned or destroyed, it does not know how successful its messages were, let alone that they were "100% successful." Pl.'s Mem. 10. CPSC "will not consider unilateral refunds to l00% of purchasers to be a l00% correction rate because a refund alone does not provide correction absent removing the hazardous product from the stream of commerce." AR10239–42.

them . . . ."). Amazon cites voluntary recall notices that expressly referred to a "recall," included photographs of the products, stated the number of units being recalled, and included contact information for consumers to obtain information about the remedy. Pl.'s Mem. 24 (citing AR4220–24; AR4225–30; CPSC, *Cozchique Tebbis, and Beeziac Girls Pajamas Recalled Due to Burn Hazard; Violation of Federal Flammability Regulations; Sold Exclusively on Amazon by Tupop*, https://perma.cc/N97M-PRW2 (Jan. 30, 2025)). Amazon's messages contained none of this. Furthermore, in contrast to Amazon's conditional phrasing that the Subject Products "*may fail*" to meet applicable requirements, AR17387 (quoting AR10196–218), the other notices unequivocally stated that carbon monoxide detectors "fail UL 217, the voluntary safety standard for smoke alarms," AR17658, and that "children's robes fail to comply with federal safety regulations for children's sleepwear," AR17663.

Amazon also ignores how mandatory recall notices "are sufficiently different from" voluntary ones, *Nat'l Weather Serv. Emps. Org.*, 966 F.3d at 884, because mandatory recall notices must satisfy a unique set of statutory and regulatory requirements. The terms of mandatory recall notices are prescribed by the CPSA, 15 U.S.C. § 2064(i)(2) ("the notice shall include the following"), and CPSC's Guidelines and Requirements for Mandatory Recall Notices, 16 C.F.R. §§ 1115.23–.29, which CPSC applied in the Final Order.[12] By contrast, the contents of a voluntary recall notice are negotiated "between CPSC staff and individual firms,

---

[12] *See* 16 C.F.R. § 1115.23(a) ("The guidelines and requirements set forth the information to be included in a notice required by an order under [15 U.S.C. § 2064(c) or (d)]. Unless otherwise ordered by the Commission . . . , the content information required in this subpart must be included in every such notice."); *id.* § 1115.27 (unless the Commission determines that one of the required recall notice elements is not required, "every recall notice must include the information set forth below"); *see also* 15 U.S.C. § 2064(i)(1) (directing the Commission to "establish guidelines setting forth a uniform class of information to be included in" mandatory recall notices).

without litigation" and formal "adjudication." AR17388 n.34; AR17675; AR17688. Similarly, Product Safety Warnings issued by CPSC outside the recall context are not subject to the requirements for mandatory recall notices. As the Commission explained, these different contexts merit different approaches. AR17675–76; AR17688–89.

Finally, although Amazon does not dispute that the Subject Products pose a risk of death, AR17688 (citing AR10958–69), it objects to the Commission's requiring a new notice with the term "death." Pl.'s Mem. 25–27. But Amazon ignores that its own example used the term "death." AR4228 ("The alarms can fail to alert consumers to the presence of a hazardous level of carbon monoxide, posing a risk of carbon monoxide poisoning or *death*." (emphasis added)). And that notice was hardly an outlier. CPSC generally requires a description of the product hazard that "enable[s] consumers and other persons to readily identify and understand the risks and potential injuries or *deaths* associated with the product conditions and circumstances giving rise to the recall," including by describing "[t]he type of hazard or risk, including . . . death." 16 C.F.R. § 1115.27(f) (emphasis added); *see id.* § 1115.26(a)(1) ("A recall notice should clearly and concisely state the potential for injury or death."). The Commission did not need to identify an "instance of . . . death related to the hazards of the Subject Products," Pl.'s Mem. 26, because mandatory recall notices must enable consumers to understand the *risk* of death. 16 C.F.R. § 1115.27(f); AR17687–88. Furthermore, identifying the risk of death helps motivate consumers to act on the recall, especially "secondhand purchasers [who] will receive" only public notice and "no direct notice of the hazards." *See* AR17688–89 (citing 74 Fed. Reg. at 11884); 16 C.F.R. § 1115.26(a)(1).

In sum, the notice ordered by the Commission was consistent with the CPSA and eminently reasonable. The Commission "reasonably considered" the requirements for recall

notices, documented the numerous ways Amazon's messages did not meet those requirements, and "reasonably explained" why Amazon's messages were insufficient to adequately protect the public and the notice ordered by the Commission was necessary. *Prometheus Radio Project*, 592 U.S. at 423. Because the Final Order was neither "unwarranted in law" nor "without justification in fact," the Court "may not overturn [the] agency's choice of remedy." *Doolin Sec. Sav. Bank*, 53 F.3d at 1408 (quoting *Am. Power & Light*, 329 U.S. at 112–13).

### B.    The Final Order's Notice Requirement Does Not Violate the First Amendment

Amazon's First Amendment challenge to the remedial notice also falls short. *See* Pl.'s Mem. 27–33. The First Amendment's protection of commercial speech is "somewhat less extensive than that afforded noncommercial speech." *Zauderer*, 471 U.S. at 651. Further, "First Amendment interests implicated by disclosure requirements are substantially weaker than those at stake when speech is actually suppressed." *Id.* at 651 n.14. Amazon wrongly contends that the *Zauderer* test applies only to advertising and point-of-sale disclosures and that the Court should therefore apply the test set out in *Central Hudson*, 447 U.S. 557. The *Zauderer* standard applies to the remedial notice ordered here—a standard that the Final Order readily meets. But even if Amazon were correct about *Central Hudson*, the Final Order also satisfies that test.

#### 1.    The Remedial Notice Should Be Upheld Under *Zauderer*

Under *Zauderer*, when a commercial speaker—like Amazon—is required to disclose factual and uncontroversial information—like the information in the recall notices—the First Amendment requires only that the disclosure is reasonably related to a governmental interest and not unjustified or unduly burdensome. *Md. Shall Issue, Inc. v. Anne Arundel Cnty. Md.*, 91 F.4th 238, 247 (4th Cir. 2024) (applying *Zauderer*). Amazon does not dispute that the Final Order's recall notices satisfy *Zauderer*'s test. The notices only require Amazon to convey factual and

uncontroversial information: that certain products have been recalled for having a defect or failing to meet certain safety standards. Next, as the Commission observed, Amazon "admits" that the government has a "substantial interest in protecting consumers." AR17710. And it is self-evident that the Final Order's remedies are reasonably related to the Commission's interest in providing consumers with information about the Subject Products, since the notifications do just that. Finally, Amazon has never argued that the remedies would be unduly burdensome. As the Commission observed, "Amazon does not—and cannot—assert" that the requirements are unduly burdensome, since it "already utilizes these methods to communicate recall information to consumers." AR17711.

Amazon instead argues that *Zauderer* does not apply at all because the recall notices are not "point-of-sale" communications. Pl.'s Mem. 31. Amazon tellingly cites no case affirmatively cabining *Zauderer* to the point-of-sale context. *See id.* 31–33. This is unsurprising, since applying *Zauderer* to recall notices is consistent with the decision's underlying rationale. Just as with point-of-sale disclosures, recall notices "promot[e] efficient exchange of information" and "protect[] individual liberty interests," which are "core First Amendment values." *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 114 (2d Cir. 2001); *see Md. Shall Issue, Inc.*, 91 F.4th at 247 (citing *Sorrell*). By providing accurate and factual information to consumers about the products, the recall notices "further[], rather than hinder[], the First Amendment goal of the discovery of truth and contribute[] to the efficiency of the 'marketplace of ideas.'" *Id.* at 114. And when the government compels disclosure of factual and accurate information about products—whether at the point-of-sale or later—there is "little risk that the state is forcing speakers to adopt disagreeable state-sanctioned positions, suppressing dissent, confounding the speaker's attempts to participate in self-governance, or interfering with an individual's right to define and express

his or her own personality." *Sorrell*, 272 F.3d at 114 (citing *44 Liquormart, Inc v. Rhode Island*, 517 U.S. 484, 501 (1996)). For those reasons, *Zauderer* applies broadly to "compelled commercial disclosure cases." *Sorrell*, 272 F.3d at 115.

Consistent with those principles, the Fourth Circuit has expressly rejected the argument that *Zauderer* is limited to speech that "propos[es] a commercial transaction." *Md. Shall Issue, Inc.*, 91 F.4th at 247–48. Instead, it made clear that *Zauderer* applied to a range of disclosures that need not necessarily arise at the point of sale, such as "assembly or user instructions, information about the product or service, disclaimers, and warnings on health and safety." *Id.* at 248. Similarly, in *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, the Fourth Circuit applied *Zauderer* to the requirement that a defendant send an email retraction correcting a prior, inaccurate email to the plaintiff's customers about the plaintiff's products. 700 F. App'x 251, 254 (4th Cir. 2017). The retraction, the court said, was akin to "disclosure requirements aimed at misleading commercial speech" and was "reasonably related to the State's interest in preventing deception of consumers." *Id.* at 264 (quotation and citation omitted). Just as in that case, the recall notices at issue here provide consumers with updated information about the Subject Products.

Amazon posits that *Central Hudson* should apply because there is a "meaningful difference" between point-of-sale statements and the recall notices. Pl.'s Mem. 32–33. Amazon says that the latter impose a higher "burden" on its First Amendment rights because at the point of sale "the seller can contextualize safety disclosures with other information about the product." *Id.* at 32. This is hard to understand. Amazon can contextualize all around the recall notices just as with point-of-sale disclosures. *See* AR17709 n.36 ("Amazon, of course, is free to issue its own public statement indicating its disagreement with the Commission's conclusion.").

Amazon also claims that "unexpected notices are more likely to confuse customers," Pl.'s Mem. 32 (citing AR3447). But the cited report (from Amazon's own expert) said that consumers "*might*" be confused, not that confusion was *likely*. AR3447 (emphasis added). Moreover, the expert provided *no* basis for his belief that consumers even *might* be confused. *Id.* Baseless speculation cannot invalidate the Commission's factual determination about the need for the Commission-ordered notice here, on terms expressly authorized by the CPSA. AR17390.

Finally, while Amazon contends that the notifications are more than a "minimal" burden on its First Amendment rights, Pl.'s Mem. 32, the Supreme Court has rejected a "least restrictive means" analysis when it comes to commercial disclosures. *Zauderer*, 471 U.S. at 651 n.14 (citing *Central Hudson*, 447 U.S. at 565). Rather, it is not "appropriate to strike down such requirements merely because other possible means by which the [government] might achieve its purposes can be hypothesized." *Id.* In sum, the Commission correctly applied *Zauderer* when rejecting Amazon's First Amendment argument. And as Amazon does not dispute, the recall notices satisfy that test.

## 2. Applying *Central Hudson* Yields the Same Result

Ultimately, the recall notices would still pass constitutional muster even if *Central Hudson* applied. A speech regulation passes the *Central Hudson* test if it "directly advances" a "substantial" governmental interest and is "not more extensive than necessary to serve that interest." *Central Hudson*, 447 U.S. at 557. Amazon does not contest that CPSC has a substantial interest in protecting the health and safety of Americans by removing hazardous products from homes and the marketplace. *See* AR17712; *see also* Pl.'s Mem. 28–33 (not contesting that prong); *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 485 (1995). And the Commission explained how the additional recall notices "directly advance" this interest. AR17712.

The Commission is charged with "protect[ing] the public against unreasonable risks of injury associated with consumer products." 15 U.S.C. § 2051(b)(1). One way to do that is by ordering distributors to "give public notice" about substantial product hazards and to "mail notice" to affected consumers. *Id.* § 2064(c). It is "simple common sense" that providing consumers with information about dangerous products they purchased or received advances the government's interest in protecting the public from dangerous products. *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (quoting *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995)); *see CTIA—The Wireless Ass'n v. City of Berkeley, Cal.*, 928 F.3d 832, 846 (9th Cir. 2019) (informing consumers about radiation emissions from cell phone and methods of avoiding excessive exposure advanced the government's interest in protecting consumers' health and safety); *Sorrell*, 272 F.3d at 115 ("increasing consumer awareness of the presence of mercury in a variety of products" advanced Vermont's interest in protecting human health and the environment).[13]

Amazon cites examples where courts have "rejected agency attempts to compel speech," Pl.'s Mem. 29, but those cases are wholly inapposite. The Commission's common-sense conclusion that recall notices help protect consumers from dangerous products is a far cry from "speculation or conjecture" about whether conflict mineral disclosures would alleviate international humanitarian crises. *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 526–27 (D.C. Cir. 2015). The notice ordered by the Commission also does not exaggerate the risk to "the average consumer" of the Subject Products. *Nat'l Ass'n of Wheat Growers v. Becerra*, 468 F. Supp. 3d

---

[13] Amazon contends the Commission's decision cannot be grounded on the inadequacy of Amazon's messages because those messages "mirror[ed]" notices that the Commission "approved" in allegedly similar cases. Pl.'s Mem. 29–30 (referencing AR1739). As set out above, however, Amazon's messages in no way "mirror[ed]" the notices in those cases. *See supra* pp. 25–27.

1247, 1264 & n.20 (E.D. Cal. 2020). And unlike *Safelite Group., Inc. v. Jepsen*, 764 F.3d 258,

265 (2d Cir. 2014), the "issue regarding the quality of" the Subject Products is undisputed.

More narrowly, Amazon argues that there "is no evidence to suggest" the notice ordered

by the Commission "would 'directly advance' the Commission's interest in promoting public

safety." Pl.'s Mem. 28. But the specific "application to" Amazon is an "issue properly . . . dealt

with under the" final *Central Hudson* factor. *United States v. Edge Broad. Co.*, 509 U.S. 418, 427

(1993). This last factor requires that the "fit" between the speech regulation and the government

interest be "reasonable." *Id.* at 429 (citing *Bd. of Trustees of State Univ. of NY v. Fox*, 492 U.S.

469, 480 (1989)). That means the fit is "'in proportion to the interest served'" but need not be

"perfect" or "the single best disposition." *Educ. Media Co. at Va. Tech v. Insley*, 731 F.3d 291,

300 (4th Cir. 2013) (quoting *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S.

173, 188 (1999)). Judged against that standard, Amazon's quibbles with the notice ordered by the

Commission do not reveal a First Amendment violation.

Amazon doubts the value of "a new round of notices." Pl.'s Mem. 29. But as the

Commission explained, a proper recall notice should "reach the broadest possible audience of

consumers that may have purchased or received the products" and "get dangerous products out

of the hands of consumers as quickly as possible." AR17713 (quoting 75 Fed. Reg. at 3359–60).

"Amazon's messages to customers were not sufficient to achieve the purposes of a recall." *Id.*

The deficiencies included "no public notice," "no attempt to remove the hazardous products from

purchasers' homes through either proof of destruction or a return," and an inaccurate description

of "the product hazards." *Id.* The Commission therefore ordered "Amazon to provide purchasers

and the public with factual and uncontroversial public health and safety information." AR17708.

The reasonableness of the "fit" between a new notice by Amazon that remedies past deficiencies

and the "ends" of adequately warning consumers about dangerous products is readily apparent. *Edge Broad.*, 509 U.S. at 427–28.

Amazon further argues that the Commission "fails to demonstrate that 'available less restrictive means would fail' to advance public safety," such as issuing the Commission's own notice or adopting Amazon's proposed language. Pl.'s Mem. 30–31 (quoting *United States v. Philip Morris USA Inc.*, 855 F.3d 321, 327 (D.C. Cir. 2017)). For starters, the Supreme Court has "made clear that the 'least restrictive means' test has no role in the commercial speech context." *Fla. Bar*, 515 U.S. at 632. Rather, the "scope" of the speech regulation need only be "in proportion to the interest served." *Insley*, 731 F.3d at 300 (quoting *Greater New Orleans Broad. Ass'n, Inc.*, 527 U.S. at 188.[14] In any event, the Commission explained why it "order[ed] Amazon to post recall releases to its website," in conjunction with the Commission's "own outreach efforts." AR17679–80. The statutory goal of protecting the public "necessitate[ed] wide dissemination of the notice." AR17680 (citing 15 U.S.C. § 2051(b)(1)). The Commission also painstakingly set forth the legal authority and reasoning behind each required modification to the content of Amazon's notices. *See* AR17686–98. Amazon may disagree with these conclusions, but the record amply demonstrates a reasonable fit between the Commission's "notice order and its asserted interest here." Pl.'s Mem. 31.

## III.    The Commission Had Statutory Authority to Order Refunds

When the Commission finds that a product presents a substantial product hazard, the CPSA authorizes the Commission to, consistent with the public interest, "order the . . . distributor . . . to refund the purchase price of such product" and "specify . . . the persons to

---

[14] Amazon's citations to *PSINet, Inc. v. Chapman*, 362 F.3d 227 (4th Cir. 2004), and *NIFLA v. Becerra*, 585 U.S. 755 (2018), are similarly inapt. *See* Pl.'s Mem. 39–30. Neither decision applied the *Central Hudson* framework.

whom refunds must be made." 15 U.S.C. § 2064(d)(1)(C), (d)(2). Here, the Commission ordered that Amazon issue refunds to customers who submitted proof of the product's destruction or disposal. AR17724. This refund determination was "required to achieve the Commission's goal of reducing the risk of harm to the public," "by removing the products from the possession of all consumers, regardless of whether they were the original purchasers." AR17700 (citing 15 U.S.C. § 2051(b)(1)); *see* AR17393–94.

Nevertheless, Amazon contends that the Commission exceeded its authority by ordering "multiple refunds for the same product" and making refunds "contingent on proof of destruction." Pl.'s Mem. 33–37. Amazon is wrong on both counts.

*First*, the Commission has *not* "order[ed] duplicative refunds." Pl.'s Mem. 35. It issued a single order requiring a single refund. AR17724.[15] The CPSA expressly authorized this remedy, upon the Commission's determination that "the Subject Products pose substantial product hazards" and refunds were "necessary to incentivize the removal of hazardous products from consumers' possession and thereby protect the public." AR17716; *see* 15 U.S.C. § 2064(d)(1). Amazon contends that a firm's voluntary action should diminish the Commission's remedial authority. *See* Pl.'s Mem. 34–35. However, Amazon cannot "preempt the Commission from engaging in the process prescribed by Congress to determine what remedies are in the public interest." AR17716.

Amazon further errs by claiming the credits it issued to consumers qualified as "refunds" under 15 U.S.C. § 2064(d)(1). *See* Pl.'s Mem. 34–35. As an initial matter, Amazon admits that its

---

[15] Amazon quotes the ALJ saying that "Amazon can't be ordered to issue refunds." Pl.'s Mem. 33 (quoting AR400). Amazon takes the statement out of context, *i.e.*, a discussion of whether the administrative complaint was moot. *See* AR397–400. In any event, the ALJ's dicta did not represent the Commission's final considered position. *See* AR11795 (clarifying that issue).

"refunds" were "in the form of Amazon gift cards," not cash. AR12400. Moreover, Amazon improperly relies on dictionary definitions in isolation and ignores the statutory context. *See Johnson v. United States*, 559 U.S. 133, 139 (2010) ("Ultimately, context determines meaning . . . ."). The CPSA requires refunds to be issued as part of a remedial "action plan" approved by the Commission, including specification of "the persons to whom the refunds must be made." 15 U.S.C. § 2064(d)(2). Amazon's attempts to preempt a mandatory order by issuing voluntary credits outside the contours of such a plan should not supplant the statutory authority Congress entrusted to CPSC.

This conclusion does not "undermine[] the CPSA's purpose" because the statutory goal is not simply fast refunds. Pl.'s Mem. 35. Rather, Congress charged the Commission with fashioning a remedial action plan appropriate to protect "the public interest" from "a substantial product hazard." 15 U.S.C. § 2064(d)(2). And it empowered the Commission to "amend" any proposed plan that "is not effective or appropriate under the circumstances." *Id.* § 2064(d)(3)(B). This case demonstrates why that power exists. Under Amazon's voluntary credit program, consumers were "not adequately informed of the [products'] hazards" and not given "any incentive" to remove the hazard by destroying or returning the products. AR17716.

*Second*, Amazon again ignores key statutory provisions when arguing that the Commission may not make refunds contingent on proof of destruction. Pl.'s Mem. 35–37. Specifically, Amazon overlooks the statutory requirement that the Commission's action plan "shall specify . . . the persons to whom refunds must be made." 15 U.S.C. § 2064(d)(2). Here, the Commission specified that only a "consumer who submits proof of destruction or disposal of a Subject Product" shall receive "a full refund." AR17724.

Amazon wrongly chides the Commission for invoking 15 U.S.C. § 2064(i)(2)(H) as support for its authority to place conditions on refunds. Pl.'s Mem. 36–37 (citing AR17395). That provision requires recall notices to describe "any action a consumer must take to obtain a remedy." 15 U.S.C. § 2064(i)(2)(H). In other words, the statute expressly permits the Commission to require that consumers take certain steps to receive a refund, such as providing proof that the product has been destroyed. *See* AR17395 (finding that 15 U.S.C. § 2064(i)(2)(H) supported the Commission's authority under 15 U.S.C. § 2064(d)(2)). To the extent Amazon implies that the Commission relied solely on Section 2064(i)(2)(H) for authority to place conditions on refunds, *see* Pl.'s Mem. 36, that is incorrect; the Commission relied on both 15 U.S.C. § 2064(d)(2) and 15 U.S.C. § 2064(i)(2)(H), *see* AR17395.

Amazon next argues that, since 15 U.S.C. § 2066(e) requires products to be destroyed if they are refused entry to the United States, the Court should "presume[]" that the lack of a similar provision in Section 2064 means that Congress was "intentional[] and purpose[ful]" in its exclusion. Pl.'s Mem. 36 (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)). However, those two sections "address wholly distinct subject matters," so the "negative inference" Amazon seeks to draw "does not arise." *Martin v. Hadix*, 527 U.S. 343, 355, 356 (1999).

Finally, Amazon argues that, even if the Commission had the authority to condition refunds on product destruction, doing so here was not in the "public interest" because there was "no evidence" that a secondary market existed for the Subject Products. Pl.'s Mem. 37 (citing 15 U.S.C. § 2064(d)(1)). As discussed above, however, the Commission had ample grounds to find that a secondary market existed, including Amazon's own admission. *See supra* p. 25.

### IV.   Amazon Is Not Entitled to Vacatur of the Final Order Based on the Removal Protection for CPSC Commissioners

Amazon alleges that the for-cause removal protection for CPSC commissioners in 15 U.S.C. § 2053(a) impinges upon the President's Article II authority. Pl.'s Mem. 37–41; *see* Compl. ¶¶ 136–44 (Count V). Though correct, Amazon is not entitled to vacatur of the Final Order, Pl.'s Mem. 37, because it has not shown harm from the removal protection. "[V]acatur is not automatically warranted when a court concludes that an executive branch decisionmaker was subject to unconstitutional removal restrictions." *K & R Contractors, LLC v. Keene*, 86 F.4th 135, 149 (4th Cir. 2023) (citing *Collins v. Yellen*, 594 U.S. 220, 256–60 (2021)). That is because "[a]n executive officer who was properly appointed may lawfully exercise the power of his office," and "[a] constitutional defect in the procedure for removing that officer—unlike a defect in his appointment—is 'no basis for concluding' that he 'lacked the authority to carry out the functions of the office.'" *Id.* (quoting *Collins*, 594 U.S. at 258). Amazon does not argue that the Commissioners were improperly appointed, and their authority to issue the Final Order is unquestioned. *See id.*

Amazon "is not entitled to have the underlying agency action set aside absent reason to believe that the unconstitutional removal provision itself inflicted harm." *Id.* The Supreme Court has identified scenarios where an unconstitutional removal provision could "inflict compensable harm": (1) if "the President had attempted to remove [the officer] but was prevented from doing so by a lower court decision holding that he did not have 'cause' for removal" and (2) if "the President had made a public statement expressing displeasure with actions taken by [the officer] and had asserted that he would remove [him] if the statute did not stand in the way." *Id.* (quoting *Collins*, 594 U.S. at 259–60) (internal quotation marks omitted). Amazon has not shown that either situation was present here.

Instead, Amazon points to "the fact that President Trump removed all the Democratic-appointed Commissioners [Boyle, Hoehn-Saric, and Trumka] three months after the Department of Justice concluded that he had authority to do so" as suggesting that, "had he understood in his first term that he had authority to remove Commissioners without cause, he would have removed the Democratic-appointed Commissioners then." Pl.'s Mem. 41. As an initial matter, however, the July 2024 and January 2025 orders were both issued by unanimous vote, including both Democratic- and Republican-appointed commissioners. AR18490; AR18494. Moreover, the fact that President Trump removed three Democratic-appointed Commissioners in May 2025 says nothing about what he would have done years earlier during his first term, especially because the removed commissioners joined the Commission *after* his first term ended. Plus, the administrative proceeding against Amazon did not even commence during President Trump's first term. The administrative complaint was filed in July 2021, and the Commission issued its orders in July 2024 and on January 16, 2025, all while President Biden was in office. AR17355; AR17724.[16] So Amazon's theory of harm requires speculating that President Trump would have removed several commissioners before his first term ended in January 2021 *and* that President Biden would have retained any commissioners appointed by President Trump to replace them. That amount of conjecture will not suffice. Because Amazon has failed to show any harm caused by the removal protection, it is not entitled to vacatur of the Final Order. *See K & R Contractors*, 86 F.4th at 149.

---

[16] Although the Commission's February 28, 2025, Stay Order was issued during the current Trump Administration, nothing in the Stay Order indicates that "the Final Order may have come out differently" if there were no removal protection. Pl.'s Mem. 41. The Commission merely stayed the Final Order until "14 days after [this Court] enters final judgment in th[is] lawsuit" to allow time for the "important issues" in this case "to be briefed by the parties and decided by the district court in an orderly fashion, rather than in the context of a motion for emergency relief." AR17791.

At most, the proper remedy is severance of the removal protection provision in 15 U.S.C. § 2053(a). "[W]hen confronting a constitutional flaw in a statute," courts generally "limit the solution to the problem," severing the "problematic portions while leaving the remainder intact." *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 508 (2010) (citation omitted); *see Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 221–22 (1974). There is a "strong presumption of severability." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 625 (2020) (plurality op.) ("The Court's precedents reflect a decisive preference for surgical severance rather than wholesale destruction, even in the absence of a severability clause." *Id.* at 626.). Because the CPSA does not have a "nonseverability clause," and "the remainder of the [CPSA] is capable of functioning independently" of the removal protection "and thus would be fully operative as a law," severance is appropriate. *Id.* at 624–30. As the Supreme Court has admonished when resolving challenges to removal restrictions, better to "use a scalpel rather than a bulldozer." *Seila L. LLC v. CFPB*, 591 U.S. 197, 235–37 (2020) (plurality op.); *see Free Enter. Fund*, 561 U.S. at 508–09.

## V.     The Final Order Did Not Deprive Amazon of Due Process

Finally, Amazon argues that the Final Order violated the Fifth Amendment's Due Process Clause because of "[t]he Commission's combination of investigatory, prosecutorial and judicial functions" and the former Acting Chairman's "public statements" that suggested "prejudgment" of the issues. Pl.'s Mem. 42–43; *see* Compl. ¶¶ 145–52 (Count VI). Neither theory works.

Amazon argues the Commission "directed staff to investigate" the Subject Products,[17] "approved the issuance of an administrative complaint," "ratified the appointment of the [ALJs] who conducted the adjudication," and ultimately issued the Final Order. Pl.'s Mem. 42–43. But,

---

[17] Amazon cites no record support for this claim, and there is none.

as the Supreme Court has held, it is "very typical" and "does not violate due process" for "the members of administrative agencies to receive the results of investigations, to approve the filing of charges or formal complaints instituting enforcement proceedings, and then to participate in the ensuing hearings."[18] *Withrow v. Larkin*, 421 U.S. 35, 56 (1975); *see also* 5 U.S.C. § 554(d). Thus, "[i]t is well established that due process rights are not violated simply by the combination of the investigative, prosecutorial, and adjudicative functions in one agency." *Marshall v. Cuomo*, 192 F.3d 473, 484 (4th Cir. 1999) (citing *Withrow*, 421 U.S. at 46–53). Instead, a due process claim requires "actual bias or a high probability of bias," *id.* (citing *Withrow*, 421 U.S. at 46–53), which Amazon has not shown.

Nor has Amazon shown that two public statements by former Acting Chairman Robert Adler constitute a due process violation. Pl.'s Mem. 3, 43. As an initial matter, former Acting Chairman Adler left the Commission in 2021, long before the ALJ's Initial Decision was appealed to the Commission in July 2023. AR12087–91. Thus, he did not participate in the hearing before the Commission in December 2023 or the Commission's orders of July 2024 and January 2025. AR18222–382; AR17339–412; AR17673–765. So even if he prejudged anything (he did not), it could not have affected the Commission's decisions or deprived Amazon of due process.

In any event, the two statements do not show anything close to prejudgment of the issues in the administrative proceeding. Amazon first cites a CPSC press release quoting former Acting Chairman Adler: "Today's vote to file an administrative complaint against Amazon was a huge step forward for this small agency . . . . But it's a huge step across a vast desert—we must

---

[18] Here, moreover, of the five Commissioners who voted to approve the July 2024 and January 2025 orders, only Commissioner Feldman was in office when the Commission voted to authorize issuance of the administrative complaint in July 2021. AR18481; AR18490; AR18494.

grapple with how to deal with these massive third-party platforms more efficiently, and how best to protect the American consumers who rely on them."[19] This statement did not prejudge any issue of liability or remediation, nor did it express a desire "to achieve a policy goal" of regulating Amazon. *Contra* Pl.'s Mem. 43. Equally innocuous is the second statement, which described the "challenge in ensuring that consumers are protected from potentially hazardous products sold on third-party platforms" and expressed the former Acting Chairman's hope that "CPSC and third-party platforms [can] work together to craft agreements that establish a framework for dealing with these products."[20] In sum, the statements do not show that the former Acting Chairman (or any Commissioner) prejudged the issues in the administrative proceeding, and do not overcome the "presumption of honesty and integrity in those serving as adjudicators." *Withrow*, 421 U.S. at 47; *see FTC v. Cement Inst.*, 333 U.S. 683, 700–03 (1948).

## CONCLUSION

For the foregoing reasons, the Court should deny Amazon's motion for summary judgment and grant the government's cross-motion for summary judgment.

---

[19] CPSC, *CPSC Sues Amazon to Force Recall of Hazardous Products Sold on Amazon.com* (July 14, 2021), https://perma.cc/MZK8-UB4Q.

[20] CPSC, *Statement of Acting Chairman Robert S. Adler on the Vote to Approve Filing of an Administrative Complaint Against Amazon.com* (July 14, 2021), https://perma.cc/Y422-66SD.

October 1, 2025                          Respectfully submitted,


                                         */s/ Oliver McDonald*
                                         ISAAC C. BELFER (D.C. Bar No. 1014909)
                                         OLIVER MCDONALD (N.Y. Bar No. 5416789)
                                         Trial Attorneys
                                         Consumer Protection Branch
                                         Civil Division
                                         U.S. Department of Justice
                                         P.O. Box 386
                                         Washington, DC 20044-0386
                                         (202) 305-7134 (Belfer)
                                         (202) 305-0168 (McDonald)
                                         (202) 514-8742 (fax)
                                         Isaac.C.Belfer@usdoj.gov
                                         Oliver.J.McDonald@usdoj.gov

                                         *Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the CM/ECF system, will be sent via electronic mail to the registered participants as identified on the Notice of Electronic Filing.

October 1, 2025                              */s/ Oliver McDonald*
                                            OLIVER MCDONALD