# EXHIBIT 1

UNITED STATES OF AMERICA
CONSUMER PRODUCT SAFETY COMMISSION

| | | |
|---|---|---|
| In the Matter of<br><br>Leachco, Inc.<br><br>Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>) | CPSC Docket No: 22-1 |

**ORDER VACATING INITIAL DECISION, DISMISSING COMPLAINT AND RETURNING CASE TO ADJUDICATION TO CLOSE THE CASE**

This proceeding is before the Commission on an appeal from the Initial Decision of Administrative Law Judge ("ALJ") Michael G. Young. Staff of the Office of Compliance and Field Operations ("Complaint Counsel") sought to have the Podster, an infant lounger manufactured by Leachco, Inc. ("Respondent"), declared a substantial product hazard and for the Commission to issue a remedial order under section 15 of the Consumer Product Safety Act ("CPSA"), 15 U.S.C. §§ 2064(c) and (d). The Initial Decision recommended denying the requested relief and dismissing the complaint. Complaint Counsel has appealed, and Respondent has cross-appealed.

For the reasons explained below, the Commission finds that, under the circumstances, it is no longer in the public interest to continue pursuing this administrative proceeding. Accordingly, the Commission is vacating the Initial Decision, dismissing the Complaint, and remanding this matter to the ALJ with instructions to close the case.

**I.**

The Podster is a small, cushioned infant support pillow with deeply contoured sides, designed for daytime use with awake infants. Beginning in 2009, Respondent manufactured and

distributed various models of the Podster, totaling approximately 180,000 units, all produced at the company's facilities in Ada, Oklahoma. JX-20, Ex. 4 and CCX-5A at 104. Respondent has ceased manufacturing the products and last sold them in 2022. CCX-5A at 104; *see also* https://leachco.com/pages/important-info.

By early 2022, the Commission had received reports raising safety concerns about the Podster. On January 20, 2022, the Commission issued a warning to the public to immediately stop using the product after receiving reports of two infant suffocation deaths associated with the product. *See* www.cpsc.gov/Warnings/2022/CPSC-Warns-Consumers-Stop-Using-the-Leachco-Podster-Podster-Plush-Bummzie-and-Podster-Playtime-Infant-Loungers-Due-to-Suffocation-Hazard-Two-Infant-Deaths-Investigated. Among other things, the warning advised consumers that the loungers are not safe for infant sleep. *See id*.

On February 9, 2022, the Commission authorized the issuance of an administrative complaint against Respondent pursuant to 16 C.F.R. § 1025.11(a). The administrative complaint alleged that the Podster was defective and posed suffocation and asphyxiation hazards and sought an order requiring the company to notify purchasers of the defect and provide consumers with a full refund. *See* Compl. at ¶ 50, Dkt. 1; *see also* www.cpsc.gov/Newsroom/News-Releases/2022/CPSC-Sues-Leachco-Over-Suffocation-Hazard-from-Defective-Infant-Loungers-Seeks-Notice-and-Refund-to-Consumers-from-Company. The administrative complaint alleged that the Podster is defective because the design foreseeably allowed infants to suffocate by obstructing their nose and mouth, prevented self-rescue, facilitated hazardous movement on or off the product, and could be used for bedsharing, all of which created a serious risk of suffocation or asphyxiation. *See* Compl. at ¶ 50, Dkt. 1.

In accordance with CPSC's Rules of Practice for Adjudicative Proceedings, *see* 16 C.F.R. part 1025, the matter then proceeded to a four-day hearing in August 2023 before the ALJ. On July 3, 2024, the ALJ issued an Initial Decision denying the requested relief, concluding that Complaint Counsel had not met its burden to show that the Podster is defective or that a defect creates a substantial risk of injury to the public, and therefore declined to find a substantial product hazard or impose any remedies. Initial Dec. and Order at 65, Dkt. 148. Following the ALJ's decision, Complaint Counsel appealed (Dkt. 153), and Respondent cross-appealed (Dkt. 159). *See also* 16 C.F.R. § 1025.53(a).

On October 16, 2024, approximately three months after the ALJ's Initial Decision and while this matter was being briefed by the parties, the Commission issued a final rule establishing a comprehensive federal mandatory safety standard for infant support cushions. *See Safety Standard for Infant Support Cushions*, 89 Fed. Reg. 87,467. The infant support cushion rule, codified at 16 C.F.R. Part 1243, became effective on May 5, 2025, and applies to all such products manufactured on or after that date. *Id*. The new federal standard adopted a broad definition of "infant support cushion," encompassing infant positioners, loungers, pillows, and other infant products marketed, designed or intended to support an infant or any portion of an infant while reclining or in a supine, prone, or recumbent position, including any associated covers. *See* 89 Fed. Reg. 87,469; *see also* 16 C.F.R. § 1243.2. Respondent does not dispute that the Podster would be regulated under the new rule if manufactured today. https://leachco.com/pages/important-info.

Under the new federal standard, infant support cushions must comply with detailed performance requirements, including a prohibition on restraints, minimum seam-strength standards, bounded-opening limitations, firmness standards, sidewall angle requirements, and a

maximum permissible incline angle of 10 degrees. *See* 16 C.F.R. § 1243.4. Under the CPSA, it is illegal to manufacture, distribute or sell a product that violates these requirements, and violators may be subject to civil or criminal penalties. *See* 15 U.S.C. §§ 2068, 2069, and 2070. In promulgating the new federal standard, the Commission relied on an extensive incident record documenting at least 124 nonfatal incidents and dozens of fatalities associated with infant support cushions between 2010 and 2022. *See* 89 Fed. Reg. 87,467. The data showed that more than 80 percent of the known fatalities involved infants three months old or younger, most commonly resulting from asphyxia in sleep-related environments, and that non-fatal incidents frequently involved falls from elevated surfaces or near-asphyxiation or entrapment hazards. *Id.*

**II.**

Congress created the Commission in 1972 "to protect the public against unreasonable risks of injury associated with consumer products." 15 U.S.C. § 2051(b)(1). To accomplish this important public safety mission, Congress entrusted the Commission with important enforcement powers, including the power to require (after an opportunity for a hearing) a manufacturer, distributor or retailer to cease distribution of a product that presents a substantial product hazard, to provide public notice of the product defect, and/or to offer to repair, replace, or refund the purchase price of the product. *See* 15 U.S.C. § 2064(c), (d). Congress committed the decision to pursue an enforcement action under Section 15 to the Commission's discretion. *See Mahoney v. CPSC*, No. 04-1833, 2004 WL 2201239 (E.D. Pa. 2004) ("The Consumer Product Safety Act does not require the Commission to take any particular action in response to a 'substantial product hazard.'"). Under the Commission's Rules of Practice, both the decision to initiate *and* the decision to terminate enforcement proceedings are within the Commission's discretion. *See, e.g.*, 16 C.F.R. §§ 1025.11(a), 1025.26(f).

In practice, because agency resources are not unlimited, the Commission must prioritize agency resources to maximize the public safety impact of its enforcement efforts. The Commission, like any federal agency, "generally cannot act against each technical violation of the statute it is charged with enforcing." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). In exercising its enforcement discretion, therefore, the Commission "must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all." *Id.* Moreover, when circumstances change, the Commission may need to reassess its priorities and redeploy agency resources to higher-impact enforcement efforts or other emerging safety issues.

That is what has occurred here. Intervening regulatory developments have substantially altered the legal and regulatory framework governing infant support cushions since the Commission authorized the initiation of this proceeding in 2022. In October 2024, the Commission adopted an infant support cushion rule that establishes a comprehensive federal mandatory safety standard for products like the Podster. *See* 16 C.F.R. part 1243. The new federal standard for infant support cushions specifically mandates detailed performance requirements intended to address the very types of suffocation and asphyxiation risks identified in the administrative complaint. 16 C.F.R. §§ 1243.3, 1243.4. In view of the new federal standard, the Commission finds that, under the circumstances, agency resources are best spent on other enforcement priorities and that it is no longer in the public interest to continue pursuing this administrative proceeding.

In making this determination, the Commission reaches no conclusions about the merits of the parties' respective arguments on appeal of the Initial Decision. It notes only that even if it were to agree with Complaint Counsel that a remedial order is warranted, the potential public safety impact of such a Commission decision today is unclear. Respondent has ceased manufacturing the Podster, and it would be illegal for the company to resume manufacturing a version of the Podster that does not comply with the performance requirements in the rule. *See* 15 U.S.C. §§ 2068, 2069, and 2070. Thus, a Commission order would be limited in its practical effect to the approximately 180,000 Podsters manufactured by Respondent between 2009 and 2022. Given the passage of time since those products were manufactured, however, the Commission cannot determine with confidence how many Podsters remain in circulation or available on the secondary market. Even if the Commission possessed perfect information about the number of products still in use, moreover, the CPSA limits the refund relief the Commission may order. Specifically, where a product has been in a consumer's possession for one year or more, the Commission may require only a refund of the purchase price, less a reasonable allowance for use. *See* 15 U.S.C. § 2064(d)(1)(C).

Taken together, these uncertainties substantially limit the likely effectiveness of a notice-and-refund remedy. When one considers that the Podster is intended for use only with infants during their first few months of life, it becomes even less clear that there is a substantial population of original purchasers who are actively using the product—in at least some cases, many years after the product was originally purchased. Finally, it is not clear that original purchasers and current consumers of the Podster could be easily identified and contacted about the defect alleged in the administrative complaint and the availability of a refund. Thus, a remedial order requiring public notice and a refund is of unknown public safety benefit,

especially given that the Commission already issued a prominent warning to the public to immediately stop using the Podster in January 2022.

Against the uncertain public safety benefit of continuing to pursue the claims in the administrative complaint, the Commission must weigh the costs. These include the substantial time and resources required to adjudicate the pending appeals. They also include the substantial agency resources that would be required to defend against a federal court challenge were the Commission to find that a remedial order is warranted.[1] Finally, there are substantial opportunity costs associated with continuing to devote agency resources to this proceeding. Those resources could not be used to pursue other enforcement priorities, like enforcement of the new federal standard against current products on the market. The U.S. market for infant products includes several thousand manufacturers and importers, including hundreds of handcrafters and direct foreign shippers. Respondent is just one of those thousands of manufacturers and has not sold the Podster for over four years.

In sum, when all the relevant factors are considered together, including the new federal mandatory safety standard for infant support cushions, the Commission finds that agency resources are better directed toward addressing other substantial product hazards. Accordingly, the Commission finds that this proceeding is no longer in the public interest and that dismissal of this matter is appropriate. This determination reflects the Commission's exercise of its enforcement discretion based on the particular circumstances presented here and does not constitute a determination on the merits of the allegations in the administrative complaint.

---

[1] The prospect of a court challenge is more than theoretical in this case. Respondent has already challenged in federal court the Commission's authority to adjudicate this matter. *See* Mot. for Prelim. Inj., *Leachco, Inc. v. Consumer Product Safety Commission*, No. 6:22-cv-00232-RAW (E.D. Okla. Aug. 19, 2022).

### III.

The Commission notes that under CPSC's Rules of Practice for Adjudicative Proceedings, the ALJ's Initial Decision has not yet become a final decision of the Commission and therefore does not constitute Commission precedent. *See* 16 C.F.R. § 1025.52 (setting forth conditions under which initial decisions become Commission decisions in absence of review); *see also Olson v. Fed. Mine Safety & Health Rev. Comm'n*, 381 F.3d 1007, 1014 (10th Cir. 2004) ("[I]nitial decisions by ALJs . . . often are not treated as binding precedent by the agency itself [and] are not regarded as legally binding inside the agency in future proceedings raising the same issue.") (quotation omitted).[2]

Nevertheless, to ensure the Initial Decision does not acquire lasting effect simply because intervening events prevented Commission consideration on the merits and to avoid treating the decision as though it had been affirmed on the merits, the Commission is also vacating the ALJ's Initial Decision.[3] The Commission is exercising this authority pursuant to 16 C.F.R. § 1025.55(b), which permits the Commission to set aside an Initial Decision. The Supreme Court has explained that to "set aside" agency action means to "cancel, annul, or revoke"—in other words, to vacate. *Corner Post, Inc. v. Board of Governors of the Federal Reserve System*, 603 U.S. 799, 829 (2024) (Kavanaugh, J., concurring); *see also id.* at 830 ("When a federal court sets aside an agency action, the federal court vacates that order—in much the same way that an

---

2 The Commission emphasizes that it has not fully reviewed, and does not adopt, the ALJ's Initial Decision, including any findings of fact and conclusions of law included therein. Because this matter is being dismissed in the exercise of the Commission's enforcement discretion, the Commission does not consider the Initial Decision to have any precedential effect and should not be cited as reflecting the view of the Commission.

3 *Cf. United States v. Munsingwear, Inc.*, 340 U.S. 36, 39 (1950) (holding that when case becomes moot while review is pending, ordinary course is to vacate decision below and remand with instructions to dismiss).

appellate court vacates the judgment of a trial court"). Federal courts likewise recognize that "set aside usually means vacate," and that the terms are interchangeable when nullifying an administrative determination. *See Virgin Islands Telephone Corp. v. FCC*, 444 F.3d 666, 671 (D.C. Cir. 2006); *Jarrell v. Nicholson*, 20 Vet. App. 326, 340 n.1 (2006). Accordingly, the Initial Decision is vacated, the Complaint is dismissed, and this matter is remanded to the ALJ with instructions to close the case.

IT IS HEREBY ORDERED THAT the Initial Decision dated July 3, 2024 is hereby VACATED; and

IT IS FURTHER ORDERED THAT the Complaint is hereby DISMISSED; and

IT IS STILL FURTHER ORDERED THAT this matter is returned to the ALJ with instructions to close the case.

SO ORDERED this 16th day of March, 2026.

BY THE COMMISSION,

ALBERTA MILLS Digitally signed by ALBERTA MILLS
Date: 2026.03.16 17:37:45 -04'00'

Alberta E. Mills
Secretary
U.S. Consumer Product Safety Commission